IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

No. 20-935 T
(Judge Marian Blank Horn)


MATTHEW and KATHERINE KAESS CHRISTENSEN,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

**REPLY OF THE UNITED STATES IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT**

_____

DAVID A. HUBBERT
Deputy Assistant Attorney General

DAVID I. PINCUS
MARY M. ABATE
JASON BERGMANN
  Attorneys
  Justice Department (Tax)
  Court of Federal Claims Section
  P.O. Box 26
  Ben Franklin Post Office
  Washington, D.C. 20044
  (202) 353-9171
  (202) 514-9440 (facsimile)
  jason.bergmann@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

ARGUMENT ...................................................................................................................... 3

    A.    Foreign Tax Credits Under the Treaty Apply Only "in Accordance With" and "Subject to the Limitations of" the Code; Because the Code Does Not Allow Foreign Tax Credits Against the NIIT, Neither Does the Treaty ........................................................ 3

    B.    Plaintiffs' Counterarguments are Meritless ................................................... 7

        1.    The Court may not rewrite the text of the Treaty to further a general policy to reduce or eliminate double taxation .......................................... 7

        2.    By its terms, article 24 does not provide foreign tax credits against all "taxes covered" under article 2 of the Treaty ................................... 10

        3.    The Government's interpretation accords with the purposes of article 24(2)(a) of the Treaty .................................................................... 13

        4.    There are no "shared expectations" to allow foreign tax credits against the NIIT ... 15

        5.    Article 24(2)(b) does not provide for foreign tax credits against the NIIT, independent of article 24(2)(a). .............................................. 17

CONCLUSION ................................................................................................................ 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adams Challenge v. Commissioner*, 156 T.C. 16 (2021) ................................. 16, 16n

*Air France v. Saks*, 470 U.S. 392 (1985) ............................................................ 17n

*Bacardi Corp. of America v. Domenech*, 311 U.S. 150 (1940) ........................... 10n

*Baturin v. Commissioner*, 31 F.4th 170 (4th Cir. 2022) ..................................... 16n

*Eastern Airlines v. Floyd*, 499 U.S. 530 (1991) ..................................................... 9

*Eshel v. Commissioner*, 831 F.3d. 512 (D.C. Cir. 2016) ........................................ 8n

*Jamieson v. Commissioner*, 584 F.3d 1074 (D.C. Cir. 2009) ................................. 8n

*Jefferson Branch Bank v. Skelly*, 66 U.S. 436 (1861) ............................................ 2n

*Kappus v. Commissioner*, 337 F.3d 1053 (D.C. Cir. 2003) .................................... 8n

*Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634 (5th Cir. 1994) ..................... 9-10

*North West Life Assurance Co. v. Commissioner*, 107 T.C. 363 (1996) .............................. 6n

*Pekar v. Commissioner*, 113 T.C. 158 (1999) ....................................................... 8n

*Providence Bank v. Billings*, 29 U.S. 514 (1830) ................................................. 2n

*Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982) ...................... 5-6

*Toulouse v. Commissioner*, 157 T.C. 49 (2021) ............................................. *passim*

*United States v. Stuart*, 489 U.S. 353 (1989) ........................................ 6n, 10n, 17n

*Whitney v. Robertson*, 124 U.S. 190 (1888) ........................................................... 6

**Statutes:**

Internal Revenue Code of 1986 (26 U.S.C):

    § 27 ................................................................................................................ 3n

    § 901 ......................................................................................................... 3n, 4

    § 904 ...................................................................................................... 3-4, 9n

    § 911 ............................................................................................................... 4

    § 1411 ........................................................................................................... 8n

# TABLE OF AUTHORITIES

**Page(s)**

**Legislative Documents:**

Jt. Comm. on Tax'n, Explanation of Proposed Protocol to the Income Tax
Treaty Between the United States and France, JCX-49-09 (2009) ................................... 7

**Treaties:**

Consolidated United States-France Income-Tax Treaty:

Article 2 ............................................................................................... 10, 11
Article 3 ................................................................................................. 2, 16
Article 24 ............................................................................................... *passim*

United States-Denmark Tax Convention (2000) ...................................................... 12, 12n, 13

United States-Italy Tax Convention (1999) ...................................................... 12n

**Administrative Documents:**

Final Regulations, Net Investment Income Tax, 78 Fed. Reg. 72394-01
(Dec. 2, 2013), *as corrected by* 79 Fed. Reg. 18161 (April 21, 2014) ............................. 6

Treasury Department Technical Explanation of The Convention Between the
Government of the United States of America and the Government of the
French Republic for the Avoidance of Double Taxation and the Prevention
of Fiscal Evasion with Respect to Taxes on Income and Capital Signed at
Paris on August 31, 1994 ("1994 Tech. Exp.") .......................................................... *passim*

United States Model Income Tax Convention of November 15, 2006 ................................. 13

United States Model Income Tax Convention of September 20, 1996:
Technical Explanation ........................................................................... 15

United States Model Technical Explanation Accompanying the United States
Model Income Tax Convention of November 15, 2006 ................................................. 15

**Other authorities:**

Rebecca M. Kysar, *Interpreting Tax Treaties,* 101 Iowa L. Rev. 1387 (2016) ................. 10, 17

OECD Model Tax Convention on Income and Capital, Introduction (2017) ........................ 8n

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————————

No. 20-935 T

(Judge Marian Blank Horn)

MATTHEW and KATHERINE KAESS CHRISTENSEN,

Plaintiffs,

v.

THE UNITED STATES,

Defendant

———————————

**REPLY OF THE UNITED STATES IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT**

———————————

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This case involves a straightforward application of the United States-France income-tax treaty. Article 24(2)(a)(i) of the Treaty provides that the United States shall allow its citizens or residents to apply foreign tax credits "against the United States income tax" for "French income tax" that they paid. (Dkt. 38-2 at 22.) Disregarding the qualifying flush language of article 24(2)(a), plaintiffs argue that this provision obligates the United States to grant foreign tax credits against the net investment income tax under § 1411 ("NIIT"), even though such credits are *not* available under the Code.[1] Under the "express terms of" article 24(2)(a), however, "any allowable foreign tax credit must be determined in accordance with the Code and is limited by the Code's provision of a credit." *Toulouse v. Commissioner*, 157 T.C. 49, 58 (2021). Thus, as the Tax Court held, "there is no independent, treaty-based credit" against the NIIT. *Id*. at 61-62.

_____

[1] Unless otherwise indicated, all citations are to sections of the Internal Revenue Code of 1986 (the "Code") [26 U.S.C.], in effect during 2015, the tax period at issue.

Plaintiffs try various tactics in an effort to circumvent the clear language of article 24. None has any merit. For example, plaintiffs may not root an entitlement to foreign tax credits in a general "purpose . . . to avoid the evil of double taxation" (P. Reply at 2), nor in some supposed "reciprocity factor" (*id.* at 4), where the Treaty does not otherwise provide such relief. And plaintiffs are mistaken that the government's position renders article 24(2)(a) superfluous (*id.* at 8-11), or that article 24(2)(b) provides an independent basis for the allowance of foreign tax credits against the NIIT. (*Id.* at 14-15.)

Plaintiffs are also wrong that the "'shared expectations' of the sovereign treaty partners" contemplates an allowance of foreign tax credits by the United States under the Treaty that could not otherwise be claimed under the Code. (*Id.* at 4.) And, even if France had any such expectation, that would be irrelevant under article 3(2) of the Treaty, which provides that, when the United States administers the Treaty with respect to its own taxpayers, it may apply to the Treaty's undefined terms "the meaning . . . under [its own] taxation laws." (Dkt. 38-2 at 2.)

The United States has the sovereign power to tax its own citizens in the manner authorized by Congress.[2] While the United States may cede that power to tax by treaty, any relinquishment of that sovereign right must be clearly expressed and may not be inferred from ambiguous text.[3] But that is precisely what plaintiffs ask the Court to do here—to hold that language in the Treaty that does not clearly support their position supersedes the decision by Congress not to allow foreign tax credits against the NIIT. The Court should decline that request.

---

[2] "The power of taxation is 'an incident of sovereignty;' and the government in whom it resides is alone competent, within its own jurisdiction, to determine how, in what manner, and upon what objects that power shall be exercised." *Providence Bank v. Billings*, 29 U.S. 514, 544 (1830) (quoting *M'Culloch v. State of Maryland*, 17 U.S. 316, 429 (1819)).

[3] *See Jefferson Branch Bank v. Skelly*, 66 U.S. 436, 446 (1861) ("[N]either the right of taxation, nor any other power of sovereignty, will be held . . . to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken.") (quoted by *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1355 (Fed. Cir. 2001)).

## ARGUMENT

**A.   Foreign Tax Credits Under the Treaty Apply Only "in Accordance With" and "Subject to the Limitations of" the Code; Because the Code Does Not Allow Foreign Tax Credits Against the NIIT, Neither Does the Treaty.**

Article 24(2)(a) of the Treaty provides unequivocally that "any allowable foreign tax credit must be determined in accordance with the Code and is limited by the Code's provision of a credit." *Toulouse*, 157 T.C. at 58. Because Congress chose to place the NIIT not in Chapter 1 of the Code, "Normal Taxes and Surtaxes," but rather in Chapter 2A, a newly-created chapter entitled "Unearned Income Medicare Contribution," the Code does not allow taxpayers to claim foreign tax credits against the NIIT.[4] As the Tax Court explained, "[t]he placement of section 1411 in a newly created chapter was not happenstance." *Id.* at 59. "The enactment of a 3.8% net investment income tax as part of Chapter 2A is a clear expression of Congressional intent that credits against section 1 not apply against the section 1411 tax." *Id.* at 60. Thus, to allow a foreign tax credit against the NIIT would not be "[i]n accordance with the provisions and subject to the limitations of the law of the United States" (Dkt. 38-2 at 22), contrary to article 24(2)(a).

In their first brief, plaintiffs had argued (at 19) that the reference in article 24(2)(a) to the "limitations" of U.S. law connote "[s]ection 904 principles regarding the amount of the foreign tax credit and not something broader," an argument they now appear to have jettisoned.[5] As

---

[4] Section 27 allows foreign tax credits to offset taxes imposed under "this chapter" (*i.e.,* Chapter 1), to the extent provided in § 901. Section 901(a) allows certain foreign taxes to be credited against "the tax imposed by this chapter" (again, Chapter 1).

[5] It is unclear whether plaintiffs contend that the foreign tax credits to which they claim an entitlement under article 24(2) would (or would not) be subject to foreign-tax-credit limitations under § 904. In some parts of their reply, plaintiffs appear to acknowledge that the § 904 limitations would apply. *See* P. Reply at 10-11 (arguing that article 24(2)(a) allows credits for "French tax that is . . . not limited by cross-crediting principles"); *id.* at 15 n.12 (referring to the limitation under § 904(d)(6)). In other places, however, plaintiffs suggest that § 904 would *not* apply to a treaty-based foreign tax credit. *See id.* at 5 n.4 (arguing that § 904 "limitations" do

defendant previously explained, the Code includes numerous provisions beyond § 904 that impose limitations on foreign tax credits, including sections 901(j), 901(k), 901(l), and 911(d)(6), among others. But even if the Court were to credit plaintiffs' narrow construction of the "limitations" referenced by article 24(2)(a), the article still requires that foreign tax credits be "in accordance with the provisions of . . . the law of the United States." (Dkt. 38-2 at 22.) Because foreign tax credits against the NIIT would not be "in accordance" with United States law, such credits are not allowed by article 24(2)(a).

There was good reason for France and the United States to refer to "the law of the United States" in article 24(2)(a). As explained in defendant's opening brief (at 5-15), the statutory and regulatory framework for computing and applying foreign tax credits under the Code is highly articulated. When Congress and the Treasury Secretary crafted that framework, they contemplated the application of foreign tax credits against income taxes under Chapter 1, but not against taxes imposed elsewhere in the Code. If the Treaty means (as plaintiffs contend) that taxpayers may credit foreign taxes against the NIIT independent of the Code, a method of computing and applying the non-statutory credit would need to be developed. That would require the creation of a parallel, foreign-tax credit regime not contemplated by the Code, which would include new methods of calculating tax-credit limitations, as well as new carryover and loss-allocation and recapture rules, and the coordination of the new, parallel, regime with the credits already allowed under the Code. (*See* Def. Br. at 35-37.) By expressly providing that United States foreign tax credits would be "in accordance with" and "subject to the limitations" of the

---

not affect "the United States income that can be offset by . . . creditable French taxes"); *id.* at 6 (arguing that a treaty-based credit under article 24(2)(a) would "not [be] subject to cross-crediting limitations"). This inconsistency makes it difficult to ascertain the precise legal basis of plaintiffs' position in this case, and demonstrates the insubstantiality of any such foundation.

Code, article 24(2)(a) ensures that any allowable tax credits must slot neatly into the foreign-tax-credit framework already in place, rendering complex new rules unnecessary. The difficulty of these potential issues may well have figured into the decision by Congress to codify the NIIT in Chapter 2A and thereby preclude the application of foreign tax credits against that new tax.[6]

The parenthetical in article 24(2)(a)[7] does not change this result. The parenthetical does not, as plaintiffs claim (at 9), "ensure[]" the allowance of foreign tax credits against any "subsequently enacted" income taxes, where Congress declined to allow foreign tax credits under the Code. The parenthetical merely recognizes a general principle that the "provisions" and "limitations" of U.S. law may be "amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained." 1994 Tech. Exp., art 24 (Dkt. 38-4 at 39). Thus, while the United States may not outright repeal the foreign-tax-credit framework from the Code, it has wide leeway to decide the extent to which to allow the credit and any conditions to attach to it.[8]

Plaintiffs acknowledge (at 2) that, "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is

_____

[6] By analogy to the Treasury regulations under § 1411, plaintiffs suggest (at 13-14) that it would be relatively simple to apply a "reasonable method" approach to address the computational complexities defendant identified. However, while the allocation of *deductions* between taxable and non-taxable income may be a relatively simple endeavor, this case involves tax *credits*, for which the Code has a completely different structural framework. Moreover, the existing rules governing foreign tax credits are extremely complex, particularly with respect to tax-credit limitations, carryovers, and the allocation and recapture of foreign losses. Comprehensive rules addressing those issues for separate tax credits against the NIIT could not be accomplished under a reasonable-method approach.

[7] With respect to the "law of the United States," the parenthetical states: "(as it may be amended from time to time without changing the general principle hereof)."

[8] Plaintiffs contend (at 8) that this interpretation of the parenthetical would render article 24(2)(a) of the Treaty meaningless. Defendant addresses this contention in section B.3 of this Reply, below.

entitled to great weight." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982). That principle is dispositive here, where both the technical explanations and U.S model treaties show that the government's interpretation of article 24(2)(a) reflects longstanding U.S. policy. (*See* D. Br. at 9-13.) Moreover, the Treasury Department has made clear its view, with respect to the NIIT specifically, that any treaty (such as the U.S.-France Treaty) whose double-taxation provision "refers to the limitations of United States law," would "not provide an independent basis for a credit against the section 1411 tax." Final Regulations, Net Investment Income Tax, 78 Fed. Reg. 72394-01, 72396. (Dec. 2, 2013), *as corrected by* 79 Fed. Reg. 18161 (April 21, 2014).[9]

Finally, the enactment of the NIIT in Chapter 2A of the Code confirms the intent of Congress to deny foreign tax credits against the NIIT, and it would override any potentially inconsistent relief under the Treaty. Under the last-in-time rule, when a statute and a treaty are "inconsistent, the last in date will control the other." *Whitney v. Robertson*, 124 U.S. 190, 194-95 (1888). While article 24(2)(a) is fully consistent with the decision by Congress to exempt the NIIT from foreign tax credits (because article 24(2)(a) expressly defers to the Code in determining when foreign tax credits are allowed), if the Court were to disagree, the Code would take precedence over the Treaty in any event. Plaintiffs are wrong (at 12) that the Code "does not

---

[9] Plaintiffs argue that the deference owed to executive interpretations of treaties "falls away" when contrary to the "purpose of the treaty." (P. Reply at 2.) The cases they cite do not support that proposition. For example, *United States v. Stuart*, 489 U.S. 353, 369 (1989) acknowledged that "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight" (quoting *Sumitomo*, 457 U.S. at 184-85), and, applying that principle, adopted the "IRS' construction" of the treaty at issue. *North West Life Assurance Co. v. Commissioner*, 107 T.C. 363 (1996), likewise acknowledged that executive interpretations are due "great weight" but not "blind acceptance," and that "the deference afforded depends upon the degree to which the interpretation proffered by respondent, as the official U.S. position, is reasonable, unbiased, and consistent with what appear to be the circumstances surrounding the convention."

prohibit . . . a foreign tax credit against the NIIT," or that it is "silent on the point." Section 901(a) specifically limits the allowance of foreign tax credits to "the tax imposed by this chapter," and Congress expressly chose to implement the NIIT in a different chapter of the Code.

**B.      Plaintiffs' Counterarguments are Meritless.**

**1.      The Court may not rewrite the text of the Treaty to further a general policy to reduce or eliminate double taxation.**

While *one* of the Treaty's purposes was "to reduce or eliminate double taxation of income earned by residents of either country from sources within the other country," Jt. Comm. on Tax'n, *Explanation of Proposed Protocol to the Income Tax Treaty Between the United States and France*, JCX-49-09, at 2 (2009), it was not *the* "purpose of the French Treaty," as plaintiffs claim (at 2). The Treaty is also intended "to prevent avoidance or evasion of the taxes of the two countries." *Id.* Those two policies can work at cross purposes, and neither is absolute. Further, those general policies do not override the specific Treaty language that the negotiators drafted and that the Senate ratified. As the Tax Court explained, while a "general purpose" of the Treaty may be "to reduce double taxation," "the specific provisions of [the] [T]reaty must be applied as written." *Toulouse*, 157 T.C. at 60.

Article 24(2)(a) of the Treaty provides only for an allowance by the United States of foreign tax credits "[i]n accordance with the provisions and subject to the limitations of the law of the United States." (Dkt. 38-2 at 22.) By expressly conditioning foreign tax credits on the provisions and limitations of U.S. law, article 24 qualifies the double-taxation relief that it grants. As the text of article 24(2)(a) makes clear, the Treaty's "purpose is not to provide absolute protection" against double taxation. *Toulouse*, 157 T.C. at 60.[10]

_____

[10] Regardless, the imposition of both the NIIT by the United States and income taxes by France on the same dollar of earnings is not the sort of "double taxation" that the Treaty intends

The Code contains numerous conditions and limitations on the allowance of foreign tax credits whose effect is to deny taxpayers absolute relief from double taxation. For example, § 901(j) denies foreign tax credits for taxes paid to countries that support international terrorism or with whom the United States has severed diplomatic relations. When applicable, that statute denies foreign tax credits to U.S. taxpayers, contrary to a general policy of reducing double taxation. If the general "purpose of the French Treaty to avoid double taxation" had the effect claimed by plaintiffs (at 2), then § 901(j) could never be enforced against a U.S. treaty partner, even though it is one of the "provisions" and "limitations" of U.S. law referenced by Treaty article 24 and in the same model language in other tax treaties. Nor could the United States have enforced § 59(a)(2) when it previously limited foreign tax credits to ninety percent of the alternative minimum tax, a provision that arguably ran counter to the broad tax-treaty purpose of reducing double taxation.[11]

For an additional reason, plaintiffs are wrong that the disallowance of foreign tax credits against the NIIT somehow offends "the treaty's purpose of avoiding double taxation." (P. Reply

to remedy. Double taxation occurs when two or more states impose "comparable" taxes on the same subject matter. OECD Model Tax Convention on Income and Capital, Introduction, ¶ 1 (2017). Here, because the NIIT applies to a far narrower tax base than do comparable French income taxes, the two are not comparable. Nor is the NIIT "almost identical in nature" to the French *Contribution Sociale Générale* ("CSG") and *Contribution au Remboursement de la Dette Sociale* ("CRDS"), as plaintiffs contend (at 2-3 n.1). The NIIT is imposed on the lesser of a taxpayer's net investment income or the excess, if any, of a taxpayer's modified adjusted gross income over a statutory threshold. §§ 1411(a)(1), (b). The CSG and CRDS, in contrast, are social contribution taxes that France imposes on a wide income base. *See, generally, Eshel v. Commissioner*, 831 F.3d. 512, 515-16 (D.C. Cir. 2016).

[11] The courts uniformly upheld that statutory foreign-tax-credit limitation, notwithstanding double-taxation provisions in applicable tax treaties. *See, e.g., Jamieson v. Commissioner*, 584 F.3d 1074, 1075 (D.C. Cir. 2009) (rejecting claim that general prohibition on double taxation in a treaty supplanted § 59(a)); *Kappus v. Commissioner*, 337 F.3d 1053, 1060 (D.C. Cir. 2003) (holding that § 59(a) was consistent with U.S.-Canada treaty, where foreign tax credit was "[i]n accordance with the provisions and subject to the limitations of the law of the United States"); *Pekar v. Commissioner*, 113 T.C. 158, 162 (1999) (acknowledging a treaty's general prohibition of double taxation, but applying "limits of law" under treaty's terms).

at 10.) The Code does not prevent plaintiffs from obtaining foreign tax credits for the creditable French taxes they paid; it merely disallows such credits against the NIIT. Plaintiffs may still use their creditable French taxes as a basis for claiming credits against U.S. taxes they owe under Chapter 1 of the Code and, because of the Code's generous carryover and carryback rules, they may make those claims in numerous additional tax years.[12] Thus, even if the decision by Congress not to allow foreign tax credits against the NIIT might affect the timing of plaintiffs' tax-credit claims, it does not necessarily prevent plaintiffs from ever claiming credits against Chapter 1 taxes for the creditable French taxes they paid.

Plaintiffs ask the Court (at 3) to adopt their interpretation of article 24 because, they say, treaties are construed liberally. However, under modern Supreme Court jurisprudence, the liberal-interpretation canon provides merely that "[t]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Eastern Airlines v. Floyd*, 499 U.S. 530, 535 (1991) (quoting *Air France v. Saks*, 470 U.S. 392, 396 (1985). The canon "does not mean . . . that treaty provisions are construed broadly. Rather, this 'liberal' approach to treaty interpretation merely reflects . . . the willingness of courts, when interpreting difficult or ambiguous treaty provisions, to 'look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 638–39 (5th Cir. 1994) (quoting *Air France*, 470 U.S. at 396). As a substantive matter:

> [E]xisting precedents—though sparse—suggest that treaty provisions
> should be construed narrowly rather than broadly. As treaties establish
> restrictions or limitations on the exercise of sovereign rights by signatory

---

[12] Section 904(c) allows taxpayers to carry over credits in excess of the § 904 limitation for use first in the previous taxable year and then in the ten succeeding taxable years.

– 9 –

> States, courts should interpret treaty provisions narrowly—for fear of
> waiving sovereign rights that the government or people of the State never
> intended to cede. Ambiguous provisions of a treaty should thus be
> interpreted to derogate minimally from the sovereign power of the State,
> which is the quintessential and most legitimate entity in international law.

*Ibid.* Thus, as the Fifth Circuit held, when treaties operate to constrain the sovereign power of the

United States, they should be interpreted narrowly in favor of the government.[13] *See Rebecca M.*

*Kysar, Interpreting Tax Treaties,* 101 Iowa L. Rev. 1387, 1441 (2016) ("A liberal presumption is

also at odds with the notion of sovereignty . . . in the tax context. Given the tie between taxation

and the fisc, the relinquishing of taxing jurisdiction is not something that a sovereign would

likely do implicitly or lightly.")

> **2.      By its terms, article 24 does not provide foreign tax credits against all "taxes
> covered" under article 2 of the Treaty.**

Plaintiffs argue (at 6-8) that article 24(2)(a) necessarily allows them to claim foreign tax

credits against the NIIT, because the NIIT qualifies as a "covered tax" under article 2(2) of the

Treaty. This argument is inconsistent with the Treaty's text.

Article 2(1) defines the "taxes which are the subject of this Convention," which, "in the

case of the United States," include "the Federal income taxes imposed by the Internal Revenue

Code (but excluding social security taxes)." (Dkt. 38-2 at 2.) Article 2(2) makes clear that the

taxes covered also include "any identical or substantially similar taxes that are imposed after the

---

[13] We are aware of only one case in the last fifty years in which the Supreme Court
suggested that a *tax* treaty should generally be interpreted "liberally." *United States v. Stuart*,
489 U.S. 353, 368 (1989). *Stuart* cited for that proposition a non-tax case involving a treaty
among nine American Nation States regarding the protection of foreign trademarks (*Bacardi
Corp. of America v. Domenech*, 311 U.S. 150, 163 (1940). Moreover, *Stuart* involved the
construction of the mutual assistance provisions of the U.S.-Canada tax treaty, in the context of
enforcement of summonses issued by the United States' Internal Revenue Service to obtain
information requested by Canadian taxing authorities for determining Canadian citizens' tax
liabilities. It did not involve issues of substantive tax law or affect the sovereign power of the
United States to tax its own citizens.

date of signature of the Convention in addition to, or in place of, the existing taxes." The NIIT is similar to "the Federal income taxes" under the Code, so it arguably qualifies as a covered tax under Treaty article 2(2).

However, the double-taxation relief under the Treaty is governed not by article 2 but rather by article 24. Article 24(2)(a) provides, among other things, that "the United States shall allow to a citizen or resident of the United States" as "a credit against the United States income tax" the "French income tax paid by or on behalf of such citizen or resident," but only if "[i]n accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof)." (Dkt. 38-2 at 22.) While article 24(2)(d) defines the "French income tax" to mean the French taxes covered under article 2, the Treaty includes *no* definition of "the United States income tax." (Dkt. 38-2 at 23.) Even if, for the sake of argument, the term "the United States income tax" does include the NIIT,[14] article 24(2)(a) would allow a credit for French income tax to be taken against the NIIT only if it were otherwise "in accordance with" and "subject to the limitations" of U.S. law. (Dkt. 38-2 at 22.) By its terms, article 24(2)(a) does not allow unfettered foreign tax credits against the NIIT, as plaintiffs claim.

Plaintiffs' argument conflates the U.S. taxes that taxpayers may credit against their tax liabilities to France (under Treaty article 24(1)) with the U.S. taxes against which foreign tax credits may be taken in accordance with U.S. law (referred to in Treaty article 24(2)). The two are not necessarily the same. For example, article 24(1)(a) requires France to "take[] into

---

[14] If the Treaty had defined "the United States income tax" by cross-reference to article 2—in a manner similar to the definition of "the French income tax"—then "the United States income tax" would include the federal income taxes imposed under the Code at the time the Treaty was signed, as well as any substantially similar taxes enacted afterwards.

– 11 –

account" income taxed in the United States "for the computation of French tax," but it does *not* require that the relevant U.S. tax be offset by foreign tax credits under the Code to be creditable against French income tax. Apparently recognizing that their theory has no support in the Treaty's text, plaintiffs refer (at 4) to what they call "the reciprocity factor," but they do not provide any authority for the concept. Elaborating on that shaky theme, plaintiffs assert (at 8) that "when a treaty provides a definition of a covered tax, it is that definition, and not the more limited definition under United States or foreign law, that is applied." But article 24 includes two separate sections governing, on the one hand, the foreign tax credits that France must allow for U.S. taxes paid and, on the other hand, the foreign tax credits the United States must allow for French taxes paid. The two sections are not, and need not be, co-extensive, and neither prescribes the domestic taxes against which the treaty partners must grant foreign tax credits.

Plaintiffs undermine their own argument by pointing out that, in some instances, the United States explicitly agreed to credit certain taxes, such as the Danish Hydrocarbon Tax.[15] As with the French Treaty, "the tax on United States income" against which the United States must provide a credit is not defined in the Danish treaty in article 23, article 2, or anywhere else. *See, generally,* U.S.-Denmark Tax Convention (2000) [available at: https://www. irs.gov/pub/irs-trty/denmark2.pdf]. By contrast, however, article 23 of the Denmark treaty explicitly invokes article 2 to define the foreign taxes that each country must credit. (For the United States, the

---

[15] "[I]n the case of a resident or national of the United States subject to the taxes imposed by the Hydrocarbon Tax Act, . . . the United States shall allow as a credit against the United States tax on income, the appropriate amount of tax paid or accrued to Denmark by or on behalf of such resident or national pursuant to the Hydrocarbon Tax Act on oil and gas extraction income from oil or gas wells in Denmark." U.S.-Denmark Tax Convention, art. 23(1)(c)(i) (2000) (subject to additional limitations set forth in art. 23(1)(c)(ii)). The U.S.-Italy tax treaty similarly provides explicitly that the *Imposta Regionale Sulle Attivita Produttive* is creditable in part against U.S. income tax. *See* U.S.-Italy Tax Convention, art. 23(2)(b), (c) [available at: https://home.treasury.gov/system/ files/131/Treaty-Italy-8-24-1999.pdf].

flush language of article 23 of the Denmark treaty states that "the Danish taxes referred to in . . . Article 2 shall be considered [creditable] income taxes." The flush language in article 23(3) similarly states that Denmark will grant a credit for U.S. taxes covered in article 2.)

The fact that the United States has agreed in treaties with some countries to treat certain foreign taxes as explicitly creditable merely shows that two countries *may* by treaty agree to modify certain specific aspects of U.S. law. There is nothing to indicate that the United States and France did so here. Thus, while plaintiffs are correct that the United States and Denmark agreed to treat Danish taxes under its Hydrocarbon Tax Act "as a credit against the United States tax on income," the U.S.-Denmark tax treaty provided so explicitly, subject to numerous limitations to which the two countries had agreed. U.S.-Denmark Tax Convention, art. 23(1)(c) (2000). The contrast between the precise language there and the absence of any such language here is telling.

### 3.   The Government's interpretation accords with the purposes of article 24(2)(a) of the Treaty.

Plaintiffs are wrong (at 8) that the government's interpretation would cause article 24(2)(a) to have "no independent purpose if its language is limited by the Code." As the U.S. model conventions show, double-taxation provisions in tax treaties between the United States and its treaty partners follow a standard pattern, with one subsection providing for double-taxation relief by the United States and another providing for double-taxation relief by the other country. (*See, e.g.*, 2006 Model, art. 23 (Dkt. 38-11 at 35).) The subsection governing double-taxation relief by the United States contains standard language providing that such relief be "[i]n accordance with the provisions and subject to the limitations of the law of the United States . . ." (*Id.*, art. 23(2).) That model language does not necessarily provide U.S. taxpayers with rights beyond those already provided by the Code, but instead appears in the treaties as a recitation of

– 13 –

the double-taxation relief available under U.S. law, to parallel the double-taxation relief provided by the treaty partner (which itself might not necessarily grant any new rights to taxpayers beyond those provided under that country's statutory laws). In this Treaty as well, article 24(2)(a) need not necessarily provide rights to taxpayers beyond those in the Code to serve a purpose.

The model language includes the parenthetical reflecting that "the law of the United States" may "be amended from time to time without changing the general principle thereof." (Dkt. 38-2 at 22.) That parenthetical recognizes that the "provisions" and "limitations" of U.S. law may be "amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained." 1994 Tech. Exp., art 24 (Dkt. 38-4 at 39). As explained, the parenthetical contemplates that article 24(2)(a) will incorporate subsequent amendments to U.S. law so long as those amendments keep the foreign-tax-credit framework intact, as Congress did when it enacted the NIIT. Plaintiffs, on the other hand, assert that the parenthetical requires the general framework to be affirmatively expanded, rather than merely "retained."

Plaintiffs are wrong to argue (at 9-10) that, because Congress has the authority to repeal the foreign-tax-credit framework in the Code and thereby override the Treaty, the Treasury Department's interpretation of the parenthetical would cause article 24(2)(a) "to have [no] purpose and effect." The fact that Congress has the authority to repeal the foreign-tax-credit framework in the Code in its entirety, contrary to article 24(2)(a), does not deprive the parenthetical of any meaning. The parenthetical in article 24(a)(2) constitutes a commitment by the United States to "retain[]" the "allowance of a credit," while recognizing that the precise contours of the tax-credit framework may change "from time to time" under U.S. law. If the Court were to accept the argument plaintiffs make here, then no treaty provision would *ever* have

any independent purpose, because Congress may constitutionally override any international treaty in a subsequently-enacted statute.[16]

### 4.    There are no "shared expectations" to allow foreign tax credits against the NIIT.

Plaintiffs argue (at 4) that the Court must interpret the treaty based on the "'shared expectations' of the sovereign treaty partners," but they provide no evidence that either the United States or France had any expectation that the United States would automatically apply foreign-tax credits against any and all income taxes subsequently enacted under the Code. The text of article 24(2)(a) reflects the two countries' agreement that the foreign tax credits provided by the United States would be both in accordance with and subject to the limitations of U.S. law, while acknowledging that such laws may change over time. That clear meaning of article 24 is confirmed by the Treasury Department's technical explanation to the 1994 convention. (*See* 1994 Tech. Exp., art. 24 (Dkt. 38-4 at 39) ("Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions of the U.S. statutory credit at the time a credit is given.").) The understanding of the United States is shown further by the U.S. model tax treaties and their technical explanations. (*See* Tech. Exp. to 1996 U.S. Model, art. 23, ¶ 1; Tech. Exp. to 2006 U.S. Model, art. 23, ¶ 2.)

Beyond the text of article 24(2) itself, there is no evidence of French expectations regarding that provision (other than the inference noted below), and nothing to suggest any disagreement by France with the interpretation of article 24(2) expressed in the U.S. executive materials. Notably, when the United States and France executed protocols amending the original

---

[16] Plaintiffs ignore other significant ways in which article 24 alters the foreign-tax-credit framework under U.S. law. As explained in depth in the government's opening brief (at 24), articles 24 and 29 together implement the three-bite rule, and article 24(2)(b)(ii) specifically modifies U.S. tax law to do so.

1994 convention, they left undisturbed the requirement that U.S. foreign tax credits be given "in accordance with the provisions of U.S. law," showing an acquiescence by France in the Treasury Department's prior explanation of the function of article 24(2)(a). *See Adams Challenge v. Commissioner*, 156 T.C. 16, 53-54 (2021). Thus, it can hardly be said that plaintiffs' interpretation of article 24 constitutes a shared expectation of the United States and France.

In its opening brief, the United States argued (at 29) that—even if they could somehow be divined—"shared expectations" may not even be relevant here. The U.S.-France Treaty specifically provides in article 3(2) that, when the United States administers the Treaty with respect to its own taxpayers, it may apply to the Treaty's undefined terms "the meaning . . . under [its own] taxation laws." (Dkt. 38-2 at 2.) The Treaty recognizes the right of the "Contracting State whose tax is being applied" to apply the "meaning under [its own] taxation law" of "a term used but not defined in the Convention."[17] 1994 Tech. Exp., art. 3 (Dkt. 38-4 at 7). When U.S. taxation is at issue, the expectations of the United States have primacy, even if those expectations may not be "shared" by the treaty partner.[18] Indeed, by allowing the United States and France to apply their own, different, definitions of the Treaty's undefined terms, article 3(2) contemplates that the treaty partners may not have "shared" expectations at all.

---

[17] The technical explanation of article 3(2) states that "in the application of the Convention by a Contracting State, any term used but not defined in the Convention will, unless the context requires otherwise, have the meaning it has under the taxation law of the Contracting State whose tax is being applied." 1994 Tech. Exp., art. 3 (Dkt. 38-4 at 7). Here, the context does not require the United States to apply anything other than its own taxation laws.

[18] *See Baturin v. Commissioner*, 31 F.4th 170, 174 (4th Cir. 2022) (pursuant to article 3(2) of U.S.-Russia tax treaty, applying U.S. tax law to determine whether particular payments were "grants" or "allowances" under article 18 of that treaty); *Adams Challenge v. Commissioner*, 156 T.C. 16, 58 (2021) ("[S]ince we are applying the Treaty to determine whether U.S. tax applies, we must ascertain the meaning that those terms have under U.S. law, particularly under U.S. tax law.").

– 16 –

It is not uncommon for tax treaties to "leav[e] terms vague" or "provide definitions that themselves employ undefined terms," and thereby invoke domestic law concepts. *See* Kysar, 101 Iowa L. Rev. at 1412. When that occurs, the treaty partners may either apply their own, conflicting definitions of a treaty's undefined terms or they may, under article 3(2), commence "competent authority procedures to attempt to avoid double taxation." *Id.* at 1413; *see, e.g.,* Treaty, art. 3(2) (Dkt. 38-2 at 2). Such competent-authority procedures (which plaintiffs could have chosen to pursue) provide a means for the United States and France to resolve any theoretical disagreements they might have regarding the effect (if any) of article 24(2) on the NIIT, in lieu of any judicial effort to try and ascertain the countries' "shared expectations."[19]

### 5. Article 24(2)(b) does not provide for foreign tax credits against the NIIT, independent of article 24(2)(a).

Contrary to plaintiffs' contention (at 14-15), article 24(2)(b) of the Treaty does not provide for foreign tax credits beyond those allowed by article 24(2)(a). Article 24(2)(b) applies where a U.S. citizen is a resident of France and has income subject to tax in both jurisdictions. Article 24(2)(b) merely provides rules for determining the order in which credits for taxes paid to France are applied when the same income is subject to tax by both countries. It does not purport to establish its own, separate foreign tax credit.

Article 24(2)(b) is an integral part of the standard three-bite rule in many U.S. income-tax treaties. Article 24(2)(b) requires the United States to "allow as a credit against the United States

---

[19] There are, of course, cases involving *non*-tax treaties holding that the courts' "responsibility [is] to give the specific words of [a] treaty a meaning consistent with the shared expectations of the contracting parties." *See, e.g., Air France v. Saks*, 470 U.S. 392 (1985). While that principle is sometimes applied when interpreting tax treaties as well, generally in those cases the treaties either did not include a version of article 3(2) or the effect of such a provision appears not to have been litigated. *See, e.g., United States v. Stuart*, 489 U.S. 353 (1989) (construing the mutual assistance provisions of the 1940 U.S.-Canada tax treaty, which did not involve U.S. substantive tax laws and lacked an article analogous to article 3(2)).

income tax the French income tax paid after the credit [for the first bite] referred to in

subparagraph (a)(iii) of paragraph 2," but it also clarifies that the credit for French taxes paid

does not offset "that portion of the United States income tax" imposed by the first bite.

(Dkt. 38-2 at 22.) Then, to account for the second-bite French income tax when computing the

§ 904 limitation for the tax credit allowed by the U.S. under the third bite, article 24(2)(b)(ii)

provides that such income "shall be considered income from sources within France." (*Id.*)

      The Technical Explanation makes clear that the purpose of article 24(2)(b) is to "provide

special rules to avoid the double taxation of U.S. citizens who are residents of France."

(Dkt. 38-4 at 39 (discussion of subparagraph 1(b).) Those special rules concern the ordering and

computation of the taxes owed to the United States and France; they do not provide U.S. citizens

residing in France with foreign tax credits that are denied by the requirements of the Code, as is

apparent from the Technical Explanation. (*See id.*)

      Plaintiffs argue (at 14) that the absence from subsection (2)(b) of the clause "in

accordance with the provisions and subject to the limitations of the law of the United States"

allows them to claim foreign tax credits against the NIIT, contrary to the Code. If the absence of

that clause had the effect that plaintiffs claim, then the Treaty would allow U.S. citizens residing

in France to claim credits against their U.S. income taxes that were *neither* in "accordance with

the provisions" *nor* "subject to the limitations" of U.S. law." Despite plaintiffs' protestation to

the contrary (text at 15 and n.12), their construction of article 24(2)(b) would theoretically allow

U.S. citizens residing in France to claim foreign tax credits in excess of the amount permitted by

the foreign-tax-credit limitations under § 904, or to obtain a double benefit by claiming credits

for foreign taxes paid on income excluded from U.S. tax by the foreign-earned income exclusion,

contrary to § 911(d)(6). Context makes clear that subsection (2)(b) was not intended to have

those effects. If plaintiffs were correct that subsection (2)(b) authorizes a separate foreign tax credit for U.S. citizens residing in France that is not in accordance with the Code, it would render meaningless the resourcing rule in subsection (2)(b)(ii), which is premised on the application of the foreign-tax-credit limitation in § 904.

**CONCLUSION**

By treaty, the United States and France "provide for general protection against double taxation," but they "do not provide absolute protection." *Toulouse*, 157 T.C. at 60. Consistent with the objective of reducing double taxation, the Code already provides substantial tax relief to plaintiffs. Although plaintiffs earned worldwide income of $478,702 in 2015, their original return reported a total U.S. income-tax liability of only $4,672, less than 1% of their total worldwide earnings. (*See* Dkt. 1-1 at 70-71.) That is a minimal sum to pay in consideration for the privilege of United States citizenship. The Court should decline plaintiffs' request to reduce that liability even further, based on a strained interpretation of the Treaty.

Here, plaintiffs are not asking the Court to put them in a position equivalent to that of U.S. taxpayers who do not live abroad, but rather are asking the Court to provide them with a unique tax advantage that results from their French residency. All U.S. taxpayers are subject to multiple distinct levies under the Code, and U.S. taxpayers with no foreign ties are potentially subject to *both* the regular U.S. income tax *and* the U.S. net investment income tax on the same dollar of investment income. Under the government's position in this case, a U.S. citizen residing in France could also be subject to two levies on the same dollar of investment income—both a regular French income tax (instead of a regular U.S. income tax, offset by foreign tax credits) and a U.S. net investment income tax. U.S. taxpayers with no foreign ties and U.S. citizens residing in France are generally treated equally under the government's position, while plaintiffs'

interpretation of the Treaty would advantage the taxpayer with French ties over the purely local U.S. taxpayer. Multiple independent levies on the same item of income are a part of the tax system in the United States, a feature that article 24 of the Treaty does not purport to change.

For the reasons explained above and in our opening brief, defendant asks the Court to enforce the Treaty as written, declining plaintiffs' request to allow foreign tax credits under article 24 beyond those sanctioned by the Code. On that basis, the Court should grant defendant's cross-motion for summary judgment and deny plaintiffs' summary judgment motion. However, if the Court were to disagree, additional work would need to be done, because neither the Treaty nor the Code provides how foreign tax credits against the NIIT would be computed, and because plaintiffs have not shown that they properly applied the three-bite rule when they computed the foreign tax credits claimed on their French and U.S. returns.

Respectfully submitted,

May 13, 2022

*s/Jason Bergmann*
JASON BERGMANN
Attorney of Record
U.S. Department of Justice, Tax Division
Court of Federal Claims Section
Post Office Box 26
Washington, D.C. 20044
202-616-3425 (v)
202-514-9440 (f)
jason.bergmann@usdoj.gov

DAVID A. HUBBERT
 Deputy Assistant Attorney General
DAVID I. PINCUS
 Chief, Court of Federal Claims Section
MARY M. ABATE
 Assistant Chief

May 13, 2022

  *s/Mary M. Abate*_____
  Of Counsel

Attorneys for Defendant

– 20 –