# In the United States Court of Federal Claims

**No. 20-935T**
**Filed: September 13, 2023**
**Reissued for Publication: October 23, 2023[1]**

```
* * * * * * * * * * * * * * * * **
                                   *
MATTHEW AND KATHERINE KAESS         *
CHRISTENSEN,                        *
                                    *
              Plaintiffs,           *
                                    *
v.                                  *
                                    *
UNITED STATES,                      *
                                    *
              Defendant.            *
                                    *
  * * * * * * * * * * * * * * * * **
```

**Stuart E. Horwich**, Horwich Law LLP, London, U.K., for plaintiffs.

**Jason Bergmann**, Assistant Chief, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C., for defendant. With him were **David I. Pincus**, Chief, Court of Federal Claims Section, and **David A. Hubbert**, Deputy Assistant Attorney General, Tax Division. **Mary M. Abate**, Assistant Chief, Court of Federal Claims Section, of counsel.

## O P I N I O N

<u>**HORN, J.**</u>

   Plaintiffs, Matthew and Katherine Kaess Christensen, filed their complaint in this court seeking a refund of $3,851.00 paid to the Internal Revenue Service (IRS) as a "net investment income tax" for tax year 2015, "plus interest and costs allowed by law, and such other relief as the Court may deem just and appropriate." Plaintiffs allege that, because they are United States citizens residing in France, "a foreign tax credit should have been allowed for French taxes that the plaintiffs paid with respect to the income giving rise to the net investment income tax, as provided by the income tax treaty that exists between the United States and France," namely the "Convention between the Government of the French Republic and the Government of the United States of America

---

[1] This Opinion was previously issued under seal on September 13, 2023. After asking for comments from with the parties, this Opinion is now issued in final form.

for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital," Fr.-U.S., Aug. 31, 1994, 1963 U.N.T.S. 67 [hereinafter the 1994 Treaty[2]], which plaintiffs refer to as the "French Treaty"[3] and defendant refers to as the "Convention."[4] After defendant filed an answer to plaintiffs' complaint, the parties engaged in fact discovery. The court held oral argument on the cross motions for summary judgment, after which, given the remaining issues on damages, the court, with the agreement of the parties, converted the motions for summary judgment into motions for partial summary judgment.

## BACKGROUND

**The 1994 Treaty**

This case concerns the intersection of the Internal Revenue Code (I.R.C.), Title 26 U.S.C. (2018), and binding treaties between the United States and France, namely the 1994 Treaty and subsequent amendatory protocols thereto. Before this court, plaintiffs argue that they are entitled to a tax refund due to the provisions of the 1994 Treaty, which was first signed by the United States and French Governments in 1994 and which was later amended in 2004 and 2009.[5] The 1994 Treaty, at Article 2, states:

---

[2] The 1994 Treaty was ratified by the United States Senate on August 11, 1995. See Tax Convention with the French Republic, CONGRESS.GOV, https://www.congress.gov/treaty-document/103rd-congress/32/resolution-text?q=%7B%22search%22%3A%22%5C%22French+Republic%5C%22%22%7D&s=3&r=1 (last visited Oct. 23, 2023).

[3] Plaintiffs consistently refer to the "French Treaty" in their filings, despite the fact that the treaty at issue is a bilateral treaty between the United States and France.

[4] Defendant consistently refers to the "Convention" in its filings, in reference to the first word of the full name of the 1994 Treaty, as well as "the Treaty." The court refers to the treaty between the United States and France at issue in this case, as it was originally agreed to by the signatory countries, as the "1994 Treaty," except when quoting the parties' filings in this case, documents in the record before this court, or publicly available documents, including legislative history, documents setting forth the executive's interpretation, and relevant judicial decisions.

[5] Defendant's cross-motion for partial summary judgment indicates that "[t]he Treasury Department publishes the texts of the 1994 convention, the 2004 protocol, and the 2009 protocol on its website," while "[t]he website of the French Embassy to the United States publishes a version that consolidates all three documents into one, at the following url: https://franceintheus.org/spip.php?article704." (alterations added). This "consolidated" version of the 1994 Treaty, as amended, is attached to defendant's cross-motion for partial summary judgment, however, at the time of issuing this Opinion, the "consolidated" version of the 1994 Treaty, as amended, is no longer available on the website of the French Embassy. See French/US Tax Treaties, FRANCE IN THE UNITED STATES,

1. The taxes which are the subject of this Convention are:
   (a) in the case of the United States:
      (i) the Federal income taxes imposed by the Internal Revenue Code (but excluding social security taxes); and
      (ii) the excise taxes imposed on insurance premiums paid to foreign insurers and with respect to private foundations

      (hereinafter referred to as "United States tax"). The Convention, however, shall apply to the excise taxes imposed on insurance premiums paid to foreign insurers only to the extent that the risks covered by such premiums are not reinsured with a person not entitled to exemption from such taxes under this or any other income tax convention which applies to these taxes;
   (b) in the case of France, all taxes imposed on behalf of the State, irrespective of the manner in which they are levied, on total income, on total capital, or on elements of income or of capital, including taxes on gains from the alienation of movable or immovable property, as well as taxes on capital appreciation, in particular:
      (i)    the income tax (l'impôt sur le revenu);
      (ii)   the company tax (l'impôt sur les sociétés);
      (iii)  the tax on salaries (la taxe sur les salaires) governed by the provisions of the Convention applicable, as the case may be, to business profits or to income from independent personal services; and
      (iv)   the wealth tax (l'impôt de solidarité sur la fortune)
      (hereinafter referred to as "French tax").
2. The Convention shall apply also to any identical or substantially similar taxes that are imposed after the date of signature of the Convention in

---

https://franceintheus.org/spip.php?article704 [https://perma.cc/YPJ8-GW9H] (last visited Oct. 23, 2023). Apart from the "consolidated" 1994 Treaty, as amended, the parties have not provided, and the court has not located, a version of the 1994 Treaty, as amended, which reflects the changes made by the 2004 and 2009 Protocols to the original 1994 Treaty. Moreover, as further discussed below, the 2004 and 2009 Protocols described changes to the 1994 Treaty without reproducing in full an amended version of the text of the 1994 Treaty as it had been changed. The court refers to the text of the 1994 Treaty with all changes from the 2004 and 2009 Protocols in effect as the "1994 Treaty, as amended," and to the historical, unamended 1994 Treaty as the "1994 Treaty." No version of the 1994 Treaty, as amended, appears to be included in official reporting services such as the United Nations Treaty Series or the United States Treaties and Other International Agreements Series. Neither plaintiffs nor defendant have objected to use of the "consolidated" version of the 1994 Treaty, as amended, provided to the court by defendant. Accordingly, to represent the present text of the 1994 Treaty, as amended, the court cites to the "consolidated" version of the treaty provided by defendant, originally from the website of the French Embassy to the United States.

> addition to, or in place of, the existing taxes. The competent authorities[6] of the Contracting States shall notify each other of any significant changes which have been made in their respective taxation laws and of any official published material concerning the application of the Convention, including explanations, regulations, rulings, or judicial decisions.

1994 Treaty, art. 2 (footnote added). No text of any "notification" as contemplated by paragraph 2 of Article 2 of the 1994 Treaty is included in the record currently before the court. The 1994 Treaty further provides, at Article 3, paragraph 2:

> 3. As regards the application of the Convention by a Contracting State, any term not defined herein shall, unless the competent authorities agree to a common meaning pursuant to the provisions of Article 26 (Mutual Agreement Procedure), have the meaning which it has under the taxation laws of that State.

1994 Treaty, art. 3, ¶ 2.

In the portion of the 1994 Treaty relied upon by plaintiffs in the above captioned case, Article 24, "Relief From Double Taxation," (capitalization and emphasis in original), the 1994 Treaty provides:

> 1. (a) In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or a resident of the United States as a credit against the United States income tax:
>    (i)   the French income tax paid by or on behalf of such citizen or resident; and
>    (ii)  in the case of a United States company owning at least 10 percent of the voting power of a company that is a resident of France and from which the United States company receives dividends, the French income tax paid by or on behalf of the distributing corporation with respect to the profits out of which the dividends are paid.
>    (b) In the case of an individual who is both a resident of France and a citizen of the United States:
>    (i)   The United States shall allow as a credit against the United States income tax the French income tax paid after the credit referred to in subparagraph (a)(iii) of paragraph 2. However, the credit so

---

[6] The 1994 Treaty provides at Article 3, in relevant part, that the meaning of "competent authority" under the Treaty is "in the United States, the Secretary of the Treasury or his delegate," or "in France, the Minister in charge of the budget or his authorized representative." 1994 Treaty, art. 3, ¶ 1(h).

allowed against United States income tax shall not reduce that portion of the United States income tax that is creditable against French income tax in accordance with subparagraph (a)(iii) of paragraph 2;

(ii) Income referred to in paragraph 2 and income that, but for the citizenship of the taxpayer, would be exempt from United States income tax under the Convention, shall be considered income from sources within France to the extent necessary to give effect to the provisions of subparagraph (b)(i). The provisions of this subparagraph (b)(ii) shall apply only to the extent that an item of income is included in gross income for purposes of determining French tax. No provision of this subparagraph (b) relating to source of income shall apply in determining credits against United States income tax for foreign taxes other than French income tax as defined in subparagraph (e); and

(c) In the case of an individual who is both a resident and citizen of the United States and a national of France, the provisions of paragraph 2 of Article 29 (Miscellaneous Provisions) shall apply to remuneration and pensions described in paragraph 1 or 2 of Article 19 (Public Remuneration), but such remuneration and pensions shall be treated by the United States as income from sources within France.

(d) If, for any taxable period, a partnership of which an individual member is a resident of France so elects, for United States tax purposes, any income which solely by reason of paragraph 4 of Article 14 is not exempt from French tax under this Article shall be considered income from sources within France. The amount of such income shall reduce (but not below zero) the amount of partnership earned income from sources outside the United States that would otherwise be allocated to partners who are not residents of France. For this purpose, the reduction shall apply first to income from sources within France and then to other income from sources outside the United States. If the individual member of the partnership is both a resident of France and a citizen of the United States, this provision shall not result in a reduction of United States tax below that which the taxpayer would have incurred without the benefit of deductions or exclusions available solely by reason of his presence or residence outside the United States.

(e) For the purposes of this Article, the term "French income tax" means the taxes referred to in subparagraph (b)(i) or (ii) of paragraph 1 of Article 2 (Taxes Covered), and any identical or substantially similar taxes that are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes.

2. In the case of France, double taxation shall be avoided in the following manner:

(a) Income arising in the United States that may be taxed or shall be taxable only in the United States in accordance with the provisions

of this Convention shall be taken into account for the computation of the French tax where the beneficiary of such income is a resident of France and where such income is not exempted from company tax according to French domestic law. In that case, the United States tax shall not be deductible from such income, but the beneficiary shall be entitled to a tax credit against the French tax. Such credit shall be equal:

(i)   in the case of income other than that referred to in subparagraphs (ii) and (iii), to the amount of French tax attributable to such income;

(ii)  in the case of income referred to in Article 14 (Independent Personal Services), to the amount of French tax attributable to such income; however, in the case referred to in paragraph 4 of Article 14 (Independent Personal Services), such credit shall not give rise to an exemption that exceeds the limit specified in that paragraph;

(iii) in the case of income referred to in Article 10 (Dividends), Article 11 (Interest), Article 12 (Royalties), paragraph 1 of Article 13 (Capital Gains), Article 16 (Directors' Fees), and Article 17 (Artistes and Sportsmen), to the amount of tax paid in the United States in accordance with the provisions of the Convention; however, such credit shall not exceed the amount of French tax attributable to such income.

(b) In the case where the beneficial owner of the income arising in the United States is an individual who is both a resident of France and a citizen of the United States, the credit provided in paragraph 2 (a)(i) shall also be granted in the case of:

(i)   income consisting of dividends paid by a company that is a resident of the United States, interest arising in the United States, as described in paragraph 5 of Article 11 (Interest), or royalties arising in the United States, as described in paragraph 6 of Article 12 (Royalties), that is derived and beneficially owned by such individual and that is paid by:

(aa) the United States or any political subdivision or local authority thereof; or

(bb) a person created or organized under the laws of a state of the United States or the District of Columbia, the principal class of shares of or interests in which is substantially and regularly traded on a recognized stock exchange as defined in subparagraph (e) of paragraph 6 of Article 30 (Limitation on Benefits of the Convention); or

(cc) a company that is a resident of the United States, provided that less than 10 percent of the outstanding shares of the voting power in such company was owned (directly or indirectly) by the resident of France at all times during the

part of such company's taxable period preceding the date of payment of the income to the owner of the income and during the prior taxable period (if any) of such company, and provided that less than 50 percent of such voting power was owned (either directly or indirectly) by residents of France during the same period; or

(dd) a resident of the United States, not more than 25 percent of the gross income of which for the prior taxable period (if any) consisted directly or indirectly of income derived from sources outside the United States;

(ii) capital gains derived from the alienation of capital assets generating income described in subparagraph (i); however, such alienation shall be taken into account for the determination of the threshold of taxation applicable in France to capital gains on movable property;

(iii) profits or gains derived from transactions on a public United States options or futures market;

(iv) income dealt with in subparagraph (a) of paragraph (1) of Article 18 (Pensions) to the extent attributable to services performed by the beneficiary of such income while his principal place of employment was in the United States;

(v) income that would be exempt from United States tax under Articles 20 (Teachers and Researchers) or 21 (Students and Trainees) if the individual were not a citizen of the United States; and

(vi) U.S. source alimony and annuities. The provisions of this subparagraph (b) shall apply only if the citizen of the United States who is a resident of France demonstrates that he has complied with his United States income tax obligations, and subject to receipt by the French tax administration of such certification as may be prescribed by the competent authority of France, or upon request to the French tax administration for refund of tax withheld together with the presentation of any certification required by the competent authority of France.

(c) A resident of France who owns capital that may be taxed in the United States according to the provisions of paragraph 1, 2, or 3 of Article 23 (Capital) may also be taxed in France in respect of such capital. The French tax shall be computed by allowing a tax credit equal to the amount of tax paid in the United States on such capital. That tax credit shall not exceed the amount of the French tax attributable to such capital.

(d) (i) For purposes of this paragraph, the term "resident of France" includes a "société de personnes," a "groupement d'intérêt économique" (economic interest group), or a "groupement européen d'intérêt économique" (European economic interest group) that is

constituted in France and has its place of effective management in France.

    (ii) The term "amount of French tax attributable to such income" as used in subparagraph (a) means:

        (aa) where the tax on such income is computed by applying a proportional rate, the amount of the net income concerned multiplied by the rate which actually applies to that income;

        (bb) where the tax on such income is computed by applying a progressive scale, the amount of the net income concerned multiplied by the rate resulting from the ratio of the French income tax actually payable on the total net income in accordance with French law to the amount of that total net income.

    (iii) The term "amount of tax paid in the United States" as used in subparagraph (a) means the amount of the United States income tax effectively and definitively borne in respect of the items of income concerned, in accordance with the provisions of the Convention, by the beneficial owner thereof who is a resident of France. But this term shall not include the amount of tax that the United States may levy under the provisions of paragraph 2 of Article 29 (Miscellaneous Provisions).

    (iv) The interpretation of subparagraphs (ii) and (iii) shall apply, by analogy, to the terms "amount of the French tax attributable to such capital" and "amount of tax paid in the United States," as used in subparagraph (c).

(e) (i) Where French domestic law allows companies that are residents of France to determine their taxable profits on a consolidation basis, including the profits or losses of subsidiaries that are residents of the United States or of permanent establishments situated in the United States, the provisions of the Convention shall not prevent the application of that law.

    (ii) Where in accordance with its domestic law, France, in determining the taxable profits of residents, permits the deduction of the losses of subsidiaries that are residents of the United States or of permanent establishments situated in the United States and includes the profits of those subsidiaries or of those permanent establishments up to the amount of the losses so deducted, the provisions of the Convention shall not prevent the application of that law.

    (iii) Nothing in the Convention shall prevent France from applying the provisions of Article 209B of its tax code (code général des impôts) or any substantially similar provisions which may amend or replace the provisions of that Article.

1994 Treaty, art. 24.

The 1994 Treaty, at Article 26, "<u>Mutual Agreement Procedures</u>," (capitalization and emphasis in original), additionally provides:

1. Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States, present his case to the competent authority of the Contracting State of which he is a resident or national. The case must be presented within three years of the notification of the action resulting in taxation not in accordance with the provisions of this Convention.

2. The competent authority shall endeavor, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention. Any agreement reached shall be implemented notwithstanding any time limits or other procedural limitations in the domestic law of the Contracting States.

3. The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular, they may agree:

   (a) to the same attribution of profits to a resident of a Contracting State and its permanent establishment situated in the other Contracting State;

   (b) to the same allocation of income between a resident of a Contracting State and any associated enterprise described in paragraph 1 of Article 9 (Associated Enterprises);

   (c) to the same determination of the source of particular items of income;

   (d) concerning the matters described in subparagraphs (a), (b), and (c) of this paragraph with respect to past or future years; or

   (e) to increase the money amounts referred to in Articles 17 (Artistes and Sportsmen) and 21 (Students and Trainees) to reflect economic or monetary developments.

   They may also agree to eliminate double taxation in cases not provided for in the Convention.

4. The competent authorities of the Contracting States may communicate with each other directly for the purpose of reaching an agreement in the sense of the preceding paragraphs. When it seems advisable for the purpose of reaching agreement, the competent authorities or their representatives may meet together for an oral exchange of opinions.

6. [sic] If an agreement cannot be reached by the competent authorities pursuant to the previous paragraphs of this Article, the case may, if both competent authorities and the taxpayer agree, be submitted for

arbitration, provided that the taxpayer agrees in writing to be bound by the decision of the arbitration board. The competent authorities may release to the arbitration board such information as is necessary for carrying out the arbitration procedure. The decision of the arbitration board shall be binding on the taxpayer and on both States with respect to that case. The procedures, including the composition of the board, shall be established between the Contracting States by notes to be exchanged through diplomatic channels after consultation between the competent authorities. The provisions of this paragraph shall not have effect until the date specified in the exchange of diplomatic notes.

1994 Treaty, art. 26 (alteration added). Moreover, the 1994 Treaty, at Article 29, provides, in relevant part:

1. The Convention shall not restrict in any manner any exclusion, exemption, deduction, credit, or other allowance now or hereafter accorded by
   (a) the laws of:
      (i) the United States;
      (ii) France, in the case of a resident (within the meaning of Article 4 (Resident)) or citizen of the United States. However, notwithstanding the preceding sentence, the provisions of paragraph 5 of Article 6 (Income from Real Property), Article 19 (Public Remuneration), Article 20 (Teachers and Researchers), and Article 24 (Relief From Double Taxation) shall apply, regardless of any exclusion, exemption, deduction, credit, or other allowance accorded by the laws of France; or
   (b) by any other agreement between the Contracting States.
2. Notwithstanding any provision of the Convention except the provisions of paragraph 3, the United States may tax its residents, as determined under Article 4 (Resident), and its citizens as if the Convention had not come into effect. For this purpose, the term "citizen" shall include a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of income tax, but only for a period of 10 years following such loss.
3. The provisions of paragraph 2 shall not affect:
   (a) the benefits conferred under paragraph 2 of Article 9 (Associated Enterprises), under paragraph 1(b) of Article 18 (Pensions), and under Articles 24 (Relief From Double Taxation), 25 (Non-Discrimination), and 26 (Mutual Agreement Procedure); and
   (b) the benefits conferred under Articles 19 (Public Remuneration), 20 (Teachers and Researchers), 21 (Students and Trainees), and 31 (Diplomatic and Consular Officers), upon individuals who are neither citizens of, nor have immigrant status in, the United States.

1994 Treaty, art. 29, ¶¶ 1-3.

Attached to defendant's cross-motion for partial summary judgment is an Executive Report from the Senate Committee on Foreign Relations, dated August 10, 1995, titled "INCOME TAX CONVENTION WITH THE FRENCH REPUBLIC," which "reports favorably" on the 1994 Treaty, "without amendment, and recommends that the Senate give its advice and consent to ratification thereof, subject to one declaration [not relevant here] as set forth in this report and accompanying resolution of ratification." S. EXEC. REP. NO. 104-7, at 1 (1995) (capitalization in original; alteration added) (1995 Senate Report). The 1995 Senate Report states:

> The principal purposes of the proposed income tax treaty between the United States and the French Republic ("France") are to reduce or eliminate double taxation of income earned by residents of either country from sources within the other country, and to prevent avoidance or evasion of income taxes of the two countries. The proposed treaty is intended to continue to promote close economic cooperation between the two countries and to eliminate possible barriers to trade caused by overlapping taxing jurisdictions of the two countries. It is also intended to enable the countries to cooperate in preventing avoidance and evasion of taxes.

Id. The 1995 Senate Report indicates that "[t]he proposed treaty was amplified by diplomatic notes signed the same day [August 31, 1994], and by additional notes signed on December 19, 1994 and December 20, 1994." Id. (alterations added). While the 1995 Senate Report and other documents relating to the 1994 Treaty and its subsequent amendatory Protocols refer to "diplomatic notes," no such diplomatic notes are included in the record currently before the court after the parties completed discovery. The 1995 Senate Report, with respect to paragraph 2 of Article 29 of the 1994 Treaty, a "savings clause," states that "[u]nder this provision, the United States generally retains the right to tax its citizens and residents as if the treaty had not come into effect," but also, in paragraph 1 of Article 29, that "the proposed treaty contains the standard provision that it does not apply to deny a taxpayer any benefits that person is entitled to under the domestic law of the country or under any other agreement between the two counties," or, as also stated in the 1995 Senate Report, "the treaty applies to the benefit of taxpayers." S. EXEC. REP. NO. 104-7, at 2-3 (alteration added). The 1995 Senate Report further states, with respect to Article 24 of the 1994 Treaty:

> The article provides special rules for U.S. citizens who reside in France. In this case, the proposed treaty provides that items of income which may be taxed by the United States solely by reason of citizenship (under the saving clause) are to be treated as French source income to the extent necessary to avoid double taxation. In no event, however, would the tax paid to the United States be less than the tax that would be paid if the individual were not a U.S. citizen. This rule is similar to corresponding rules in several recent U.S. treaties.

S. Exec. Rep. No. 104-7, at 13. Moreover, with respect to the binding arbitration provisions of Article 26 of the 1994 Treaty, the 1995 Senate Report explains: "The arbitration procedure can only be invoked by the agreement of both countries." S. Exec. Rep. No. 104-7, at 14.

Attached to the defendant's cross-motion for partial summary judgment is a document which defendant identifies as a "Treasury Department Technical Explanation" of the 1994 Treaty,[7] (capitalization in original) (1994 Treaty Treasury Department Technical Explanation), which states that it "is an official guide to the Convention" which "reflects the policies behind particular Convention provisions, as well as understandings reached with respect to the application and interpretation of the Convention." According to the 1994 Treaty Treasury Department Technical Explanation, "the saving clause in [Article 29 of] this Convention is, at France's request, unilateral, applying only for United States tax purposes." (alteration added). The 1994 Treaty Treasury Department Technical Explanation states with respect to the "competent authority" for the United States under the 1994 Treaty:

> The U.S. competent authority is the Secretary of the Treasury or his delegate. The Secretary of the Treasury has delegated the competent authority function to the commissioner of Internal Revenue, who has, in turn, redelegated the authority to the [IRS] Assistant Commissioner (International). With respect to interpretive issues, the Assistant Commissioner acts with the concurrence of the Associate Chief Counsel (International) of the Internal Revenue Service.

(alteration added). The 1994 Treaty Treasury Department Technical Explanation, with respect to Article 24, "Relief From Double Taxation," (capitalization and emphasis in original), of the 1994 Treaty, further states, in relevant part:

---

[7] The full title of the 1994 Treaty Treasury Department Technical Explanation, as stated on the first page of that document, is

> TREASURY DEPARTMENT TECHNICAL EXPLANATION OF THE CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE FRENCH REPUBLIC FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME AND CAPITAL SIGNED AT PARIS ON AUGUST 31, 1994.

(capitalization in original). The 1994 Treaty Treasury Department Technical Explanation is not dated. The 1994 Treaty Treasury Department Technical Explanation is available on the IRS website in a list of "complete texts" of "tax treaty documents," along with the 1994 Treaty, its subsequent amendatory Protocols, and their corresponding technical explanations. See France - Tax Treaty Documents, Internal Rev. Serv., https://www.irs.gov/businesses/international-businesses/france-tax-treaty-documents (last visited Oct. 23, 2023).

This Article describes the manner in which each Contracting State undertakes to relieve double taxation. The United States uses the foreign tax credit method exclusively. France uses a combination of foreign tax credit and exemption methods. The provisions of this Article are more complicated than in most U.S. income tax treaties, because they include special relief provisions for U.S. citizens resident in France. The format of the Article has been revised, but the provisions are substantially the same as in the 1967 Convention (as amended by subsequent Protocols).

In subparagraph 1(a) [of Article 24], the United States agrees to allow its citizens and residents to credit against their U.S. income tax the income taxes paid or accrued to France. Subparagraph 1(a) also provides for a deemed-paid credit, consistent with section 902 of the Code, to a U.S. corporation in respect of dividends received from a French corporation in which the U.S. corporation owns at least 10 percent of the voting power. The deemed-paid credit is for the tax paid by the French corporation on the portion of the profits that is distributed as dividends to the U.S. parent company.

The credits provided under the Convention are allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained. Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions of the U.S. statutory credit at the time a credit is given. The limitations of U.S. law generally limit the credit against U.S. tax to the amount of U.S. tax due with respect to net foreign source income within the relevant foreign tax credit limitation category (see [Internal Revenue] Code section 904(a)). Nothing in the Convention prevents the limitation of the U.S. credit from being applied on an overall or per-country basis or on some variation thereof.

Subparagraph 1(b) [of Article 24] provides special rules to avoid the double taxation of U.S. citizens who are residents of France. Under subparagraph 2(a)(iii), France agrees to credit the U.S. tax paid, but only for the amount of tax that the United States could impose under the Convention on a resident of France who is not a citizen of the United States. Under subparagraph 1(b), the United States agrees that, where additional U.S. tax is due solely by reason of citizenship, it will credit the French tax imposed on the basis of residence to the extent that the French tax exceeds the tax that the United States may impose on the basis of source (i.e., net of the credit allowed by France). Under subparagraph 2(b), France shares the burden of avoiding double taxation of U.S. citizens resident in France by exempting from French tax certain items of U.S. source income of such citizens that would otherwise be subject to French tax.

Subparagraph 1(b) also provides that certain U.S. source income will be treated as French source income to permit the additional credit to fit within the foreign tax credit limitation of [Internal Revenue] Code Section 904. This

resourcing provision applies only to items of income that are included in gross income for French tax purposes, and it cannot be used in determining the foreign tax credit limitation applicable to income taxes paid to any other country.

The following simplified example illustrates how subparagraph 1(b) works. The U.S. tax on a dividend paid by a U.S. corporation to a portfolio investor resident in France is limited by Article 10 (Dividends) of the Convention to 15 percent. The United States, therefore, will impose a tax of 15 on a dividend of 100, and France will allow a tax credit of 15. Suppose that the French individual income tax due is 22 percent. In that case, the net tax payable to France will be 7. However, assume that this individual is a U.S. citizen and, therefore, liable to U.S. tax of 22 percent. In the absence of a special relief provision, the individuals total tax would be 35: 28 to the United States, with no foreign tax credit because the dividend is from U.S. sources, and 7 to France. Under subparagraph 1(b), the 7 of French tax is credited against the 28 of U.S. tax, reducing the combined burden to 28, the higher of the two taxes. In this example, in order to credit the French tax of 7 at a U.S. rate of 28, 25 of the dividend would be treated as from French sources so that the 7 of French tax could be claimed as a foreign tax credit (7/28 x 100). Additional examples of the calculation of this additional credit are provided in IRS Publication 901 on U.S. tax treaties.

(alterations added).

Moreover, the 1994 Treaty Treasury Department Technical Explanation states, with respect to the "Mutual Agreement Procedure" set forth in Article 26 of the 1994 Treaty, that "[i]t is not necessary for the taxpayer to have fully exhausted the remedies provided under the national laws of the Contracting States before presenting a case to the competent authorities." (alteration added). Additionally, the 1994 Treaty Treasury Department Technical Explanation states with respect to arbitration procedures under the same Article 26 of the 1994 Treaty, "[i]t is expected that such procedures will ensure that arbitration will not generally be available where matters of either State's tax policy or domestic law are involved." (alteration added).

**The 2004 Protocol**

On December 8, 2004, the Government of the United States and the Government of the French Republic agreed to a "Protocol amending the Convention between the Government of the French Republic and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital," signed at Paris on 31 August 1994, Fr.-U.S., Dec. 8, 2004, 2478 U.N.T.S. 175 [hereinafter the 2004 Protocol],[8] which entered into force on

---

[8] The 2004 Protocol was ratified by the United States Senate on March 31, 2006. See Protocol Amending the Tax Convention with France, CONGRESS.GOV,

December 21, 2006.[9] As relevant to the above captioned case, the 2004 Protocol, in Article V, made the following amendment to Article 24 of the 1994 Treaty:

1. Subparagraph (b)(iv) of paragraph 2 [*Paragraph 1 in French language*] of Article 24 (Relief From Double Taxation) of the Convention shall be deleted.
2. Subparagraphs (b)(v) and (b)(vi) of paragraph 2 [*Paragraph 1 in French language*] of Article 24 (Relief From Double Taxation) of the Convention shall be renumbered as subparagraphs (b)(iv) and (b)(v), respectively.
3. Subparagraph (c) of paragraph 1 [*Paragraph 2 in French language*] of Article 24 (Relief From Double Taxation) of the Convention shall be deleted and replaced by the following:
    "(c) In the case of an individual who is both a resident and citizen of the United States and a national of France, the provisions of paragraph 2 of Article 29 (Miscellaneous Provisions) shall apply to remuneration described in paragraph 1 of
    [sic]
    Article 19 (Public Remuneration), but such remuneration shall be treated by the United States as income from sources within France."

Id. art. V (emphasis in original; last alteration added).

Attached to defendant's cross-motion for partial summary judgment is a United States Treasury Department "Technical Explanation" of the 2004 Protocol (2004 Protocol Treasury Department Technical Explanation). Like the 1994 Treaty Treasury Department Technical Explanation, the 2004 Protocol Treasury Department Technical Explanation was prepared by the United States Treasury Department and states that it "is an official guide to the Protocol" which "explains policies behind particular provisions, as well as understandings reached during the negotiations with respect to the interpretation and application of the Protocol," and also states that "[t]o the extent that the Convention has not been amended by the Protocol, the Technical Explanation of the Convention remains the official explanation." (alteration added). With respect to the changes made by the 2004 Protocol to Article 24 of the 1994 Treaty, the 2004 Protocol Treasury Department Technical Explanation states:

_____

https://www.congress.gov/treaty-document/109th-congress/4/resolution-text?s=4&r=2 (last visited Oct. 23, 2023).

[9] The title page of the 2004 Protocol states that the 2004 Protocol entered into force on "21 December 2006 by notification, in accordance with article VII." See 2004 Protocol, 2478 U.N.T.S. at 175. Article VII of the 2004 Protocol states, at paragraph 1: "The Contracting States shall notify each other when their respective constitutional and statutory requirements for the entry into force of this Protocol have been satisfied. The Protocol shall enter into force on the date of receipt of the later of such notifications." Id. art. VII ¶ 1.

The Protocol deletes subparagraph (b)(iv) of paragraph 2 [Paragraph 1 in French language] of Article 24 (Relief From Double Taxation) of the treaty, which allows a U.S. citizen and resident of France a credit equal to the amount of French tax attributable to income dealt with in subparagraph (a) of paragraph 1 of Article 18 (Pensions) that was also subject to tax in the United States. Subparagraph (b)(iv) is rendered obsolete by the provisions of Article 18 as amended by the Protocol.

The Protocol renumbers subparagraphs (b)(v) and (vi) of paragraph 2 [Paragraph 1 in French language] of Article 24 subparagraphs (b)(iv) and (v) respectively to account for the deletion of subparagraph (b)(iv).

The Protocol replaces subparagraph (c) of paragraph 1 [Paragraph 2 in French language] of Article 24 to omit the reference to paragraph 2 of Article 19 (Public Remuneration). This change conforms to revisions made to Article 18 and Article 19 (Public Remuneration) by the Protocol.

(alterations in original).

Also attached to defendant's cross-motion for partial summary judgment is a report on the 2004 Protocol from the Senate Committee on Foreign Relations, dated March 27, 2006, and titled "PROTOCOL AMENDING THE INCOME TAX CONVENTION WITH FRANCE (TREATY DOC. 109-4)." S. EXEC. REP. NO. 109-9, at 1 (2006) (capitalization in original) (2006 Senate Report). The 2006 Senate Report states that the Senate Committee on Foreign Relations "reports favorably" on the 2004 Protocol and recommends ratification thereof. See id. With respect to the purpose of the 1994 Treaty and the 2004 Protocol, the 2006 Senate Report states:

The principal purposes of the existing income tax treaty between the United States and France and the proposed protocol amending the treaty are to reduce or eliminate double taxation of income earned by residents of either country from sources within the other country and to prevent avoidance or evasion of the taxes of the two countries. The existing treaty and proposed protocol also are intended to continue to promote close economic cooperation between the two countries and to eliminate possible barriers to trade and investment caused by overlapping taxing jurisdictions of the two countries.

Id. at 1-2 (footnote omitted).

**The 2009 Protocol**

On January 13, 2009, the Government of the United States of America and the Government of the French Republic agreed to a further

> Protocol amending the Convention between the Government of the French Republic and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, signed at Paris on 31 August 1994, as amended by the Protocol signed on 8 December 2004 (with Memorandum of Understanding),

Fr.-U.S., Jan. 13, 2009, 2659 U.N.T.S. 82 [hereinafter the 2009 Protocol],[10] which entered into force on December 23, 2009.[11] As relevant to the above captioned case, the 2009 Protocol, at Article VIII, amends Article 24 of the 1994 Treaty. As particularly relevant to the above captioned case, and as described below, at paragraph 1 of Article VIII, the 2009 Protocol renumbers and reorders the paragraphs of Article 24 of the 1994 Treaty, resulting in the numbering of paragraphs 1 and 2 of Article 24 of the 1994 Treaty, as amended, currently in effect. The 2009 Protocol provides, in relevant part:

1. Regarding Article 24 (Relief From Double Taxation) of the Convention as incorporated in the alternat[[12]] of the United States, in both the English and French version of such alternat, paragraph 1 shall be renumbered paragraph 2, and paragraph 2 shall be renumbered paragraph 1.
2. Clause (iii) of subparagraph a) of paragraph 1 of Article 24 (Relief From Double Taxation) of the Convention, as amended by paragraph 1 of this Article VIII of this Protocol, shall be deleted and replaced by the following:

   "(iii) in the case of income referred to in Article 10 (Dividends), Article 11 (Interest), paragraph 1 of Article 13 (Capital Gains), Article 16 (Director's Fees), and Article 17 (Artistes and Sportsmen), to the

---

[10] The 2009 Protocol was ratified by the United States Senate on December 3, 2009. See Protocol Amending Tax Convention with France, CONGRESS.GOV, https://www.congress.gov/treaty-document/111th-congress/4?q=%7B%22search%22%3A%22%5C%22French+Republic%5C%22%22%7D&s=6&r=1 (last visited Oct. 23, 2023).

[11] The title page of the 2009 Protocol states that it entered into force on "23 December 2009 by notification, in accordance with article XVI." See 2009 Protocol, 2659 U.N.T.S. at 82. Article XVI of the 2009 Protocol provides, at paragraph 1: "The Contracting States shall notify each other when their respective constitutional and statutory requirements for the entry into force of this Protocol have been satisfied. The Protocol shall enter into force on the date of receipt of the later of such notifications." Id. art. XVI ¶ 1.

[12] The term "alternat" is a French word meaning "[t]he rotation in precedence among states, diplomats, etc., esp. in the signing of treaties." Alternat, BLACK'S LAW DICTIONARY (11th ed. 2019) (alteration added). According to Black's Law Dictionary, "[t]his practice gives each diplomat a copy of the treaty with the diplomat's signature appearing first." Id. (alteration added).

amount of tax paid in the United States in accordance with the provisions of the Convention; however, such credit shall not exceed the amount of French tax attributable to such income."

3. Clause (i) of subparagraph b) of paragraph 1 of Article 24 (Relief From Double Taxation) of the Convention, as amended by paragraph 1 of this Article VIII of this Protocol, shall be deleted and replaced by the following:

"(i) income consisting of dividends paid by a company that is a resident of the United States, or interest arising in the United States, as described in paragraph 5 of Article 11 (Interest), or royalties arising in the United States, as described in paragraph 4 of Article 12 (Royalties), that is derived and beneficially owned by such individual and that is paid by:

aa) the United States or any political subdivision or local authority thereof; or

bb) a person created or organized under the laws of a state of the United States or the District of Columbia, the principal class of shares of or interests in which is substantially and regularly traded on a recognized stock exchange as defined in subparagraph d) of paragraph 7 of Article 30 (Limitation on Benefits of the Convention); or

cc) a company that is a resident of the United States, provided that less than 10 percent of the outstanding shares of the voting power in such company was owned (directly or indirectly) by the resident of France at tall times during the part of such company's taxable period preceding the date of payment of the income to the owner of the income and during the prior taxable period (if any) of such company, and provided that less than 50 percent of such voting power was owned (either directly or indirectly) by residents of France during the same period; or

dd) a resident of the United States, not more than 25 percent of the gross income of which for the prior taxable period (if any) consisted directly or indirectly of income derived from sources outside the United States;".

4. Clause (i) of subparagraph e) of paragraph 1 of Article 24 (Relief From Double Taxation) of the Convention as amended by paragraph 1 of this Article VIII of this Protocol, shall be deleted and replaced by the following:

"(i) Where a company resident of France is taxed in that state according to French domestic law on a consolidated tax base, including the profits or losses of subsidiaries that are residents of the United States or of permanent establishments situated in the United States, the provisions of the Convention shall not prevent the application of that law."

5. Subparagraph c) of paragraph 2 of Article 24 (Relief From Double Taxation) of the Convention, as amended by paragraph 1 of this Article VIII of this Protocol, shall be deleted.

2009 Protocol, art. VIII (footnote added).

The 2009 Protocol, at Article X, makes the following amendment to Article 26 of the 1994 Treaty:

Paragraph 5 of Article 26 (Mutual Agreement Procedure) shall be deleted and replaced by the following paragraphs:

"5. Where, pursuant to a mutual agreement procedure under this Article, the competent authorities have endeavored but are unable to reach a complete agreement, the case shall be resolved through arbitration conducted in the manner prescribed by, and subject to, the requirements of paragraph 6 and any rules or procedures agreed upon by the Contracting States, if:

a) tax returns have been filed with at least one of the Contracting States with respect to the taxable years at issue in the case;

b) the case is not a particular case that both competent authorities agree, before the date on which arbitration proceedings would otherwise have begun, is not suitable for determination by arbitration; and

c) all concerned persons agree according to the provisions of subparagraph (d) of paragraph 6.

An unresolved case shall not, however, be submitted to arbitration if a decision on such case has already been rendered by a court or administrative tribunal of either Contracting State.

6. For the purposes of paragraph 5 and this paragraph, the following rules and definitions shall apply:

a) the term "concerned person" means the presenter of a case to a competent authority for consideration under this Article and all other persons, if any, whose tax liability to either Contracting State may be directly affected by a mutual agreement arising from that consideration;

b) the "commencement date" for a case is the earliest date on which the information necessary to undertake substantive consideration for a mutual agreement has been received by both competent authorities;

c) arbitration proceedings in a case shall being on the later of:

(i) two years after the commencement date of that case, unless both competent authorities have previously agreed to a different date, and

(ii) the earliest date upon which the agreement required by subparagraph d) has been received by both competent authorities;

    d) the concerned person(s), and their authorized representatives or agents, must agree prior to the beginning of arbitration proceedings not to disclose to any other person any information received during the course of the arbitration proceeding from either Contracting State or the arbitration panel, other than the determination of such panel;

    e) unless any concerned person does not accept the determination of an arbitration panel the determination shall constitute a resolution by mutual agreement under this Article and shall be binding on both Contracting States with respect to that case only; and

    f) for the purposes of an arbitration proceeding under paragraph 5 and this paragraph, the members of the arbitration panel and their staffs shall be concerned "persons or authorities" to whom information may be disclosed under Article 27 (Exchange of Information) of the Convention."

2009 Protocol, art. X.[13]

Attached to defendant's cross-motion for partial summary judgment is the United States Treasury Department's "Technical Explanation" for the 2009 Protocol (2009 Protocol Treasury Department Technical Explanation). Similar to the Technical Explanations for the 1994 Treaty and 2004 Protocol, the 2009 Protocol Treasury Department Technical Explanation was prepared by the United States Treasury Department and states that it "is an official guide to the [2009] Protocol and Memorandum of Understanding. It explains policies behind particular provisions, as well as

---

[13] Appended to the 2009 Protocol in the United Nations Treaty Series is a "**MEMORANDUM OF UNDERSTANDING**," (capitalization and emphasis in original), in which the Government of the United States of America and the Government of the French Republic "have agreed to define the mode of application of paragraphs 5 and 6 of Article 26 (Mutual Agreement Procedure) of the Convention," and in which the signatory governments state:

    In respect of any case where the competent authorities have endeavored but are unable to reach an agreement under Article 26 regarding the application of the Convention, binding arbitration shall be used to determine such application, unless the competent authorities agree that the particular case is not suitable for determination by arbitration. If an arbitration proceeding under paragraph 5 of Article 26 commences (the Proceeding), the following rules and procedures shall apply.

2009 Protocol, 2659 U.N.T.S. at 112. In the Memorandum of Understanding, the United States and France detail rules for the procedures of arbitration proceedings commenced pursuant to the 1994 Treaty. The Memorandum of Understanding entered into force on the same date on which the 2009 Protocol entered into force, December 23, 2009.

understandings reached during the negotiations with respect to the interpretation and application of the Protocol and Memorandum of Understanding." (alteration added). The 2009 Treasury Department Technical Explanation states, however, that it "is not intended to provide a complete guide to the existing [1994] Convention as amended by the [2009] Protocol and Memorandum of Understanding." (alterations added).

With respect to the changes made to Article 24 of the 1994 Treaty by the 2009 Protocol, the 2009 Protocol Treasury Department Technical Explanation provides that the renumbering of paragraphs 1 and 2 of Article 24 "is intended to make the numbering of the paragraphs of Article 24 of the Convention in the alternat of the United States and the alternat of France consistent." The 2009 Protocol Treasury Department Technical Explanation further provides that other changes were made to Article 24 in order to "update[] cross-references and make[] them consistent with amendments made by this Protocol" and "to clarify" the application of provisions of the 1994 Treaty not relevant to the above captioned case. (alterations added). Moreover, with respect to the changes made to Article 26 of the 1994 Treaty by the 2009 Protocol, the 2009 Protocol Treasury Department Technical Explanation indicates that the added paragraphs "provide a mandatory binding arbitration proceeding" and that the Memorandum of Understanding included with the 2009 Protocol "provides additional rules and procedures that apply to a case considered under the arbitration provisions." The 2009 Protocol Treasury Department Technical Explanation states with respect to the arbitration proceedings:

> New paragraph 5 provides that a case shall be resolved through arbitration when the competent authorities have endeavored but are unable to reach a complete agreement regarding a case and the following three conditions are satisfied. First, tax returns have been filed with at least one of the Contracting States with respect to the taxable years at issue in the case. Second, the case is not a case that the competent authorities agree before the date on which arbitration proceedings would otherwise have begun, is not suitable for determination by arbitration. Third, all concerned persons and their authorized representatives agree, according to the provisions of subparagraph (d) of paragraph 6, not to disclose to any other person any information received during the course of the arbitration proceeding from either Contracting State or the arbitration board, other than the determination of the board (confidentiality agreement). The confidentiality agreement may also be executed by any concerned person that has the legal authority to bind any other concerned person on the matter. For example, a parent corporation with the legal authority to bind its subsidiary with respect to confidentiality may execute a comprehensive confidentiality agreement on its own behalf and that of its subsidiary.
> New paragraph 5 provides that an unresolved case shall not be submitted to arbitration if a decision on such case has already been rendered by a court or administrative tribunal of either Contracting State.

Attached to defendant's cross-motion for partial summary judgment is the Report of the Senate Committee on Foreign Relations on the 2009 Protocol, dated December 1,

2009, and titled "PROTOCOL AMENDING THE CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE FRENCH REPUBLIC FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME AND CAPITAL (TREATY DOC. 111-4)." See S. EXEC. REP. No. 111-1, at 1 (2009) (capitalization in original) (2009 Senate Report). Similar to the Senate Reports on the 1994 Treaty and the 2004 Protocol, the 2009 Senate Report states that the Foreign Relations Committee "reports favorably" on the 2009 Protocol and recommends that the Senate ratify the 2009 Protocol. See id. The 2009 Senate Report provides, with respect to the purpose of the 2009 Protocol:

> The purpose of the Protocol, along with the underlying treaty, is to promote and facilitate trade and investment between the United States and France. Principally, the Protocol would amend the existing tax treaty with France (the "Treaty" or "Convention") in order to eliminate withholding taxes on cross-border dividend and royalty payments, establish a mandatory arbitration scheme for resolving disputes between the parties to the treaty, prevent inappropriate use of the treaty, as amended, by third-country residents, and facilitate the exchange of information between tax authorities in both countries.

Id. at 2. The 2009 Senate Report further provides that "[t]his [2009] Protocol was negotiated to modernize our relationship with France in the areas set forth above and to update the 1994 treaty to better reflect U.S. and French domestic law." Id. (alterations added). In the conclusion of the 2009 Senate Report, the Senate Committee on Foreign Affairs recommends ratification of the 2009 Protocol, subject to the condition that the Secretary of the Treasury submit to the Senate Committees on Finance and Foreign Relations and the Joint Committee on Taxation the rules and procedures to be used during mandatory arbitration proceedings under the 1994 Treaty as amended by the 2009 Protocol. See id. at 4-7.

**Relevant Internal Revenue Code Provisions**

In its cross-motion for partial summary judgment, defendant describes the statutorily provided process by which United States taxpayers living abroad may reduce their tax liability to the United States with respect to foreign income: "The Code provides U.S. citizens living abroad with two primary methods of relief from double taxation—an exclusion from U.S. tax of certain foreign earned income (under [I.R.C., 26 U.S.C.] § 911) and credits for foreign income taxes paid (under [I.R.C.] §§ 901-909)." (alterations added). Quoting I.R.C. § 911, defendant explains that "Section 911(a) allows a 'qualified individual' to elect to exclude 'foreign earned income' from his or her taxable income in the United States,"[14] and that "Foreign earned income is 'the amount received by such

---

[14] The statute at I.R.C. § 911(d)(1) (2018) defines "qualified individual" in the context of foreign tax credits as:

individual from sources within a foreign country . . . which constitute earned income attributable to services performed by such individual.'"[15] (ellipsis in defendant's brief) (quoting I.R.C. § 911(a), (b)(1)(A)). In addition, quoting I.R.C. § 901, defendant states that "the Code allows 'a citizen of the United States' to credit against 'the tax imposed by' Chapter 1 [of the I.R.C.] 'the amount of any income, war profits, and excess profits taxes paid or accrued' to 'any foreign country.'" (alteration added) (quoting I.R.C. § 901(a), (b)(1) (2018)).

---

> **(1) Qualified individual.--**The term "qualified individual" means an individual whose tax home is in a foreign country and who is--
>> **(A)** a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or
>> **(B)** a citizen or resident of the United States and who, during any period of 12 consecutive months, is present in a foreign country or countries during at least 330 full days in such period.

I.R.C. § 911(d)(1) (emphasis in original). The statute at I.R.C. § 911(d)(2)(A) further provides:

> The term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered.

I.R.C. § 911(d)(2)(A).

[15] The statute at I.R.C. § 911(b)(1)(A) provides:

> The term "foreign earned income" with respect to any individual means the amount received by such individual from sources within a foreign country or countries which constitute earned income attributable to services performed by such individual during the period described in subparagraph (A) or (B) of subsection (d)(1), whichever is applicable.

I.R.C. § 911(b)(1)(A). The statute at I.R.C. § 911(b)(2)(A) further provides:

> The foreign earned income of an individual which may be excluded under subsection (a)(1) for any taxable year shall not exceed the amount of foreign earned income computed on a daily basis at an annual rate equal to the exclusion amount for the calendar year in which such taxable year begins.

I.R.C. § 911(b)(2)(A).

Three sections of the I.R.C., I.R.C. §§ 27, 901, and 904, are particularly relevant to understanding the case currently before this court. The statute section 27 of the I.R.C. provides: "The amount of taxes imposed by foreign countries and possessions of the United States shall be allowed as a credit against the tax imposed by this chapter [Chapter 1 of the I.R.C.[16]] to the extent provided in section 901[.]" I.R.C. § 27 (2018) (alterations and footnote added). Additionally, the statute at I.R.C. § 901 provides, in relevant part:

**(a) Allowance of credit.**--If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter [Chapter 1 of the I.R.C.] shall, subject to the limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under section 960. Such choice for any taxable year may be made or changed at any time before the expiration of the period prescribed for making a claim for credit or refund of the tax imposed by this chapter for such taxable year. The credit shall not be allowed against any tax treated as a tax not imposed by this chapter under section 26(b).

**(b) Amount allowed.--**Subject to the limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

**(1) Citizens and domestic corporations.--**In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; and

**(2) Resident of the United States or Puerto Rico.--**In the case of a resident of the United States and in the case of an individual who is a bona fide resident of Puerto Rico during the entire taxable year, the amount of any such taxes paid or accrued during the taxable year to any possession of the United States; and

**(3) Alien resident of the United States or Puerto Rico.--**In the case of an alien resident of the United States and in the case of an alien individual who is a bona fide resident of Puerto Rico during the entire taxable year, the amount of any such taxes paid or accrued during the taxable year to any foreign country; and

**(4) Nonresident alien individuals and foreign corporations.--**In the case of any nonresident alien individual not described in section 876 and in the case of any foreign corporation, the amount determined pursuant to section 906; and

---

[16] Chapter 1 of the I.R.C. is titled "Normal Taxes and Surtaxes" and includes certain I.R.C. sections which are relevant to the above captioned case, including I.R.C. §§ 27, 901, 904, and 911, but, as explained further below, Chapter 1 does not include I.R.C. § 1411, which imposes the net investment income tax and which is in Chapter 2A of the I.R.C., titled "Unearned Income Medicare Contribution."

**(5)  Partnerships and estates.--**In the case of any person described in paragraph (1), (2), (3), or (4), who is a member of a partnership or a beneficiary of an estate or trust, the amount of his proportionate share of the taxes (described in such paragraph) of the partnership or the estate or trust paid or accrued during the taxable year to a foreign country or to any possession of the United States, as the case may be. Under rules or regulations prescribed by the Secretary, in the case of any foreign trust of which the settlor or another person would be treated as owner of any portion of the trust under subpart E but for section 672(f), the allocable amount of any income, war profits, and excess profits taxes imposed by any foreign country or possession of the United States on the settlor or such other person in respect of trust income.

I.R.C. § 901(a)-(b) (emphasis in original; alteration added). The provisions found in I.R.C. §§ 27 and 901(a) restrict foreign tax credits to apply only against taxes imposed by Chapter 1 of the I.R.C. and are central to the issue currently before the court because, as explained further below, the net investment income tax, against which plaintiffs seek to apply a foreign tax credit, is imposed by I.R.C. § 1411, which is in Chapter 2A of the I.R.C.

The I.R.C. further provides, at section 904, in relevant part:

**(a)  Limitation.--**The total amount of the credit taken under section 901(a) shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year.

I.R.C. § 904(a) (emphasis in original). The statute at I.R.C. § 904 sets forth a number of detailed limitations on foreign tax credits which, however, are not relevant to the issues raised by plaintiffs' complaint in this court. See, e.g., I.R.C. § 904(c) (providing a one-year carryback and ten-year carryover for foreign tax credits exceeding the limitation of I.R.C. § 904(a)). Defendant, quoting Dirk Suringa, The Foreign Tax Credit Limitation Under Section 904, 6060 Tax Mgmt., at A-1 (BNA 2016), states that the statute at I.R.C. § 904's limitation of foreign tax credits "'prevent[s] the foreign tax credit from relieving a taxpayer of U.S. tax that would otherwise be payable against U.S.-source income.'" (alteration added).

The case currently before the court concerns the availability of foreign tax credits against the net investment income tax, which is imposed by I.R.C. § 1411 (2018). As plaintiffs indicate in their motion for partial summary judgment, the net investment income tax was originally created in 2010, when the Health Care and Education Reconciliation Act of 2010 inserted I.R.C. § 1411 into the newly created Chapter 2A of Subtitle A of the I.R.C., titled "UNEARED INCOME MEDICARE CONTRIBUTION." See Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1402(a)(1), 124 Stat. 1029,

1060-61 (capitalization in original). The statute at I.R.C. § 1411 has not been amended since it was first enacted in 2010 and describes the application of the net investment income tax to taxpayers:

> **(a) In general.**--Except as provided in subsection (e)--
>> **(1) Application to individuals.**--In the case of an individual, there is hereby imposed (in addition to any other tax imposed by this subtitle) for each taxable year a tax equal to 3.8 percent of the lesser of--
>>> **(A)** net investment income for such taxable year, or
>>> **(B)** the excess (if any) of--
>>>> **(i)** the modified adjusted gross income for such taxable year, over
>>>> **(ii)** the threshold amount.
>> **(2) Application to estates and trusts.**--In the case of an estate or trust, there is hereby imposed (in addition to any other tax imposed by this subtitle) for each taxable year a tax of 3.8 percent of the lesser of--
>>> **(A)** the undistributed net investment income for such taxable year, or
>>> **(B)** the excess (if any) of--
>>>> **(i)** the adjusted gross income (as defined in section 67(e)) for such taxable year, over
>>>> **(ii)** the dollar amount at which the highest tax bracket in section 1(e) begins for such taxable year.
> **(b) Threshold amount.**--For purposes of this chapter, the term "threshold amount" means--
>> **(1)** in the case of a taxpayer making a joint return under section 6013 or a surviving spouse (as defined in section 2(a)), $250,000,
>> **(2)** in the case of a married taxpayer (as defined in section 7703) filing a separate return, ½ of the dollar amount determined under paragraph (1), and
>> **(3)** in any other case, $200,000.
> **(c) Net investment income.**--For purposes of this chapter--
>> **(1) In general.**--The term "net investment income" means the excess (if any) of--
>>> **(A)** the sum of--
>>>> **(i)** gross income from interest, dividends, annuities, royalties, and rents, other than such income which is derived in the ordinary course of a trade or business not described in paragraph (2),
>>>> **(ii)** other gross income derived from a trade or business described in paragraph (2), and
>>>> **(iii)** net gain (to the extent taken into account in computing taxable income) attributable to the

disposition of property other than property held in a trade or business not described in paragraph (2), over

**(B)** the deductions allowed by this subtitle which are properly allocable to such gross income or net gain.

**(2) Trades and businesses to which tax applies.**--A trade or business is described in this paragraph if such trade or business is--

**(A)** a passive activity (within the meaning of section 469) with respect to the taxpayer, or

**(B)** a trade or business of trading in financial instruments or commodities (as defined in section 475(e)(2)).

**(3) Income on investment of working capital subject to tax.**--A rule similar to the rule of section 469(e)(1)(B) shall apply for purposes of this subsection.

**(4) Exception for certain active interests in partnerships and S corporations.**--In the case of a disposition of an interest in a partnership or S corporation--

**(A)** gain from such disposition shall be taken into account under clause (iii) of paragraph (1)(A) only to the extent of the net gain which would be so taken into account by the transferor if all property of the partnership or S corporation were sold for fair market value immediately before the disposition of such interest, and

**(B)** a rule similar to the rule of subparagraph (A) shall apply to a loss from such disposition.

**(5) Exception for distributions from qualified plans.**--The term "net investment income" shall not include any distribution from a plan or arrangement described in section 401(a), 403(a), 403(b), 408, 408A, or 457(b).

**(6) Special rule.**--Net investment income shall not include any item taken into account in determining self-employment income for such taxable year on which a tax is imposed by section 1401(b).

**(d) Modified adjusted gross income.**--For purposes of this chapter, the term "modified adjusted gross income" means adjusted gross income increased by the excess of--

**(1)** the amount excluded from gross income under section 911(a)(1), over

**(2)** the amount of any deductions (taken into account in computing adjusted gross income) or exclusions disallowed under section 911(d)(6) with respect to the amounts described in paragraph (1).

**(e) Nonapplication of section.**--This section shall not apply to--

**(1)** a nonresident alien, or

**(2)** a trust all of the unexpired interests in which are devoted to one or more of the purposes described in section 170(c)(2)(B).

I.R.C. § 1411 (2018) (emphasis in original). During the tax year at issue in this case, tax year 2015, and to the time of the issuance of this Opinion, Chapter 2A of Subtitle A of the I.R.C. included only I.R.C. § 1411.

The Treasury Department has promulgated regulations implementing I.R.C. § 1411 at Treasury Regulation, 26 C.F.R., § 1.1411-0 et seq., certain of which sections describe the net investment income tax and its relationship to the foreign tax credits at issue in this case. The regulation at Treasury Regulation § 1.1411-1(e) provides:

> **(e) Disallowance of certain credits against the section 1411 tax.** Amounts that may be credited against only the tax imposed by chapter 1 of the [Internal Revenue] Code may not be credited against the section 1411 tax imposed by chapter 2A of the Code unless specifically provided in the Code. For example, the foreign income, war profits, and excess profits taxes that are allowed as a foreign tax credit by section 27(a), section 642(a), and section 901, respectively, are not allowed as a credit against the section 1411 tax.

Treas. Reg. § 1.1411-1(e) (2022) (emphasis in original; alteration added).

The regulation at Treasury Regulation § 1.1411-2(a) provides, in relevant part, that "[s]ection 1411 applies to an individual who is a citizen or resident of the United States (within the meaning of section 7701(a)(30)(A)). Section 1411 does not apply to nonresident alien individuals (within the meaning of section 7701(b)(1)(B))." Treas. Reg. § 1.1411-2(a)(1) (alteration added). The regulation at the same section, Treasury Regulation § 1.1411-2, at paragraph (b), provides, in relevant part:

> In the case of an individual described in paragraph (a)(1) of this section, the tax imposed by [I.R.C.] section 1411(a)(1) for each taxable year is equal to 3.8 percent of the lesser of—
>
> (i)    Net investment income for such taxable year; or
> (ii)   The excess (if any) of—
>    (A)   The modified adjusted gross income (as defined in paragraph (c) of this section) for such taxable year; over
>    (B)   The threshold amount (as defined in paragraph (d) of this section).

Treas. Reg. § 1.1411-2(b)(1) (alteration added). The regulation at the same section, Treasury Regulation § 1.1411-2, at paragraph (c), provides, in relevant part:

> For purposes of [I.R.C.] section 1411, the term modified adjusted gross income means adjusted gross income increased by the excess of—
> (i) The amount excluded from gross income under [I.R.C.] section 911(a)(1); over
> (ii) The amount of any deductions (taken into account in computing adjusted gross income) or exclusions disallowed under [I.R.C.] section 911(d)(6) with respect to the amounts described in paragraph (c)(1)(i) of this section.

Treas. Reg. § 1.1411-2(c)(1) (alterations added).

The regulation at Treasury Regulation § 1.1411-4(a) defines net investment income in relevant part:

> For purposes of [I.R.C.] section 1411 and the regulations thereunder, net investment income means the excess (if any) of—
> (1) The sum of—
>   (i) Gross income from interest, dividends, annuities, royalties, and rents, except to the extent excluded by the ordinary course of a trade or business exception described in paragraph (b) of this section;
>   (ii) Other gross income derived from a trade or business described in § 1.1411–5; and
>   (iii) Net gain (to the extent taken into account in computing taxable income) attributable to the disposition of property, except to the extent excluded by the exception described in paragraph (d)(4)(i)(A) of this section for gain or loss attributable to property held in a trade or business not described in § 1.1411–5; over
> (2) The deductions allowed by subtitle A that are properly allocable to such gross income or net gain (as determined in paragraph (f) of this section).

Treas. Reg. § 1.1411-4(a) (alteration added).

Plaintiffs characterize the net investment income tax imposed by I.R.C. § 1411 as "an income tax, imposed using concepts identical to those already contained in Chapter 1 [of the I.R.C.] of the normal income tax provisions, and meets the definition in the Code for a tax on income as that concept is understood in the foreign tax credit provisions." (alterations added) (citing Treas. Reg. §§ 1.901-2(b)(4) (2022), 1.1411-1(a)). Plaintiffs further state that the net investment income tax "did not yet exist at the time of the ratification of the French Treaty" and that the net investment income tax "is a U.S. income tax applied on items of income on which a French resident U.S. citizen would also pay French taxes."

Defendant characterizes the net investment income tax as "a separate levy that is 'in addition to' the regular income tax imposed under Chapter 1" of the I.R.C. Defendant further states:

> Each of those two levies has its own tax base, and each its own applicable deductions. For certain taxpayers, the NIIT [net investment income tax] may impose a second levy on investment income that is already subject to the Chapter 1 income tax. However, depending on the circumstances, investment income may be taxed under Chapter 1 but not be subject to the NIIT, and investment income may sometimes be subject to the NIIT but be exempt from regular income tax.

(alteration added).

The IRS website provides the following description of the net investment income tax:

> If an individual has income from investments, the individual may be subject to net investment income tax. Effective Jan. 1, 2013, individual taxpayers are liable for a 3.8 percent Net Investment Income Tax on the lesser of their net investment income, or the amount by which their modified adjusted gross income exceeds the statutory threshold amount based on their filing status.
>
> The statutory threshold amounts are:
> - Married filing jointly — $250,000,
> - Married filing separately — $125,000,
> - Single or head of household — $200,000, or
> - Qualifying widow(er) with a child — $250,000.
>
> In general, net investment income includes, but is not limited to: interest, dividends, capital gains, rental and royalty income, and non-qualified annuities.
>
> Net investment income generally does not include wages, unemployment compensation, Social Security Benefits, alimony, and most self-employment income.
>
> Additionally, net investment income does not include any gain on the sale of a personal residence that is excluded from gross income for regular income tax purposes. To the extent the gain is excluded from gross income for regular income tax purposes, it is not subject to the Net Investment Income Tax.
>
> If an individual owes the net investment income tax, the individual must file Form 8960. Form 8960 Instructions provides details on how to figure the amount of investment income subject to the tax.

Net Investment Income Tax, INTERNAL REVENUE SERV., https://www.irs.gov/individuals/net-investment-income-tax (last visited Oct. 23, 2023).

The IRS website also contains a "Questions and Answers" page with respect to the net investment income tax. See Questions and Answers on the Net Investment Income Tax, INTERNAL REVENUE SERV., https://www.irs.gov/newsroom/questions-and-answers-on-the-net-investment-income-tax (last visited Oct. 23, 2023). The "Questions and Answers" page provides:

> **4. What is modified adjusted gross income for purposes of the Net Investment Income Tax?**
> For the Net Investment Income Tax, modified adjusted gross income is adjusted gross income (Form 1040, Line 37) increased by the difference between amounts excluded from gross income under [I.R.C.] section 911(a)(1) and the amount of any deductions (taken into account in

computing adjusted gross income) or exclusions disallowed under section 911(d)(6) for amounts described in section 911(a)(1). In the case of taxpayers with income from controlled foreign corporations (CFCs) and passive foreign investment companies (PFICs), they may have additional adjustments to their AGI [adjusted gross income]. See section 1.1411-10(e) of the final regulations.

Id. (emphasis in original; alterations added). The "Questions and Answers" page further provides:

**8. What is included in Net Investment Income?**

In general, investment income includes, but is not limited to: interest, dividends, capital gains, rental and royalty income, non-qualified annuities, income from businesses involved in trading of financial instruments or commodities and businesses that are passive activities to the taxpayer (within the meaning of section 469). To calculate your Net Investment Income, your investment income is reduced by certain expenses properly allocable to the income (see #13 below).

Id. (emphasis in original). The "Questions and Answers" page additionally provides:

**10. What kinds of gains are included in Net Investment Income?**

To the extent that gains are not otherwise offset by capital losses, the following gains are common examples of items taken into account in computing Net Investment Income:

A. Gains from the sale of stocks, bonds, and mutual funds.

B. Capital gain distributions from mutual funds.

C. Gain from the sale of investment real estate (including gain from the sale of a second home that is not a primary residence).

D. Gains from the sale of interests in partnerships and S corporations (to the extent the partner or shareholder was a passive owner). See section 1.1411-7 of the 2013 proposed regulations.

Id. (emphasis in original). The "Questions and Answers" page also provides:

**13. What investment expenses are deductible in computing NII [Net Investment Income]?**

In order to arrive at Net Investment Income, Gross Investment Income (items described in items 7-11 above) is reduced by deductions that are properly allocable to items of Gross Investment Income. Examples of deductions, a portion of which may be properly allocable to Gross Investment Income, include investment interest expense, investment advisory and brokerage fees, expenses related to rental and royalty income, tax preparation fees, fiduciary expenses (in the case of an estate or trust) and state and local income taxes.

Id. (emphasis in original; alteration added). Moreover, the "Questions and Answers" page provides:

> **17. Can tax credits reduce my NIIT liability?**
> Any federal income tax credit that may be used to offset a tax liability imposed by subtitle A of the Code may be used to offset the NII. However, if the tax credit is allowed only against the tax imposed by chapter 1 of the Code (regular income tax), those credits may not reduce the NIIT. For example, foreign income tax credits (sections 27(a) and 901(a)) and the general business credit (section 38) are allowed as credits only against the tax imposed by chapter 1 of the Code, and therefore may not be used to reduce your NIIT liability. If you take foreign income taxes as an income tax deduction (versus a tax credit), some (or all) of the deduction amount may [sic] deducted against NII.

Id. (emphasis in original; alteration added).

A committee print from the United States Senate Committee on the Budget titled "Tax Expenditures: Compendium of Background Material on Individual Provisions," prepared by the Congressional Research Service, provides information on the net investment income tax enacted in I.R.C. § 1411, under the title "**SURTAX ON UNEARNED INCOME**." Cong. Rsch. Serv., 111th Cong., TAX EXPENDITURES: Compendium of Background Material on Individual Provisions 413 (Comm. Print 2010) (capitalization and emphasis in original). The Senate Budget Committee print states:

> This provision imposes a 3.8-percent unearned income Medicare contribution tax on the lesser of net investment income or the excess of modified adjusted gross income over the threshold amount of an individual. The threshold amount is $250,000 in the case of a joint return or surviving spouse, $125,000 in the case of a married individual filing a separate return, and $200,000 in any other case. In the case of an estate or trust, the tax is 3.8 percent of the lesser of undistributed net investment income or the excess of adjusted gross income over the dollar amount at which the highest income tax bracket applicable to an estate or trust begins. As the provision raises revenue, this special rate of tax represents a negative tax expenditure over the 2010-2014 time period.

Id. The Senate Budget Committee print describes the "***Impact***" of the net investment income tax: "This provision raises the Medicare taxes paid by high-income individuals and estates and trusts." Id. (capitalization and emphasis in original).

**Plaintiffs' 2015 Tax Returns**

As indicated above, plaintiffs Matthew and Katherine Kaess Christensen, a married couple, are United States citizens who currently reside in Paris, France and who resided

in France during the tax year at issue in this case, tax year 2015. According to plaintiffs' complaint, "[o]n or about December 15, 2016, plaintiffs filed a timely joint federal income return for the year 2010 [sic[17]] with the Internal Revenue Service Center at Charlotte, North Carolina. Plaintiffs timely paid income taxes in the amount of $4,672.00 on account of this return." (alterations and footnote added). Plaintiffs attached to their complaint their original tax return for tax year 2015, filed in 2016, and their complete amended tax return for tax year 2015 which, as noted above, was filed in January 2020. Plaintiffs' original tax return includes plaintiffs' original Form 1040, original Form 1116, and original Form 8960, as well as other documents not relevant to the issues currently before the court. Plaintiffs' amended tax return includes plaintiffs' Form 1040X, filed in January 2020, as well as amended versions of forms filed with plaintiffs' original tax return for tax year 2015, such as an amended Form 1040, Form 1116, and Form 8960. Plaintiffs' amended tax return also includes a Form 8833 and a Form 8275, which do not appear previously to have been included in plaintiffs' original tax return as it is included in the record before the court, and other documents not relevant to the issues currently before the court.

In their motion for partial summary judgment in this court, plaintiffs summarize the income they reported to the IRS in both their original and their amended tax returns for 2015:

(i) earned income of $369,373; (ii) U.S. source passive income of $7,976; and (iii) foreign source passive income of $101,353. Before taking into account any foreign tax credits, Plaintiffs had a $76,376 U.S. federal income tax liability on this income arising under Chapter 1 of the Internal Revenue Code of 1986 (26 U.S.C.) (the "Code").

(footnote added). Plaintiffs further state in their motion for partial summary judgment that they paid a net investment income tax of 3.8 percent on the $7,976.00 of United States source passive income and also on the $101,353.00 foreign source passive income, for a total of $4,155.00 in net investment income tax. According to plaintiffs' motion for partial summary judgment, "[o]f that $4,155 NIIT liability, $3,851 related to the $101,342 of foreign source investment income." (alteration added). Plaintiffs further state in their motion for partial summary judgment that they "also incurred French income tax equal to $140,398 on their earned income and non-U.S. source investment income, of which $113,745 was attributable to the earned income and $26,635 was attributable to their passive foreign source investment income."

Attached to plaintiffs' complaint is plaintiffs' original IRS Form 1040 "**U.S. Individual Income Tax Return**" for the 2015 tax year, which bears the signature of plaintiffs' tax preparer, Steven R. Horton, CPA, the date December 15, 2016, and is stamped "AS ORIGINALLY FILED." (capitalization and emphasis in original). According to plaintiffs' original Form 1040 for tax year 2015, plaintiffs claimed an exclusion of

---

[17] After inquiry by the court, plaintiffs confirmed in a joint status report "that the reference in paragraph 4 of the initial complaint to 'federal income tax [sic] return for 2010' [sic] was mistaken and that the applicable tax year is 2015." (alterations added).

$148,172.00, as well as a deduction of $12,600.00 and an exemption of $16,400.00, all of which reduced plaintiffs' taxable income to $301,530.00, on which plaintiffs reported a United States income tax of $76,287.00 and an alternative minimum tax of $89.00. As documented by plaintiffs' original Form 1040, plaintiffs claimed a foreign tax credit of $75,859.00 against their reported United States income tax of $76,287.00. Plaintiffs' original Form 1040 for 2015 indicates that plaintiffs originally paid $4,155.00 in net investment income tax.

Plaintiffs allege that "[o]n or about January 8, 2020, plaintiffs filed a Form 1040X claim with the Internal Revenue Service Center in Austin, Texas for refund of the federal income tax and interest paid for 2015 in the amount of $3,851.00 together with interest as allowed by law." (alteration added). Plaintiffs' IRS Form 1040X "**Amended U.S. Individual Income Tax Return**," (capitalization and emphasis in original), for tax year 2015, is included in the record before the court and is signed by plaintiffs jointly and by their tax preparer, Mr. Horton, on December 9, 2019. Plaintiffs' Form 1040X for the year 2015 indicates that originally plaintiffs had claimed a "[t]otal tax" of $4,672.00 for tax year 2015, and that plaintiffs claimed on their amended tax return a "[t]otal tax" of $821.00 for tax year 2015, a difference of $3,851.00. (alterations added). On their Form 1040X for tax year 2015, plaintiffs claim a refund of $3,851.00. On the second page of plaintiffs' Form 1040X for tax year 2015, plaintiffs state, in a typewritten-in addition under the header "**Part III**" "**Explanation of changes**:" "THIS RETURN CLAIMS A REFUND OF NET INVESTMENT INCOME TAX (NIIT) FOR $3,851 AS EXPLAINED ON FORM 8833. SEE AMENDED FORM 8833 ATTACHED ALONG WITH AMENDED FORMS 8960 AND FORMS 1116." (capitalization and emphasis in original).

Included in plaintiffs' amended tax return, attached to plaintiffs' complaint, is an IRS Form 8833 "**Treaty-Based Return position Disclosure Under Section 6114 or 7701(b)**," (capitalization and emphasis in original), which does not have a signature or date portion as it appears in the record before the court.[18] Plaintiffs' Form 8833 states that "[t]he taxpayer is disclosing a treaty-based return position as required by [I.R.C.] section 6114," (alterations added), and indicates, with respect to "the specific treaty position relied on," the country "FRANCE" and the articles "2 & 24." (capitalization in original). Plaintiffs' Form 8833 provides that plaintiffs claim that I.R.C. § 1411 is "overruled or modified by the treaty-based return position" in the 1994 Treaty, as amended. Moreover, in their Form 8833, plaintiffs provide the following typewritten-in explanation for their claimed treaty-based return:

---

[18] A number of plaintiffs' tax documents, which are attached to plaintiffs' complaint, do not bear plaintiffs' signatures, or the signature of plaintiffs' tax preparer, or the date of any signatures, as they are included in the record before the court. Moreover, some of plaintiffs' tax documents do not include signature and date portions. Some of these records appear be duplicates of documents previously submitted to the IRS. Defendant has not challenged the veracity of the information included on plaintiffs' tax forms, without regard to the lack of signatures and dates on certain forms, although defendant has raised the computational issue of whether plaintiffs have correctly applied the rule of tax calculation referred to as the "three-bite rule," which is discussed further below.

TAXPAYER IS FILING THIS CLAIM FOR REFUND TO SEEK A FOREIGN
TAX CREDIT TO REDUCE THE NET INVESTMENT INCOME TAX (THE
"NIIT", CODIFIED IN CODE SEC. 1411). TAXPAYER BELIEVES THAT
EITHER THE NIIT IS A COVERED TAX UNDER THE TERMS OF THE
UNITED STATES / FRANCE INCOME TAX TREATY (THE "FRENCH
TREATY", [sic] IN WHICH CASE A FOREIGN TAX CREDIT SHOULD BE
ALLOWED UNDER ARTICLES 2 & 24 OF THE FRENCH TREATY, OR
THAT THE NIIT FALLS WITHIN THE DEFINITION OF A COVERED TAX
UNDER THE UNITED STATES / FRANCE TOTALIZATION AGREEMENT
(THE "TOTALIZATION AGREEMENT") IN WHICH CASE THE TAXPAYER
IS EXEMPT FROM THE NIIT AS A FRENCH RESIDENT.
ON THE ASSUMPTION THAT THE FRENCH TREATY APPLIES, THE
TAXPAYER HAS ADJUSTED THE FOREIGN TAX CREDIT FORMS (THE
FORMS 1116) TO REFLECT THE USE OF THE CREDIT (THE "FORM
1116 ADJUSTMENT") AND HAS ELIMINATED THE TAX ON THE FORM
8960 BASED UPON THE FORM 1116 ADJUSTMENT. IN THE EVENT
THE TOTALIZATION AGREEMENT POSITION APPLIES, THE SAME
REFUND AMOUNT WOULD OCCUR, ALTHOUGH NO FOREIGN TAX
CREDIT ADJUSTMENT WOULD BE REQUIRED.

(capitalization in original).[19]

Also included in plaintiffs' amended tax return, attached to plaintiffs' complaint, is
an IRS Form 8960, "**Net Investment Income Tax – Individuals, Estates, and Trusts**,"
for plaintiffs for tax year 2015, which does not include a signature and date portion and is
stamped "AS AMENDED" as it appears in the record before the court. (capitalization and
emphasis in original). Plaintiffs' amended Form 8960 indicates that in tax year 2015,
plaintiffs had "[t]otal investment income" of $109,329.00. (alteration added). Plaintiffs'
amended Form 8960 includes the instructions for calculation of the "[n]et investment
income tax for individuals," according to which instructions plaintiffs would "[m]ultiply" their
$109,329.00 "by 3.8% (.038)." (alterations added). Plaintiffs' amended Form 8960
indicates for the net investment income tax that plaintiffs owe $304.00, and plaintiffs also

---

[19] Also included in plaintiffs' amended tax return, attached to plaintiffs' complaint, is a
Form 1116 "**Foreign Tax Credit**" for plaintiffs for tax year 2015, which does not include
a signature and date portion and is stamped "AS AMENDED" as it appears in the record
before the court. (capitalization and emphasis in original). Plaintiffs' amended Form 1116
for tax year 2015 indicates that plaintiffs accrued $113,745.00 in "[o]ther foreign taxes,"
and $26,653.00 in foreign taxes withheld on dividends and interest, for a foreign tax credit
of $75,859.00. (alteration added). Also on the amended Form 1116, plaintiffs indicate on
the line "[t]axes reclassified under high tax kickout," $22,802.00 in taxes, and plaintiffs
state in a handwritten explanation: "High tax kickout, $26,653, less foreign taxes claimed
as credit against Net Investment Income Tax on Form 8960, $3851." (capitalization in
original; alteration added).

include the following unexplained handwritten notation on the Form 8960: "A Net investment income tax before foreign tax credit $4155 Less Foreign Tax credit on foreign source investment income –(carried from general limitation Form 1116) $\frac{(3851)}{\$304}$ ." (capitalization in original).

In addition, included in plaintiffs' amended tax return, attached to plaintiffs' complaint, is an IRS Form 8275, "**Disclosure Statement**" for tax year 2015, which does not include a portion for signatures and dates as it appears in the record before the court. (capitalization and emphasis in original). On the Form 8275, under "**Part I**" "**General Information**," plaintiffs list the "Rev. Rul., Rev. Proc., etc.," as "T.D.9644 [sic], FED REG 72393," the "Item or Group of Items" as "SEC. 1411," the "Detailed Description of Items" as "FOREIGN TAX CREDIT FOR NET INVESTMENT INCOME TAX PURSUANT TO FRENCH/U.S. TREATY OR TOTALIZATION AGREEMNT [sic]," the "Form or Schedule" as 8960, and the "Amount" as $3,851.00. (capitalization and emphasis in original; alterations added). Plaintiffs provide the following "**Detailed Explanation**" on the Form 8275:

> TAXPAYERS BELIEVE THAT ARITCLES 2&24 [sic] OF THE FRENCH/US TAX TREATY PROVIDE AN INDEPENDENT BASIS FOR CLAIMING A FOREIGN TAX CREDIT TO REDUCE NET INVESTMENT INCOME TAX (NIIT) OR THAT THE FRENCH/US TOTALIZATION AGREEMENT WOULD EXEMPTS [sic] TAXPAYERS FORM [sic] PAYING THIS TAX. THIS IS CONTRARY TO THE POSITION ANNOUNCED BY THE IRS (WITHOUT ANY
> (SEE NEXT)

(capitalization in original; alterations added). Plaintiffs' detailed explanation continues in a separate section on the following page of the Form 8275: "ANALYSIS) IN THE ABOVE CITED PREAMBLE TO THE REGULATIONS PROMULGATED UNDER CODE SEC. 1411. THE IRS 1040 FORMS AND RELATED SCHEDULES DO NOT ALLOW FOR A FOREIGN TAX CREDIT CLAIM AND HAVE BEEN OVERRIDDEN TO ACHIEVE THAT RESULT." (capitalization in original).

Included in the record before the court is a letter dated February 20, 2020, from the IRS to plaintiffs, in which the IRS denied plaintiffs' claim for a foreign tax credit-based refund of the net investment income tax paid for tax year 2015. The IRS' denial letter states:

> WE CAN'T ALLOW YOUR CLAIM
> We disallowed your claim for credit for the tax period listed at the top of this letter.
> WHY WE CAN'T ALLOW YOUR CLAIM
> The postmark date on your tax return's envelope is Jan. 08, 2020. The last day to file a claim for tax year 2015 was Oct. 15, 2019. We can't allow your claim because the postmark is after the deadline.
> WHAT TO DO IF YOU DISAGREE

You can appeal our decision with the Office of Appeals (which is an independent organization within the IRS) if we disallowed your claim because our records show that you filed your claim late. Generally, a claim is late if you filed it after the later of:

- 3 years from the due date of a timely-filed return without an extension
- 3 years from the date we received a late return or a timely filed return with an approved extension
- 2 years after you paid the tax

In addition, for a claim filed within three years of the date you filed your tax return, we can only refund or credit the amount you paid during the three-year period before the date you file the claim (plus any approved extension of time to file). If you file your claim more than three years after the date you filed your return, we can only credit or refund the amount you paid during the two-year period before the date you file the claim. The Appeals Office can't change the amount of time the law allows you to file a claim for refund or credit.

If you decide to appeal our decision, send us an explanation of why you believe you filed your claim on time; for example, you had an extension of time to file your original tax return. We will consider your explanation before forwarding your request to the Office of Appeals.

(capitalization in original).

Plaintiffs state in their motion for partial summary judgment, however, that "Defendant now agrees that the refund suit has been timely filed as it relates to whether Plaintiffs are eligible for a foreign tax credit under the provisions of the French Treaty." Defendant indicated in a joint status report that it "agrees that the refund suit has been timely filed under I.R.C. Sec [sic] 6511(d)(3)." (alteration added). There is no dispute with respect to the timeliness of plaintiffs' claim in the case currently before the court.

## PROCEDURAL HISTORY

The record before the court indicates that plaintiffs did not appeal the IRS' denial of their refund claim in administrative proceedings before the IRS, and that plaintiffs instead opted to commence litigation in this court. Plaintiffs filed suit in this court on July 31, 2020, seeking a refund of the net investment income tax paid by plaintiffs for tax year 2015. After the defendant filed an answer to plaintiffs' complaint, the parties engaged in lengthy fact discovery, offering different views of what should be disclosed. During fact discovery, despite extensive discussions as to how to proceed, the parties did not produce documents which offered an interpretation by the French Government of the 1994 Treaty as originally entered into or as amended by the 2004 and 2009 Protocols with respect to the issue of the availability of a foreign tax credit against the United States net investment income tax.

**Discovery and the Three-Bite Rule as Related to Plaintiffs' Tax Refund Claim**

In their briefing and at oral argument on the cross-motions for partial summary judgment, the parties contested the relevance and application of the "three-bite rule" in the above captioned case. In its cross-motion for partial summary judgment, defendant indicates that the three-bite rule is implemented in part by paragraph (2)(b) of Article 24 of the 1994 Treaty, as amended, and defendant states: "Article 24(2)(b) is an integral part of an ordering rule established by the Treaty (colloquially referred to as a 'three-bite rule') governing the application of foreign tax credits to both French and U.S. taxes on income earned by U.S. citizens residing in France." Defendant explains the three-bite rule, in which each "bite" is a tax by either the United States Government or the French Government assessed against the taxpayer, as follows:

> The three pertinent taxes, or "bites," are: (1) the Treaty-authorized U.S. tax on certain U.S.-source income earned by the French resident; (2) the French tax on income earned by the French residents; and (3) the U.S. tax on worldwide income imposed on the basis of U.S. citizenship that is preserved by the Treaty's saving clause. Under the three-bite rule, the imposition of U.S. tax on certain U.S.-source income (principally investment income) has primacy (the *first* bite), followed by the French income tax on its residents (the *second* bite), and then by the U.S. income tax on its citizens (the *third* bite). Under this framework, when France takes the second bite, it provides the U.S. citizen with foreign tax credits for the first-bite U.S. tax applied to U.S.-source passive income. And, when the United States takes the third bite, it provides its citizens with foreign tax credits for the second-bite income tax imposed by France on the basis of French residence (but the U.S. foreign tax credits may not reduce the first-bite U.S. tax claimed as a credit against the French second bite).

(emphasis in original; footnotes omitted).

Defendant further explains its view of how certain provisions of the 1994 Treaty, as amended, including paragraph 2(b) of Article 24, one of the provisions at issue in the above captioned case, implement the three-bite rule:

> The Treaty incorporates the three-bite rule in the following manner. To implement the second bite, article 24(1)(a)(iii) requires France to grant a foreign tax credit for "the amount of tax paid in the United States" on certain "income arising in the United States," including dividends, interest, and certain capital gains, among other things. To implement the third bite, article 24(2)(b)(i) requires the United States to "allow as a credit against the United States income tax the French income tax paid after the credit [for the first bite] referred to in subparagraph (a)(iii) of paragraph 2," but clarifies that the credit for French taxes paid would not affect "that portion of the United States income tax" imposed by the first bite. Then, to properly account for the second-bite French income tax when computing the § 904 limitation for

the foreign tax credit allowed by the United States against its third-bite, article 24(2)(b)(ii) provides that such income "shall be considered income from sources within France."

(alteration in original; footnote omitted). In a footnote to the above-quoted text, defendant also asserts that "[t]he technical explanation to the 1994 convention explains the operation of the three-bite rule under these provisions of the Treaty." (alteration added). The 1994 Treaty Treasury Department Technical Explanation states, at the portion cited by defendant:

> Subparagraph 1(b) [of Article 24[20]] provides special rules to avoid the double taxation of U.S. citizens who are residents of France. Under subparagraph 2(a)(iii), France agrees to credit the U.S. tax paid, but only for the amount of tax that the United States could impose under the Convention on a resident of France who is not a citizen of the United States. Under subparagraph 1(b), the United States agrees that, where additional U.S. tax is due solely by reason of citizenship, it will credit the French tax imposed on the basis of residence to the extent that the French tax exceeds the tax that the United States may impose on the basis of source (i.e., net of the credit allowed by France). Under subparagraph 2(b), France shares the burden of avoiding double taxation of U.S. citizens resident in France by exempting from French tax certain items of U.S. source income of such citizens that would otherwise be subject to French tax.
> Subparagraph 1(b) also provides that certain U.S. source income will be treated as French source income to permit the additional credit to fit within the foreign tax credit limitation of [Internal Revenue] Code Section 904. This resourcing provision applies only to items of income that are included in gross income for French tax purposes, and it cannot be used in determining the foreign tax credit limitation applicable to income taxes paid to any other country.

(alterations and footnote added).[21]

---

[20] As explained above, the order of the paragraphs of Article 24 of the 1994 Treaty were reversed by the 2009 Protocol, such that paragraph 1 of Article 24 of the 1994 Treaty was renumbered paragraph 2 of Article 24 of the 1994 Treaty, as amended.

[21] The 1994 Treaty Treasury Department Technical Explanation offers a "simplified example" to illustrate the operation of paragraph 1(b) of Article 24, which would be paragraph 2(b) of Article 24 in the 1994 Treaty, as amended:

> The U.S. tax on a dividend paid by a U.S. corporation to a portfolio investor resident in France is limited by Article 10 (Dividends) of the Convention to 15 percent. The United States, therefore, will impose a tax of 15 on a dividend of 100, and France will allow a tax credit of 15. Suppose that the French individual income tax due is 22 percent. In that case, the net tax

Plaintiffs provide their explanation of the three-bite rule and its implementation by provisions of the 1994 Treaty, as amended, specifically paragraph 2(b) of Article 24, which plaintiffs indicate aligns with defendant's explanation:

> Article 24(2)(b)(i) [of the 1994 Treaty, as amended,] provides that, in the case of a U.S. citizen living in France, the United States retains the same primary taxing rights regardless of the French resident's citizenship. Thus, for example, a dividend paid by a U.S. corporation to a French resident is subject to a 15 percent withholding tax (in the case of a non-U.S. citizen) and, hence, the United States retains the right to levy a 15 percent tax on the French resident U.S. citizen (referred to by the Defendant as the first bite of the three-bite rule). France, in turn, has the right to levy tax on any amount in excess of 15 percent (referred to as the second bite of the three-bite rule). Finally, any such French tax shall be allowed as a credit against U.S. tax (other than the first 15 percent allowed to the United States under the first bite), but if the French tax is less than any additional U.S. tax, the United States may top up the 15 percent collected in the first bite by such shortfall (the third bite). The parties do not disagree as to any of this.

(alteration added). As plaintiffs indicate in the foregoing quotation, plaintiffs and defendant appear to agree in principle on how the three-bite rule is implemented by the 1994 Treaty, as amended, however, as discussed further below, the parties disagree with respect to how to calculate any taxes due under the three-bite rule, with respect to plaintiffs' French and United States income taxes.

In its cross-motion for partial summary judgment, defendant challenges plaintiffs' calculations and states that "[w]hen plaintiffs computed their French income-tax liability, they applied 'foreign income tax credits,'" but that "the three-bite rule required plaintiffs to take foreign tax credits for the first-bite U.S. tax applied to their U.S. source passive income. Plaintiffs have not provided evidence that they performed this calculation properly." (alteration added). Defendant continues to dispute how plaintiffs' French and United States income tax were calculated, as represented in plaintiffs' amended tax return forms filed with the IRS.

---

payable to France will be 7. However, assume that this individual is a U.S. citizen and, therefore, liable to U.S. tax of 22 percent. In the absence of a special relief provision, the individuals [sic] total tax would be 35: 28 to the United States, with no foreign tax credit because the dividend is from U.S. sources, and 7 to France. Under subparagraph 1(b), the 7 of French tax is credited against the 28 of U.S. tax, reducing the combined burden to 28, the higher of the two taxes. In this example, in order to credit the French tax of 7 at a U.S. rate of 28, 25 of the dividend would be treated as from French sources so that the 7 of French tax could be claimed as a foreign tax credit (7/28 x 100).

(alteration added).

After multiple discussions between plaintiffs' and defendant's attorneys about how to calculate the dollar impact of the three-bite rule and what documents defendant's attorney requested to verify that plaintiffs had properly accounted for the three-bite rule in their claims in this court, at oral argument, plaintiffs, after once again stating that the government had all it needed to confirm plaintiffs' calculations, stated:

> The Government takes issue with whether or not there should be a remand because we have not demonstrated that we complied with what they call the three-bite rule. That position is, again, simply wrong.
> I have submitted affidavits. I have submitted French tax returns or French avis d'impot, which is the -- effectively the receipt, and I've submitted U.S. tax returns. All of those show we did not try to claim a credit for any U.S. -- credit -- a French tax credit for any U.S. source income tax.
> I will go further and say say that I have asked the Government from the very outset of this case, what do you need? What documents do you want from me? And they've repeatedly said none. It's only at the last minute that they came up and said we need a remand[22] because you haven't established it.

(footnote added). As plaintiffs' attorney emphasized, and as defendant had indicated in its cross-motion for partial summary judgment, the dispute between the parties with respect to the application of the three-bite rule is whether sufficient evidence exists that the three-bite rule was properly accounted for in plaintiffs' calculations of their French and United States income taxes.

Defendant's attorney responded during oral argument and confirmed that the issue of the three-bite rule concerned whether the three-bite rule taxes had been properly calculated by plaintiffs:

> The Government's issue here with respect to the computations in this case is not one that is based upon needing documents from the Plaintiff [sic] that they have not provided. What we asked for is for the Plaintiff [sic] to demonstrate that when they computed the foreign tax credits, when they computed their French tax, that they properly took account of U.S. tax on the first bite that applies to U.S. source investment income, and so it is essential for a taxpayer, when properly applying the three-bite rule, when they pay French tax in step two, to make sure that they account for the U.S. tax that was due in step one.
> And we asked the Plaintiff [sic] to -- really as part of their burden of proof in their summary judgment motion -- where we said, yeah, we agree you paid the tax. You've given us sufficient evidence to show your returns, but you

---

[22] Plaintiffs' new and only reference to requiring a "remand" at oral argument was not discussed in the parties' briefs on the cross-motions for partial summary judgment currently under consideration.

> haven't showed us that when you computed the amount of French tax that you paid, that you properly took account of the first bite of U.S. income tax, and that's an issue that we believe is part of their burden of proof.

(alterations added). Defendant's attorney further stated:

> We're not saying that, because they failed to meet this burden of proof, that if Your Honor agreed with them as a matter of law, that they should somehow lose. We're just saying that if the Court were to agree with them as a matter of law, that we have some work to do which might just involve the Plaintiff [sic] showing us how they specifically computed the dollar amounts of foreign tax credits that were claimed on both their U.S. foreign -- on their U.S. income tax returns and their French income tax returns.

(alteration added).

At oral argument, plaintiffs' attorney ultimately agreed to give plaintiffs' 2015 French income tax return to defendant in order for defendant's counsel to try to verify the calculation of the three-bite rule. In a subsequent status report submitted to the court, defendant stated:

> Defendant's counsel has reviewed that return [plaintiffs' French tax return], along with the "taxpayers' annual statement issued by the French Government, the *Avis d'Impot*," that plaintiffs submitted in support of their motion for summary judgment. Dkt. 29-3 at 1, 6-13. Unfortunately, these documents do not themselves reveal how plaintiffs arrived at the numbers recorded thereon. Among other things, it is not possible, from review of the documents alone, to reconcile the income reported on plaintiffs' United States tax return with the income reported on their French return, or to determine whether the foreign tax credits reported on the French return properly include United States tax on U.S.-sourced passive income.
> More specifically, it is not possible to determine, from review of those documents, whether plaintiffs properly applied the "three-bite rule" when they claimed foreign tax credits on their French income-tax return for tax they owed to the United States under the "first bite."

(emphasis in original; alteration added). Defendant's status report further stated that

> during the course of the colloquy at oral argument on the parties' summary judgment motions, defendant's counsel may have been unclear in describing with particularity the information that the United States needed to review to determine whether plaintiffs properly applied the three-bite rule, leaving the erroneous impression that a review of plaintiffs' French tax return would be sufficient.

Defendant's status report indicated that defendant had asked plaintiffs' counsel a series of detailed questions related to plaintiffs' 2015 French and United States taxes, which "plaintiffs' counsel declined to answer," and defendant reiterated its position that "defendant has been unable to determine whether plaintiffs properly applied the three-bite rule in preparing their 2015 French return because defendant does not know how various sums appearing on the French return and on the *Avis d'Impot* were computed." (emphasis in original; footnote omitted). In a footnote to the foregoing quote from defendant's status report, however, defendant stated:

> If the Court is willing to defer the resolution of computational issues until after it resolves the disputed legal issues in this case, then this issue can be tabled at this time. However, if the Court would prefer that defendant state a definitive position as to whether plaintiffs properly applied the three-bite rule when preparing their 2015 returns, defendant will need to obtain additional information from plaintiffs.

> In response, plaintiffs argued in another status report that,

> by email dated September 2, 2022, Plaintiffs reiterated to Defendant that the three-bite rule did not apply. Specifically, Plaintiffs explained that they did not claim a foreign tax credit against U.S. income taxes for French taxes paid on U.S. source income. Had Plaintiffs made any such claims, these would have been listed on a separate Form 1116 for the category "certain income re-sourced by treaty." As Defendant knows, no such Form 1116 was filed.

(footnote omitted). In a footnote to the foregoing quote in plaintiffs' status report, plaintiffs further stated:

> The September 2, 2022 email [from plaintiffs' counsel] to Defendant states "[y]ou have indicated an interest in how the "three-bite" rule has been applied. You are fundamentally mistaken in this inquiry as in their U.S. tax return, my clients did not claim any foreign tax credits on U.S. source income (there is no Form 1116 seeking to re-source U.S. source income for purposes of the 'three-bite' rule) and therefore the "three-bite" rule has not been applied and does not apply."

(second alteration in original). Also in plaintiffs' status report, plaintiffs argued that defendant's detailed "questions make no sense, do not reflect Plaintiffs' attempts to resolve the issue, or can be readily answered by reference to the materials provided," and that

> Defendant ignores that the amount of French tax imposed on Plaintiffs' French-source passive income exceeded the U.S. tax on that same income by over $10,000. (Horton Affidavit, Dkt 29-3.) The total U.S. source income shown on Plaintiffs' U.S. tax return was less than $8,000. As such, even if

the entire amount of U.S. income gave rise to a tax liability in France (it did not), a disallowance of that hypothetical tax would not preclude the Plaintiffs from the $3,851 refund in this case. Simply put, Defendant has not and cannot demonstrate that its concerns, even if well founded (they are not), would have any impact on Plaintiffs' entitlement to the claimed refund amount and thus, these concerns do not rise to a material issue of fact sufficient to defeat a summary judgment motion.

Finally, plaintiffs stated in their status report:

Despite Defendant's approach, Plaintiffs remain convinced that it is in the interests of both the Government and all U.S. citizens living in France that there be a clear and timely resolution of this legal issue. To that end, Plaintiffs do not object to Defendant's proposed delay in resolution of the computational question until after the substantive issue – the proper interpretation of the French Treaty – is resolved (Def. Status Report fn. 1), [sic]

(alteration added).

As referred to above, because of the ongoing debate and the inability of the parties to resolve the issues regarding the three-bite rule, the court indicated, with the agreement of the parties, that the factual question of whether plaintiffs had properly calculated their United States and French income taxes with respect to the three-bite rule would be deferred until after a decision on the pending motions for partial summary judgment first to resolve the legal issue of whether foreign tax credits may be taken against the net investment income tax based on the 1994 Treaty, as amended. Therefore, as indicated above, the court issued an order converting the parties' cross-motions for summary judgment to cross-motions for partial summary judgment. This Opinion, therefore, only evaluates the parties' cross-motions for partial summary judgment with respect to the issue of whether the 1994 Treaty, as amended, provides a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411.

## DISCUSSION

**Subject Matter Jurisdiction**

The court ordered additional briefing to address jurisdictional concerns presented by plaintiffs' reliance solely on the terms of the 1994 Treaty, as amended, to provide plaintiffs a foreign tax credit. The statute at 28 U.S.C. § 1502 provides: "Except as otherwise provided by Act of Congress, the United States Court of Federal Claims shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations." 28 U.S.C. § 1502 (2018). In supplemental briefing, the court ordered the parties to address whether the statute at 28 U.S.C. § 1502 resulted in plaintiffs' claims as beyond the jurisdiction of the United States Court of Federal Claims.

In the case of <u>United States v. Weld</u>, 127 U.S. 51 (1888), the United States Supreme Court considered the application of a predecessor to the modern version of 28 U.S.C. § 1502, identified as "section 1066, Rev. St. U. S.," which deprived the earlier United States Court of Claims of jurisdiction over any "case growing out of, and dependent upon," a treaty of the United States. <u>See</u> <u>United States v. Weld</u>, 127 U.S. at 54. The Supreme Court in <u>Weld</u> explained that jurisdiction was barred under the statute only when "the right itself, which the petition makes to be the foundation of the claim, must have its origin—derive its life and existence— from some treaty stipulation." <u>Id.</u> at 57; <u>Societe Anonyme Des Ateliers Brillie Freres v. United States</u>, 160 Ct. Cl. 192, 197 (1963) (explaining that "[t]he Supreme Court of the United States provided us with an objective standard when it defined section 1066 of the Revised Statutes, the forerunner of the present section [1502]" (alterations added)); <u>see also</u> <u>Wood v. United States</u>, 961 F.2d 195, 200 (Fed. Cir. 1992) ("Section 1502 has been given a narrow interpretation; its applicability is limited to those cases relying so heavily on a treaty that, but for the treaty, the plaintiff's claim would not exist." (citing <u>Hughes Aircraft Co. v. United States</u>, 209 Ct. Cl. 446, 534 F.2d 889, 904 (1976))); <u>Kuwait Pearls Catering Co., WLL v. United States</u>, 145 Fed. Cl. 357, 369 (2019) (quoting <u>United States v. Weld</u>, 127 U.S. at 57; <u>Wood v. United States</u>, 961 F.2d at 199; <u>Hughes Aircraft Co. v. United States</u>, 534 F.2d at 903-04).

Plaintiffs, in their supplemental brief, argue that a provision of the Internal Revenue Code, I.R.C. § 7422, creates an exception to 28 U.S.C. § 1502 and "provides this Court jurisdiction to hear the tax refund suit based upon the proper interpretation of the French Treaty." (alteration added). In its supplemental brief, defendant agrees that I.R.C. § 7422 provides a statutory exception to the jurisdictional bar imposed by 28 U.S.C. § 1502, and, therefore, "the jurisdictional bar does not apply." (citing <u>McManus v. United States</u>, 130 Fed. Cl. 613, 620 n.16 (2017); <u>De Archibold v. United States</u>, 57 Fed. Cl. 29, 32 n.6 (2003); <u>Sarkisov v. United States</u>, 95 A.F.T.R.2d 2005-738 (Fed. Cl. 1994)). The statute at I.R.C. § 7422 provides, in relevant part, that a tax refund "suit or proceeding may be maintained against the United States notwithstanding the provisions of section 2502 of title 28 of the United States Code (relating to aliens' privilege to sue) and <u>notwithstanding the provisions of section 1502 of such title 28</u> (relating to certain treaty cases)." I.R.C. § 7422(f)(1) (2018) (emphasis added). Because the statute at I.R.C. § 7422(f)(1) expressly provides an exception to the jurisdictional bar on treaty-based claims "by Act of Congress," <u>see</u> 28 U.S.C. § 1502, which is applicable to this case as also agreed to by the parties, jurisdiction for this court exists to hear plaintiffs' treaty-based claim.

**The Parties' Cross-Motions for Partial Summary Judgment**

Before the court are the parties' cross-motions for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) (2021). RCFC 56 is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a) (alteration added); Fed. R. Civ. P. 56(a)

(2023); see also Young v. United Parcel Serv., Inc., 575 U.S. 206, 231 (2015); Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Anderson v. United States, 23 F.4th 1357, 1361 (Fed. Cir. 2022); Shell Oil Co. v. United States, 7 F.4th 1165, 1171 (Fed. Cir. 2021); Authentic Apparel Grp., LLC v. United States, 989 F.3d 1008, 1014 (Fed. Cir. 2021); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Capitol Indem. Corp. v. United States, 162 Fed. Cl. 388, 397 (2022); King v. United States, 159 Fed. Cl. 450, 461 (2022); Desert Sunlight 250, LLC v. United States, 157 Fed. Cl. 209, 222 (2021).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011). Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); BASF Corp. v. SNF Holding Co., 955 F.3d 958, 963 (Fed. Cir. 2020); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Trust v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. 607, 611 (2011); Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or

whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health & Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. 315, 316 (2012). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; 3rd Eye Surveillance, LLC v. United States, 151 Fed. Cl. 49, 54 (2020) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587); Pfizer Inc. v. United States, 149 Fed. Cl. 711, 715 (2020) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

Summary judgment, however, will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248 (alteration added); see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Lab'ys., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587-88; Dethmers Mfg. Co., Inc. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; and Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266-67 (Fed. Cir. 2008); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 807 (Fed. Cir. 1999). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States,

584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; Univ. South Florida v. United States, 146 Fed. Cl. 274, 280 (2019).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co., Inc. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968-69; Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Massey v. Del Lab'ys., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010), aff'd, 814 F.3d 1299 (Fed. Cir. 2015); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378 (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Beard v. United States, 125 Fed. Cl. 148, 156 (2016); Two Shields v. United States, 119 Fed. Cl. 762, 775 (2015), aff'd sub nom. Ramona Two Shields v. United States, 820 F.3d 1324 (Fed. Cir. 2016).

The parties' dispute in the current case concerns whether plaintiffs are allowed under the terms of certain provisions of the I.R.C. and the 1994 Treaty, as amended, a foreign tax credit against the United States net investment income tax. As explained above, both I.R.C. §§ 27 and 901(a) restrict foreign tax credits to apply only against taxes imposed by Chapter 1 of the I.R.C., the statute at I.R.C. § 27 provides that "[t]he amount of taxes imposed by foreign countries and possessions of the United States shall be allowed as a credit against the tax imposed by this chapter," Chapter 1 of the I.R.C., see I.R.C. § 27 (alteration added), and the statute at I.R.C. § 901(a) also provides that "the tax imposed by this chapter," Chapter 1 of the I.R.C., shall "be credited" with foreign tax credits. See I.R.C. § 901(a). The net investment income tax, however, is imposed by the statute at I.R.C. § 1411, which, as explained above, is located in Chapter 2A of the I.R.C. and is the sole statutory section in Chapter 2A. As a result, by their terms, I.R.C. §§ 27 and 901(a) do not provide for foreign income taxes from applying against the net

investment income tax, because I.R.C. §§ 27 and 901(a) restrict foreign tax credits to apply only against taxes imposed by Chapter 1 of the I.R.C., which is not the case for the net investment income tax imposed by I.R.C. § 1411.

In their motion for partial summary judgment, plaintiffs argue that the net investment income tax at issue in this case "is an income tax, imposed using concepts identical to those already contained in Chapter 1 of the normal income tax provisions, and meets the definition in the Code for a tax on income as that concept is understood in the foreign tax credit provisions." (citing Treas. Reg. §§ 1.901-2(b)(4), 1.1411-1(a)). Plaintiffs argue that, because the net investment income tax is a United States income tax, it is covered by the 1994 Treaty, as amended. Plaintiffs contend that

> Article 2(1)(a) of the French Treaty defines the types of U.S. taxes to which it [the 1994 Treaty, as amended] applies. This article provides that, in the case of the United States, the treaty covers, inter alia "(i) the Federal income taxes imposed by the Internal Revenue Code (but excluding social security taxes) * * *." Although the NIIT [net investment income tax] did not yet exist at the time of the ratification of the French Treaty, Article 2(2) contemplates the eventuality of new taxes by providing that "[t]he Convention shall apply also to any identical or substantially similar taxes that are imposed after the date of the signature of the Convention in addition to, or in place of, the existing taxes." As a result, the NIIT is a covered income tax under the French Treaty.

(third alteration and ellipsis in original). Plaintiffs, therefore, claim that the 1994 Treaty, as amended, provides a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, in Chapter 2A of the I.R.C., notwithstanding the restrictions in I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C. In their motion for partial summary judgment, plaintiffs agree that "absent application of the French Treaty, the Code would not provide for a foreign tax credit to offset the NIIT and instead would result in double taxation of the same income."

Defendant argues that the net investment income tax is imposed by the statute at I.R.C. § 1411, which is "in Chapter 2A [of the I.R.C.], a newly-created chapter entitled 'Unearned Income Medicare Contribution'" and that "[b]ecause the tax imposed by § 1411 on net investment income is not a Chapter 1 tax, the text and structure of the Code make clear that foreign tax credits are not allowed against it." (alterations added). Defendant states that "as they must, plaintiffs concede here that the 'U.S. domestic provisions of the Code . . . preclude a foreign tax credit for the NIIT.'" (ellipsis in original).

In order to avoid the restrictions of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C., plaintiffs, however, argue that "two separate provisions of the French Treaty," paragraphs 2(a) and 2(b) of Article 24 of the 1994 Treaty, as amended, each allow for a foreign tax credit against the net investment income tax. As described above, the renumbered paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, provides:

2.(a) In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or a resident of the United States as a credit against the United States income tax:

(i) the French income tax paid by or on behalf of such citizen or resident; and

(ii) in the case of a United States company owning at least 10 percent of the voting power of a company that is a resident of France and from which the United States company receives dividends, the French income tax paid by or on behalf of the distributing corporation with respect to the profits out of which the dividends are paid.

Plaintiffs refer to the language in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, "the provisions and . . . the limitations of the law of the United States," (ellipsis added), which plaintiffs argue "refers to [I.R.C.] Section 904[23] principles regarding the amount of the foreign tax credit and not something broader." (alteration and footnote added).

The second provision relied on by plaintiffs, paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, provides, in relevant part:

(b) In the case of an individual who is both a resident of France and a citizen of the United States:

(i) the United States shall allow as a credit against the United States income tax the French income tax paid after the credit referred to in subparagraph (a)(iii) of paragraph 2.[24] However, the credit so

---

[23] As explained above, the statute at I.R.C. § 904 is titled "Limitation on credit" and provides detailed limitations on the application of foreign tax credits under the I.R.C., which limitations are not at issue in the above captioned case. See I.R.C. § 904.

[24] Plaintiffs quote paragraph 2(b)(i) of Article 24 of the 1994 Treaty, as amended, as including a reference to "subparagraph (a)(iii) of paragraph 1" of Article 24 of the 1994 Treaty, as amended, as opposed to the reference to "subparagraph (a)(iii) of paragraph 2" included in the court's quotation above. The 1994 Treaty as originally agreed-to by the United States and France contains the language "subparagraph (a)(iii) of paragraph 2" of the 1994 Treaty, as amended. See 1994 Treaty, art. 24, ¶ 1(b)(i). As noted above, the 2009 Protocol amended Article 24 of the 1994 Treaty such that "paragraph 1 shall be renumbered paragraph 2, and paragraph 2 shall be renumbered paragraph 1," in effect reversing the order of paragraphs 1 and 2 of Article 24 of the 1994 Treaty. See 2009 Protocol, art. VIII, ¶ 1. Accordingly, after the 2009 Protocol, the text of the renumbered paragraph 2(b)(i) of Article 24 of the 1994 Treaty, as amended, should have referred to "subparagraph (a)(iii) of paragraph 1," which is how plaintiffs quote that provision. The "consolidated" 1994 Treaty, as amended, reverses the order of paragraphs 1 and 2 of the

> allowed against United States income tax shall not reduce that portion of the United States income tax that is creditable against French income tax in accordance with subparagraph (a)(iii) of paragraph 2;
>
> (ii) income referred to in paragraph 2 and income that, but for the citizenship of the taxpayer, would be exempt from United States income tax under the Convention, shall be considered income from sources within France to the extent necessary to give effect to the provisions of subparagraph (b)(i). The provisions of this subparagraph (b)(ii) shall apply only to the extent that an item of income is included in gross income for purposes of determining French tax. No provision of this subparagraph (b) relating to source of income shall apply in determining credits against United States income tax for foreign taxes other than French income tax as defined in subparagraph (e).[25]

(footnotes added). Drawing a distinction between the wordings of the two treaty provisions upon which they rely, plaintiffs point out that "Article 24(2)(b) neither contains nor refers to the Article 24(2)(a) limitations."

Defendant argues that neither paragraph 2(a) nor paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, provides a foreign tax credit against the net investment income tax. With respect to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, defendant argues that "the [1994] Treaty[, as amended,] provides for relief from double taxation in the form of a foreign tax credit, and the extent of a taxpayer's eligibility for that foreign tax credit is determined in accordance with the Code," (alterations added), including the restriction of I.R.C. §§ 27 and 901(a) to applying foreign tax credits only against taxes "imposed by this chapter," Chapter 1 of the I.R.C. <u>See</u> I.R.C. §§ 27, 901(a). With respect to paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, defendant

---

1994 Treaty, consistent with the 2009 Protocol, however, the "consolidated" version erroneously retains the language "subparagraph (a)(iii) of paragraph 2" from the unamended 1994 Treaty. There is no "subparagraph (a)(iii) of paragraph 2" in Article 24 of the 1994 Treaty, as amended.

[25] In the "consolidated" version of the 1994 Treaty, as amended, which, as noted above, came from the website of the Embassy of France in the United States, although it is no longer available at that website, subparagraph 2(b)(ii) of Article 24 ends with the words "subparagraph (e). And[.]" (capitalization in original; alteration added). The inclusion of a period and the capitalized word "And" appears to be a typographical error in the "consolidated" version of the 1994 Treaty, as amended. In the original 1994 Treaty the corresponding paragraph ends "subparagraph (e); and[.]" <u>See</u> 1994 Treaty, art. 24, ¶ 1(b)(ii) (alteration added). The differences are that the "consolidated" version of the 1994 Treaty, as amended, capitalized "And" and replaced the semicolon after "(e)" with a period. These changes in the "consolidated" version are in error and are not a product of the amendments to the 1994 Treaty made by the 2004 and 2009 Protocols.

argues that "[t]o construe subsection 2(b) to sanction such bold departures from the foreign-tax-credit framework under U.S. law would frustrate the policy foundation on which the framework was built." (alteration added). This court, therefore, must consider whether, by the terms of the 1994 Treaty, as amended, plaintiffs are entitled to take a foreign tax credit for their French income taxes against the net investment income tax imposed by I.R.C. § 1411. Also at issue are which provisions of the 1994 Treaty, as amended, namely paragraphs 2(a) and 2(b) of Article 24, could provide such a foreign tax credit, and whether the language of paragraphs 2(a) and 2(b) of Article 24 of the 1994 Treaty, as amended, potentially conflict with two provisions of the I.R.C., I.R.C. §§ 27 and 901(a), which allow United States taxpayers to take foreign tax credits on their United States tax returns only against the taxes imposed by Chapter 1 of the I.R.C., given that the net investment income tax is imposed by I.R.C. § 1411, located in Chapter 2A of the I.R.C.

Defendant argues that, rather than this court conducting an independent interpretation of the 1994 Treaty, as amended, the court should afford deference to the United States' interpretation of the 1994 Treaty, as amended. According to defendant, "[t]he Treasury Department has consistently interpreted both article 24(2)(a) of the Treaty, and the model U.S. treaty[26] on which it was based, to provide for foreign tax credits against U.S. income taxes only to the extent that the Internal Revenue Code allows such credits." (alteration and footnote added). Defendant quotes the United States Supreme Court's decision in <u>Sumitomo Shoji America, Inc. v. Avagliano</u>, 457 U.S. 176, 184-85

---

[26] In support of the United States' interpretation of the 1994 Treaty, as amended, defendant cites to three United States model tax treaties produced by the United States Treasury Department which are "dated 1981, 1996, and 2006," as well as technical explanations of the model treaties, also produced by the United States Treasury Department, which documents defendant claims "informed treaty negotiations between the United States and France." Defendant provides no evidence for its claim that the model treaties and their accompanying technical explanations, which set forth the United States' interpretations of the model treaties, "informed" the negotiations of the 1994 Treaty, the 2004 Protocol, or the 2009 Protocol when those agreements were negotiated by the United States and France. Defendant argues that because the most recent protocol between the Government of the United States and the Government of the French Republic, the 2009 Protocol, postdates the United States' creation and interpretation of the 2006 model treaty, the court should infer that the French Government assented to the United States' interpretation of the 2006 model treaty as controlling on the meaning of the 1994 Treaty, as amended. The model treaties relied on by defendant, however, were produced by only one government, the United States, and therefore represent only the United States' view of the language contained in the 2006 model treaty. As the court explains in this Opinion, the interpretation of treaties involves giving effect to the shared expectations of the sovereign authorities which have entered into agreement with one another. <u>See, e.g.</u>, <u>Air France v. Saks</u>, 470 U.S. 392, 399 (1985). Defendant provides no citation to any authority by which the United States Department of the Treasury may unilaterally determine the meaning of treaties with foreign governments by interpreting the terms of a model treaty, however similarly worded the model treaty may be to a treaty under consideration.

(1982), for the proposition that "'[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.'" (alteration in original) (citing Kolovrat v. Oregon, 366 U.S. 187, 194 (1961)). Defendant further argues that "when the U.S. and France executed two protocols [the 2004 and 2009 Protocols] amending the original 1994 convention, they left undisturbed the requirement [in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended,] that U.S. foreign tax credits be given 'in accordance with the provisions of U.S. law,' demonstrating an acquiescence by France in the Treasury Department's prior explanation of the function of article 24(2)(a)." (alterations added) (citing Adams Challenge (UK) Ltd. v. Comm'r, 156 T.C. 16, 53-54 (2021)). Defendant relies upon the United States Treasury Department's Technical Explanation of the 1994 Treaty to demonstrate the United States' interpretation, and defendant argues that "[w]hile courts sometimes decline to follow treaty interpretations reflected in technical explanations prepared by Treasury, they generally do so only when there is reason to doubt whether the documents reflect official U.S. policy." (alteration added) (citing Snap-On Tools, Inc. v. United States, 26 Cl. Ct. 1045, 1070 (1992), aff'd, 26 F.3d 137 (Fed. Cir. 1994)). In addition, defendant cites the Federal Circuit's opinion in Xerox Corp. v. United States to argue that the Federal Circuit "disregarded 'a position taken by Treasury' in the technical explanation, where the Senate executive report had criticized it," (alteration added), however, according to defendant, "the Federal Circuit recognized that 'extrinsic material is often helpful in understanding the treaty and its purposes.'" (quoting Xerox Corp. v. United States, 41 F.3d 647, 652 (Fed. Cir. 1994)).

Plaintiffs, however, argue that the court should not defer to the United States' interpretation of the 1994 Treaty, as amended. Plaintiffs argue that courts do not afford deference "when the Executive Branch's interpretation is not supported by negotiating history, diplomatic communications or the method by which the other sovereign has interpreted the treaty." (citing Nat'l Westminster Bank, PLC v. United States, 512 F.3d 1347 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Eshel v. Comm'r, 831 F.3d 512, 521 (D.C. Cir. 2016); Iceland S.S. Co., Ltd.-Eimskip v. United States Dep't of Army, 201 F.3d 451 (D.C. Cir. 2000); North West Life Assur. Co. of Canada v. Comm'r, 107 T.C. 363, 379 (1996)). Plaintiffs additionally argue that "'where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights that may be claimed under it, the more liberal interpretation is to be preferred.'" (quoting United States v. Stuart, 489 U.S. 353, 368 (1989) (internal quotations omitted), and citing Jordan v. Tashiro, 278 U.S. 123, 128 (1928)). Therefore, plaintiffs argue, because the 1994 Treaty, as amended, "has as one of its principal purposes to avoid" double taxation of citizens of one signatory country residing in the other, "the French Treaty should be read in a way to avoid that evil, not to perpetuate it."

The Supreme Court has held that "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 184-85 (alteration added). The Supreme Court guidance, however, did not indicate that absolute deference is required to the position taken by the United States, but

rather that appropriate deference should be considered on a case-by-case basis, including in the current case. According to the Supreme Court:

> "It is our 'responsibility to read the treaty in a manner "consistent with the *shared* expectations of the contracting parties."' . . . Even if a background principle is relevant to the interpretation of federal statutes, it has no proper role in the interpretation of treaties unless that principle is shared by the parties to 'an agreement among sovereign powers[.]'"

Lozano v. Montoya Alvarez, 572 U.S. 1, 12 (2014) (emphasis in original; alteration and ellipsis added) (quoting Olympic Airways v. Husain, 540 U.S. 644, 650 (2004) (quoting Air France v. Saks, 470 U.S. 392, 399 (1985)); Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. 217, 226 (1996)); see also Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 185 ("When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation."). Therefore, "an agency's position merits less deference 'where an agency and another country disagree on the meaning of a treaty.'" See Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1358 (quoting Iceland S.S. Co., Ltd.-Eimskip v. United States Dep't of Army, 201 F.3d at 458). The United States Court of Appeals for the Federal Circuit also has explained that "effect must be given to the intent of both signatories" to a treaty. See id. at 1353 (citing Xerox Corp. v. United States, 41 F.3d at 656).

In the above captioned case, defendant has tried to rely on interpretations issued by the United States Treasury Department of the 1994 Treaty, as amended, as indicating that the 1994 Treaty, as amended, does not provide a foreign tax credit against the net investment income tax. Defendant has not, however, presented evidence regarding the interpretation held by the Government of the French Republic with respect to this issue regarding a foreign tax credit against the net investment income tax. Moreover, the parties agree that no evidence has been produced regarding the Government of the French Republic's interpretation of the 1994 Treaty, as amended, in relation to the foreign tax credit issue presented by plaintiffs' claims.

Without evidence as to the Government of the French Republic's interpretation of the 1994 Treaty, as amended, with respect to the foreign tax credit issue currently before the court, this court cannot afford total deference to the United States' interpretation, because the United States cannot demonstrate that defendant's interpretation is shared by the Government of the French Republic. As the Federal Circuit explained in National Westminster Bank, "when the language of a treaty provision 'only imperfectly manifests its purpose,'" the court is "required to give effect to its underlying purpose," and "[t]o this end," the court "must 'examine not only the language, but the entire context of agreement.'" Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1353 (quoting Great-West Life Assur. Co. v. United States, 230 Ct. Cl. 477, 481, 678 F.2d 180, 183 (1982) (citing In re Ross, 140 U.S. 453, 475 (1891))). The United States Supreme Court has addressed what may be considered within "the entire context of agreement," see Great West Life Assur. Co. v. United States, 230 Ct. Cl. at 481, including the public acts

of signatory governments. See United States v. Reynes, 50 U.S. (9 How.) 127, 147-148 (1850) (considering "the public acts and proclamations of the Spanish and French governments, and those of their publicly recognized agents, in carrying into effect those treaties" to which Spain and France were signatories). The Supreme Court also has held that negotiations and diplomatic correspondence, both prior to and after, a treaty or international agreement was executed, may be considered. See Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 183-84 and n.9 (considering a diplomatic cable "relaying the position of the Ministry of Foreign Affairs of Japan" and a later communication in which "'[t]he Government of Japan reconfirms its view'" (alteration added)); Factor v. Laubenheimer, 290 U.S. 276, 294-95 (1933) ("In ascertaining the meaning of a treaty we may look beyond its written words to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter, and to their own practical construction of it." (citing Nielsen v. Johnson, 279 U.S. 47, 52 (1929); Terrace v. Thompson, 263 U.S. 197, 223 (1923); United States v. Texas, 162 U.S. 1, 23 (1896); Kinkead v. United States, 150 U.S. 483, 486 (1893); In re Ross, 140 U.S. at 467)); Cook v. United States, 288 U.S. 102, 109, 112-15 nn.6-7, nn. 10-15 (1933) (explaining that "[i]n construing the Treaty its history should be consulted" including "note[s]" between diplomatic officials, "repl[ies] to "question[s]," "statement[s] of the American position," and "letter[s]" and other communications from the British Government (alterations added)); Todok v. Union State Bank of Harvard, Neb., 281 U.S. 449, 454 (1930) (considering "a note addressed by the Swedish Minister at Washington to the Department of State" in which "the Swedish Minister stated his understanding that the authorities in Sweden had always held that the words 'goods and effects' in article 6 of the treaty of 1783 include real estate"); Nielsen v. Johnson, 279 U.S. at 52 ("When their [treaties'] meaning is uncertain, recourse may be had to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter and to their own practical construction of it." (alteration added) (citing Terrace v. Thompson, 263 U.S. at 223; United States v. Texas, 162 U.S. at 23; Kinkead v. United States, 150 U.S. at 486; In re Ross, 140 U.S. at 467)); Terrace v. Thompson, 263 U.S. at 223 ("But if the language left the meaning of its provisions doubtful or obscure, the circumstances of the making of the treaty . . . would resolve all doubts against the appellants' contention." (ellipsis added)); United States v. Texas, 162 U.S. at 23 ("Before examining those articles [of the treaty], it will be useful to refer to the diplomatic correspondence that preceded the making of the treaty." (alteration added)).

Reliance by a court on evidence of the shared expectations of the signatory governments to a treaty or international agreement is exemplified by the Coplin cases and the decisions of the United States Claims Court, United States Court of Appeals for the Federal Circuit, and United States Supreme Court. See Coplin v. United States, 6 Cl. Ct. 115 (1984), rev'd, 761 F.2d 688 (Fed. Cir. 1985), aff'd on other grounds sub nom., O'Connor v. United States, 479 U.S. 27 (1986). In Coplin, the United States Claims Court, a predecessor court to this court, addressed the interpretation of an "Implementation Agreement" to the Panama Canal Treaty and negotiated in parallel with the Panama Canal Treaty between the United States and the Republic of Panama. See Coplin v. United States, 6 Cl. Ct. at 119. At issue in Coplin, similar to the above captioned case, was taxation of United States citizens in a foreign country pursuant to an international

agreement or treaty which addressed such taxation. See id. at 120 (considering the language in the Implementation Agreement to the Panama Canal Treaty which read: "*United States citizen employees and dependents shall be exempt from any taxes, fees, or other charges on income received as a result of their work for the Commission*" (emphasis in original)). While the United States Claims Court in Coplin explained that a court should not "give literal effect to treaty language if it is persuaded that such language does not reflect the intention of the high contracting parties," the court noted that "[w]here the language is reasonably clear, the party proffering a contrary interpretation must persuade the court that its construction comports with the view of *both* parties" to the treaty. See id. at 128 (emphasis in original; alteration added) (citing Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 180; United States v. Texas, 162 U.S. at 36). The United States Claims Court in Coplin emphasized that "there is *no evidence whatsoever* as to the interpretation given this language by Panama" and that "[w]hile the record provides valuable insights as to the interests and motivations of the parties, the court is left largely to surmise and conjecture as to how they resolved their differences and what might have motivated each side to agree to the language finally adopted." Id. at 128-29 (emphasis in original; alteration added). The Claims Court in Coplin did not afford deference to the United States' interpretation, stating that "nothing presented by defendant supports the finding that Panama and the United States 'intended to agree on something different from that appearing on the face of' Article XV of the Implementation Agreement" and that "'[w]ithout such a finding the agreement must be interpreted according to its unambiguous language.'" Id. at 145 (alteration added) (quoting Choctaw Nation of Indians v. United States, 318 U.S. 423, 432 (1943)).

A panel of five judges of the United States Court of Appeals for the Federal Circuit reversed the Claims Court's decision in Coplin on narrow grounds. See Coplin v. United States, 761 F.2d 688, 691-92 (Fed. Cir. 1985), aff'd on other grounds sub nom., O'Connor v. United States, 479 U.S. 27 (1986). The Federal Circuit explained that, immediately prior to hearing oral argument in the appeal to the Federal Circuit of Coplin, the United States provided the Federal Circuit with a diplomatic note from the Panamanian Foreign Minister, containing "letters from the Panamanian team that negotiated the Implementation Agreement," which "confirmed" that Panama shared the United States' interpretation of the Implementation Agreement provisions at issue. See id. at 691. The Panamanian Foreign Minister's diplomatic note was dated after the United States Claims Court's earlier decision in Coplin had been issued, and, therefore, the diplomatic note was not available to the Claims Court at the time of the Claims Court's decision. See id. The Federal Circuit cited to the Supreme Court's decisions in United States v. Reynes, 50 U.S. (9 How.) at 147-48, Jones v. United States, 137 U.S. 202, 214-16 (1890), Factor v. Laubenheimer, 290 U.S. at 295, and Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. at 184 n.9, considering diplomatic correspondences and public acts of signatory governments to international agreements and treaties, and held that the Panamanian diplomatic note should be considered. See Coplin v. United States, 761 F.2d at 691. Relying on the Panamanian Foreign Minister's diplomatic note's expression of the Panamanian Government's interpretation of the Implementation Agreement, the Federal Circuit held that "the record now reveals the intent of each government," and because the

governments' interpretations of the Implementation Agreement were aligned, the judgment of the Claims Court was reversed. See id. at 692.

The United States Supreme Court affirmed the United States Court of Appeals for the Federal Circuit's Coplin decision on other grounds in O'Connor v. United States, 479 U.S. 27 (1986). As the Supreme Court explained, while "[t]here is some purely textual evidence, albeit subtle" in support of the United States' interpretation of the Implementation Agreement, "[m]ore persuasive than the textual evidence, and in our view overwhelmingly convincing, is the contextual case" for the United States' interpretation. See id. at 31 (alterations added). The Supreme Court further held that the United States' interpretation was

> in accord with the consistent application of the Agreement by the Executive Branch—a factor which alone is entitled to great weight, see Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85, 102 S. Ct. 2374, 2379, 72 L. Ed. 2d 765 (1982)—but that application has gone unchallenged by Panama.

O'Connor v. United States, 479 U.S. at 33. According to the Supreme Court, Panama "did not object" to the United States' interpretation. See id. The Supreme Court in O'Connor explained that "[t]he course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning." Id. (alteration added) (citing Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 259-60 (1984); Pigeon River Imp., Slide & Boom Co. v. Charles W. Cox, Ltd., 291 U.S. 138, 158-61 (1934)). In a footnote to its decision in O'Connor, the Supreme Court addressed the Panamanian Foreign Minister's diplomatic note and described the parties' views of the note, but the Supreme Court concluded, "[s]ince we would sustain the Government's position without reference to the note, we need not resolve these disputes." See id. at 33 n.2 (alteration added).

The various precedential cases of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit direct that, in the above captioned case, for the United States' interpretation of the 1994 Treaty, as amended, to be afforded deference by this court, the United States' interpretation should be a shared interpretation by the French Government, because the court must give effect to the "shared expectations" of the signatory governments. As discussed by several cases above, including Air France v. Saks, "it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." Air France v. Saks, 470 U.S. at 399 (citing Reed v. Wiser, 555 F.2d 1079, 1090 (2d Cir. 1977); Day v. Trans World Airlines, Inc., 528 F.2d 31 (2d Cir. 1975)). As described above, neither party has produced any materials from the Government of the French Republic offering France's interpretation of the terms of the 1994 Treaty, as amended, with respect to the application of foreign tax credits against the United States net investment income tax. Moreover, there is no evidence before the court which indicates that the United States and France have engaged in diplomatic consultation with respect to the taxation issues presented by plaintiffs' claim for a foreign tax credit against the net investment income

tax imposed by I.R.C. § 1411, or that France was notified of the post-1994 Treaty, as amended, enactment of the net investment income tax at I.R.C. § 1411.[27]

While defendant argues that the Government of the French Republic has acquiesced to the United States' interpretation that foreign tax credits are exempted from the foreign tax credits allowed by the 1994 Treaty, as amended, no such inference can be drawn from the lack of evidence in the current case before the court. See O'Connor v. United States, 479 U.S. at 33. The Supreme Court in O'Connor observed that the Panamanian Government had not objected to the United States subjecting Panamanian citizens to United States income tax, which failure to object the Supreme Court understood as evidence of the Implementation Agreement's "meaning" consistent with the United States' interpretation. See id. In O'Connor, there was an opportunity for Panama to object, if Panama disagreed with the United States' interpretation. See id. In the above captioned case, however, there is no such certainty that France had an opportunity to object, or did object, to the United States' interpretation of the 1994 Treaty, as amended, with respect to the net investment income tax question at issue in the case before this court. This is, in part, because, as noted above, there is no evidence in the record before this court that the United States "notified" the Government of the French Republic of the enactment of the net investment income tax, as contemplated by the 1994 Treaty, as amended, and, as indicated above, I.R.C. § 1411 was enacted after the 1994 Treaty, as amended, was agreed to by the respective governments. Therefore, the court should not infer from the absence of an indication of the Government of the French Republic's interpretation that France agrees with the interpretation offered by the United States of the 1994 Treaty, as amended. The court does not assume that the interpretation of the 1994 Treaty, as amended, by the United States represents "the shared expectations of the contracting parties," see Air France v. Saks, 470 U.S. at 399, and the court does not give deference to the United States' interpretation that the 1994 Treaty, as amended, should exclude the net investment income taxes from the foreign tax credits available. The court does not afford deference to the United States' interpretation based on the non-binding interpretative documents which defendant cites to this court, namely the United States Treasury Department Technical Explanations of the 1994 Treaty, 2004 Protocol, and 2009 Protocol, and the United States Treasury Department's model treaties and accompanying technical explanations, because the technical explanations and model treaties represent only the United States' interpretation, and not the interpretation of the French Government.

---

[27] Plaintiffs allege, without further support in the record before the court, in their motion for partial summary judgment that they submitted "a Freedom of Information Act request," to which defendant responded and "confirmed that no discussions took place between the U.S. and French Governments at the time the NIIT was enacted and, after exhaustive discovery, Defendant has produced no evidence of any communications with the French Government that accords with the Defendant's treaty interpretation." (capitalization in original).

**The Parties' Arguments With Respect to Treaty Interpretation Standards**

The court ordered specific briefing from the parties in this case on the issue of determining whether a potential conflict might exist between the relevant treaty provisions and United States statutory sections, and if so, how the court should resolve that potential conflict. Plaintiffs state that they are "not aware of any case law that provides a comprehensive definition of when such a conflict exists, but there are clear standards as to when such a conflict does not exist," namely that "[a] conflict may arise only when it is not possible to harmonize inconsistent statutory and treaty provisions." (alteration added). Plaintiffs argue that "[w]hen provisions of a treaty and of a statute appear inconsistent, the Supreme Court has repeatedly held that, if possible, the two provisions should be harmonized to the maximum extent possible to avoid an actual conflict." (alteration added) (citing Weinberger v. Rossi, 456 U.S. 25, 32 (1982); Moser v. United States, 341 U.S. 41, 45 (1951); United States v. Lee Yen Tai, 185 U.S. 213, 221-22 (1902); Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804)). Moreover, plaintiffs quote from the United States Claims Court's decision in Snap-On Tools, Inc. v. United States, 26 Cl. Ct. 1045, to state that "'when the two [the treaty and the statute] are inconsistent, or irreconcilable, the last in time should take precedence.'" (alteration added) (quoting Snap-On Tools, Inc. v. United States, 26 Cl. Ct. at 1067). Plaintiffs argue that "there is no language in either the NIIT statutory provisions or any legislative history suggesting that the enactment of the NIIT was intended to modify any United States' treaty obligations." According to plaintiffs, "when a treaty obligation applies, reciprocal rights that can be harmonized with the Code are created" under which "the United States must allow a foreign tax credit to offset the NIIT based upon which country has primary taxing rights under the French Treaty on the income giving rise to the NIIT." Plaintiffs further argue that "[a]llowing for a foreign tax credit under the French Treaty gives full effect to both the Code (because no statutory-based credit is given) and the treaty (because a treaty-based credit is given)." (alteration added).

In response, defendant cites to Breard v. Greene, 523 U.S. 371, 376 (1998), and Kappus v. Commissioner of Internal Revenue, 337 F.3d 1053, 1058-60 (D.C. Cir. 2003), and quotes the Supreme Court's decision in Whitney v. Robertson, 124 U.S. 190, 194-95 (1888), to argue that "the Supreme Court established a last-in-date rule to resolve conflicts between statutes and treaties," such that "'[t]*he duty of the courts is to construe and give effect to the latest expression of the sovereign will.*'" (emphasis in original; alteration added). Defendant argues, however, that "the last-in-date rule applies only when a statute and a treaty conflict—i.e., when courts are not able to 'construe them to give effect to both' without 'violating the language of either.'" (quoting Whitney v. Robertson, 124 U.S. at 194). Defendant quotes the decision of the United States Tax Court in Adams Challenge (UK) Ltd. v. Commissioner to argue that "'[t]o carry out the process of harmonization, courts construe earlier and later provisions in a way that is consistent with the intent of each and that results in an absence of conflict between the two.'" (alteration added) (quoting Adams Challenge (UK) Ltd. v. Comm'r, 156 T.C. at 45 (internal quotations omitted)). Moreover, defendant argues that "plaintiffs' contention that the Internal Revenue Code cannot override a tax treaty absent an express statement of Congressional intent to do so has already been rejected by Congress," and defendant

quotes I.R.C. § 7852, "Other applicable rules," which states at paragraph (d), "**Treaty obligations**" (emphasis in original), in relevant part, "'[f]or purposes of determining the provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status by reason of its being a treaty or law.'" (alteration in original) (quoting I.R.C. § 7852(d)(1)). Defendant contends that "[w]hen Congress enacts a statute whose terms are inconsistent with a prior treaty, the text of the statute is sufficient to demonstrate the intent of Congress to override the treaty." (alteration added). According to defendant, "[h]armonization does not put a thumb on the scale in favor of the Treaty [in this case the 1994 Treaty, as amended,] or the Code, or in favor of the more lenient or the more restrictive," but rather, harmonization "examines the language and the intent of the statute and the treaty and considers whether they may be fairly construed in a way that results in an 'absence of conflict.'" (alterations added) (quoting <u>Adams Challenge (UK) Ltd. v. Comm'r</u>, 156 T.C. at 45). Defendant argues, based on the supposed principle that tax credits "'are a matter of legislative grace,'" (quoting <u>Phila. Energy Sols. Refin. & Mktg., LLC v. United States</u>, 159 Fed. Cl. 230, 236, <u>appeal filed</u>, No. 2022-1834 (Fed. Cir. May 27, 2022)), that "if it ever became necessary for the Court to apply a tie breaker to decide between two equally plausible interpretations of the Treaty—one allowing a tax credit and the other disallowing a credit—the tax credit should be denied consistent with domestic-law tax-credit principles." Defendant argues that, in the above captioned case, "the Treaty and the Code work in harmony" and that interpreting the 1994 Treaty, as amended, to allow a foreign tax credit against the net investment income tax "would conflict directly with [I.R.C.] §§ 27 and 901(a), which explicitly provide that foreign tax credits may reduce *only* taxes imposed 'by this chapter,'" <u>i.e.</u>, Chapter 1 of the I.R.C. (emphasis in original; alteration added).

In their briefs and at oral argument on the cross-motions for partial summary judgment, the parties have made numerous further arguments concerning the potential conflict and overlap of the terms of the 1994 Treaty, as amended, and the statutory provisions at issue in this case, I.R.C. §§ 27 and 901(a), which restrict foreign tax credits to apply only against "the tax imposed by this chapter," Chapter 1 of the I.R.C., <u>see</u> I.R.C. §§ 27, 901(a), and whether foreign tax credits may be claimed against the net investment income tax imposed by I.R.C. § 1411, which is in Chapter 2A of the I.R.C.

Regarding the statute at I.R.C. § 1411, at issue in the current case, the United States Department of the Treasury issued Treasury Decision 9644, interpreting I.R.C. § 1411 on December 2, 2013. <u>See</u> T.D. 9644, 2013-51 I.R.B. 676.[28] Treasury Decision

---

[28] Treasury Decision 9644 was first published in the Federal Register at Net Investment Income Tax, 78 Fed. Reg. 72,393 (Dec. 2, 2013), and corrections to Treasury Decision 9644 were published in the Federal Register on April 1, 2014. <u>See</u> Net Investment Income Tax; Correction, 79 Fed. Reg. 18159 (Apr. 1, 2014). To explain the corrections to Treasury Decision 9644, the United States Treasury Department states in the corrective Federal Register document that "[a]s published, the final regulations (TD 9644) contain errors that may prove to be misleading and are in need of clarification." Net Investment Income Tax; Correction, 79 Fed. Reg. at 18159 (alteration added). The corrections provided by the Treasury Department at 79 Federal Register 18159 do not restate the entire Treasury

9644 addresses whether the net investment income tax imposed by I.R.C. § 1411 is subject to foreign tax credits, including based on tax treaties between the United States and other governments. Treasury Decision 9644 states, in relevant part:

> The Treasury Department and the IRS received comments asking whether foreign income, war profits, and excess profits taxes ("foreign income taxes") are allowed under sections 27(a) and 901 as a credit against the section 1411 tax. Under the express language of sections 27(a) and 901(a), foreign income taxes are not creditable against United States taxes other than those imposed by chapter 1 of the Code. Section 1.1411–1(e) of the final regulations clarifies that amounts that are allowed as credits only against the tax imposed by chapter 1 of the Code, including credits for foreign income taxes, may not be credited against the section 1411 tax, which is imposed by chapter 2A of the Code. This limitation is similar to the limitation applicable to a number of other credits that are allowed only against the tax imposed by chapter 1 of the Code. See, for example, section 38. The Treasury Department and the IRS also received comments asking whether United States income tax treaties may provide an independent basis to credit foreign income taxes against the section 1411 tax. The Treasury Department and the IRS do not believe that these regulations are an appropriate vehicle for guidance with respect to specific treaties. An analysis of each United States income tax treaty would be required to determine whether the United States would have an obligation under that treaty to provide a credit against the section 1411 tax for foreign income taxes paid to the other country. If, however, a United States income tax treaty contains language similar to that in paragraph 2 of Article 23 (Relief from Double Taxation) of the 2006 United States Model Income Tax Convention, which refers to the limitations of United States law (which include sections 27(a) and 901), then such treaty would not provide an independent basis for a credit against the section 1411 tax.

T.D. 9644, 2013-51 I.R.B. at 679.

Defendant relies on Treasury Decision 9644 to interpret the statute at I.R.C. § 1411 as excluding the net investment income tax from foreign tax credits. Defendant argues that Treasury Decision 9644 "determined that such [foreign] tax credits were not available, because the NIIT 'is imposed by Chapter 2A of the Code.'" (alteration added) (quoting Net Investment Income Tax, 78 Fed. Reg. at 72,396). Defendant further argues that Treasury Decision 9644 addressed "'whether United States income tax treaties may provide an independent basis to credit foreign income taxes against the section 1411 tax,'" and that, with respect to treaties containing the language found in the 1994 Treaty,

---

Decision 9644, but only the changes made thereto, and the changes made at 79 Federal Register 18159 are not relevant to the above captioned case. See Net Investment Income Tax; Correction, 79 Fed. Reg. at 18159. Accordingly, the court cites to Treasury Decision 9644 as published at Internal Revenue Bulletin No. 2013-51.

as amended, "'such treaty would not provide an independent basis for a credit against the section 1411 tax.'" (quoting Net Investment Income Tax, 78 Fed. Reg. at 72,396).

In its cross-motion for partial summary judgment, defendant argues that "the enactment of the NIIT [at I.R.C. § 1411 by the Health Care and Education Reconciliation Act of 2010] *after* the Treaty was signed in a new Chapter 2A of the Code confirms the intent of Congress to exempt the NIIT from the allowance of a foreign tax credit, and would override any potentially inconsistent relief under the Treaty." (emphasis in original; alteration added). Defendant further argues, citing Whitney v. Robertson, 124 U.S. at 194-95, that "harmonization is self-evident here, as [I.R.C.] § 1411 and the [1994] Treaty[, as amended,] are fully consistent with each another," (alterations added), because the I.R.C. "does not allow a foreign tax credit against the NIIT because it is not a Chapter 1 tax," a reference to the restriction of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against "the tax imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. §§ 27, 901(a).

Plaintiffs dispute the United States Treasury Department's analysis in Treasury Decision 9644 as applicable to the case currently before the court, arguing that the Treasury Department's

> interpretation [in Treasury Decision 9644] ignores the purpose of the French Treaty to eliminate double taxation, renders a series of inter-related treaty provisions moot, fails to harmonize the treaty with the Code provisions, and ignores the general principle established by Congress that treaty foreign tax credit entitlement is wider than that contained in the Code, unless subject to a specifically legislated treaty override.

(alteration added). Plaintiffs argue that "[t]he 'shared expectations' of the sovereigns govern the interpretation of the treaty as evidenced by the text used in the agreement, unless the result does not accord with the literal language used." (alteration added) (quoting Great-West Life Assur. Co. v. United States, 230 Ct. Cl. at 481).[29]

Plaintiffs quote from the 1994 Treaty Treasury Department Technical Explanation, described above, to support their interpretation:

> The Technical Explanation provides the rationale of the language used by Article 24(2)(a): "[t]he credits provided under the Convention are allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., **the allowance of a credit**, is retained." (Emphasis added.) This Technical Explanation then provides that "the terms of the credit are determined by the provisions of the U.S. statutory credit at the time the

---

[29] Plaintiffs' citation to Great-West Life Assurance misidentifies that decision issued by the United States Court of Claims, as a decision issued by the United States Court of Appeals for the Federal Circuit.

credit is given. The limitation of law generally limits the credit against **U.S. tax to the amount of U.S. tax due** with respect to net foreign source income within the relevant foreign tax credit limitation category (see Code Section 904(a))."

(emphasis and alteration in original; footnote omitted). Moreover, plaintiffs argue: "Enactment of the NIIT in 2010 is precisely the type of amendment contemplated by the provisions of Article 2(2) [of the 1994 Treaty, as amended,[30]] and the essential and meaningful parenthetical text of Article 24(2)(a) ensures that the general principle – that a credit is allowed for a subsequently enacted U.S. income tax – is guaranteed."[31] (footnote added).

---

[30] As described above, paragraph 2 of Article 2 of the 1994 Treaty, as amended, provides:

2. The Convention shall apply also to any identical or substantially similar taxes that are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes. The competent authorities of the Contracting States shall notify each other of any significant changes which have been made in their respective taxation laws and of any official published material concerning the application of the Convention, including explanations, regulations, rulings, or judicial decisions.

As also stated above, no "notification" as contemplated by paragraph 2 of Article 2 of the 1994 Treaty, as amended, is included in the record currently before the court. Although the relation of paragraph 2 of Article 2 of the 1994 Treaty, as amended, to paragraph 2 of Article 24 of the 1994 Treaty, as amended, is not fully explained by plaintiffs, plaintiffs state at a different point in their motion for partial summary judgment:

Although the NIIT did not yet exist at the time of the ratification of the French Treaty, Article 2(2) contemplates the eventuality of new taxes by providing that "[t]he Convention shall apply also to any identical or substantially similar taxes that are imposed after the date of the signature of the Convention in addition to, or in place of, the existing taxes." As a result, the NIIT is a covered income tax under the French Treaty.

(alteration in plaintiffs' brief).

[31] In a footnote to its cross-motion for partial summary judgment, defendant states that it

does not disagree with plaintiffs' claim (at 10-11) that the NIIT is a "covered tax" under article 2(2) of the Treaty. However, the Treaty does not by its terms require the United States to allow foreign tax credits against all covered U.S. taxes, but merely requires the United States to allow foreign tax credits in accordance with the provisions and subject to the limitations of U.S. law.

Plaintiffs also try to rely on paragraphs 2(a) and 2(b) of Article 24 of the 1994 Treaty, as amended, to contest defendant's interpretation of the net investment income tax, set forth in Treasury Decision 9644, as ineligible for foreign tax credits. As noted above, plaintiffs argue that the reference to "the provisions and . . . the limitations of the law of the United States" in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, "refers to [I.R.C.] Section 904 principles regarding the amount of the foreign tax credit and not something broader." (alteration and ellipsis added). Plaintiffs contend that the limitations on foreign tax credits imposed by I.R.C. § 904, described above, are the only "limitations" contemplated by paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, and that that the other restrictions on foreign tax credit availability, namely the restriction in I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against "the tax imposed by this chapter," Chapter 1 of the I.R.C., see I.R.C. §§ 27, 901(a), are not incorporated into the language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. As noted above, the limitations set forth in I.R.C. § 904 are not relevant to the above captioned case.

As described above, paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, includes a parenthetical reference to "the law of the United States (as it may be amended from time to time without changing the general principle hereof) . . . ." (ellipsis added). Plaintiffs argue that "[t]he 'general principle' referred to in Article 24(2)(a) [of the 1994 Treaty, as amended,] is that a credit is allowed for French income taxes against U.S. income taxes." (alterations added). Plaintiffs claim that "[t]he passage into law of a new 'United States income tax' [after the 1994 Treaty, as amended,] cannot be said to have any bearing under the treaty on whether an amount of French tax paid is a foreign income tax that is creditable per se," because "Plaintiffs' French income taxes equal to $140,398 remain eligible for a foreign tax credit against their substantive U.S. tax liability." (alterations added). Plaintiffs also claim, "[n]or does a new 'United States income tax' alter the amount of the Code Section 904 limitation – Plaintiffs did not, and could not, argue that French income taxes are creditable against, for example, U.S. source income." (alteration added). Plaintiffs further argue that if the court did not adopt plaintiffs' interpretation, that "would result in it [paragraph 2(a) of Article 24 of the 1994 Treaty, as amended,] having no independent purpose if its language is limited by the Code, rendering the position superfluous." (alteration added). According to plaintiff, "[f]or Article 24(2)(a) [of the 1994 Treaty, as amended,] to have any purpose and effect, it must be that it ensures that a foreign tax credit will be allowed against any subsequently enacted United States income tax that is covered by the French Treaty, which would include the NIIT." (alterations added).

According to plaintiffs, "the [Internal Revenue] Code need *not* expressly provide for a foreign tax credit if the foreign levy in question falls within the treaty definition of a creditable tax" because "what constitutes a United States income tax for purposes of the application of a treaty derives from the treaty's definition and not from domestic law."[32]

---

[32] Plaintiffs argue that "[w]hat constitutes a creditable foreign tax under a treaty may be broader than the Code Section 901 definition . . . ." (ellipsis added). In support of this contention, plaintiffs argue that "[t]here are numerous instances where the terms of a

(emphasis in original; alteration added). Plaintiffs argue that "[d]omestic law therefore does not constitute an absolute limitation on the rights and entitlements that may be granted to treaty beneficiaries under the terms of a U.S. tax treaty." (alteration added). Plaintiffs state that "[t]he parties agree that the NIIT constitutes a United States income tax as defined in Article 2(1) and 2(2) of the French Treaty," and, therefore, "that when a treaty provides a definition of a covered tax, it is that definition, and not the more limited definition under United States or foreign law, that is applied." (alteration added).

In addition to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, plaintiffs also argue that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, "allows a foreign tax credit for the NIIT." Plaintiffs contrast paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, with the above-discussed paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, stating that "Article 24(2)(b) neither contains nor refers to the Article 24(2)(a) limitations." Plaintiffs disagree with defendant's claim that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, in plaintiffs' language, "incorporates" the limitations language of paragraph 2(a) of the same article, arguing that "Defendant confuses the question of what French taxes are creditable with the question of what United States income taxes can be offset by creditable French taxes, which, not surprisingly, gives an illogical outcome." Plaintiffs further argue, because paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, "allows as a credit against U.S. income tax, which by definition includes the NIIT, any French income taxes 'after the credit referred to in subparagraph (a)(iii) of paragraph 1 [of Article 24 of the 1994 Treaty, as amended],'"[33] that "the Article 24(1)(a)(iii) [of the 1994 Treaty, as amended,] credit is zero

_____

bilateral treaty give a different result than would be achieved exclusively under domestic law," (alterations added), citing to a treaty between the United States and Denmark, a treaty between the United States and Italy, and a treaty between the United States and Mexico, all of which concern, among other issues, the availability of foreign tax credits against taxes imposed by the United States' respective treaty partners. Although plaintiffs may be correct that the definition of a "creditable foreign tax," to use plaintiffs' language, may have been found to be "broader" when the terms of a relevant treaty so provide, the treaties and taxes plaintiffs cite in support of this point are not presently before this court and are not determinative of the interpretation of the 1994 Treaty, as amended, between the United States and France.

[33] Plaintiff's quotation of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, contains a reference to "subparagraph (a)(iii) of paragraph 1" of the same Article 24 of the 1994 Treaty, as amended. As explained above, the "consolidated" version of the 1994 Treaty, as amended, the version in the record before the court, refers instead to "subparagraph (a)(iii) of paragraph 2" of Article 24 of the 1994 Treaty, as amended. As also explained above, the "consolidated" version's reference to paragraph 2 in this quotation is an error, as there is no subparagraph (a)(iii) of paragraph 2 of Article 24 of the 1994 Treaty, as amended. Plaintiff's quotation, referring to "subparagraph (a)(iii) of paragraph 1," accurately reflects how Article 24 of the 1994 Treaty, as amended, should read after the re-ordering of the paragraphs of Article 24 by the 2009 Protocol.

as Plaintiffs did not incur French tax on any U.S. source income," and, therefore, "the language of Article 24(2)(b) [of the 1994 Treaty, as amended,] provides that a foreign tax credit is allowed." (alterations added).

As explained above, plaintiffs agree with defendant's characterization that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, implements the second bite of the three-bite rule.[34] Plaintiffs, in a passage which also is quoted above setting forth plaintiffs' understanding of the three bite rule, indicate that "the United States retains the right to levy a 15 percent tax on the French resident U.S. citizen," which is the first bite, while France may "levy tax on any amount in excess of 15 percent," which French income tax is the second bite. As a result of the second bite French tax, according to plaintiffs, "any such French tax shall be allowed as a credit against U.S. tax" in excess of the 15 percent United States income tax assessed in the first bite. It is this allowance of a credit for French taxes against United States taxes that plaintiffs argue, in agreement with defendant, is implemented by paragraph 2(b) of Article 24 of the 1994 Treaty, as amended. Plaintiffs also state that "Article 24(2)(b)(ii) further provides that U.S. source income is considered French source 'to the extent necessary to give effect to the provisions of subparagraph (b)(i),'" which "ensures that a foreign tax credit is allowed for U.S. source income to avoid the French taxing that income (the second bite) and the U.S. taxing that same amount (the third bite)."[35]

In response to plaintiffs' argument that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, incorporates only the limitations set forth in I.R.C. § 904, defendant argues that the restrictions of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against "the tax imposed by this chapter," Chapter 1 of the I.R.C., see I.R.C. §§ 27, 901(a), applies because the "provisions" and "limitations" language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, "expressly defers to the provisions of the statute in determining when foreign tax credits may be allowed." (alteration added). According to defendant, "there are numerous provisions of the [Internal Revenue] Code and regulations that regulate the boundaries of the foreign-tax-credit framework under U.S. law," and that "[i]f the two countries had intended for [I.R.C.] § 904 to be the only relevant limitation, the [1994] Treaty[, as amended,] would have said so explicitly." (alterations added). According to defendant, "Congress intentionally placed the NIIT [in I.R.C. § 1411, in Chapter 2A] outside of Chapter 1 [of the I.R.C.], demonstrating unequivocally the intent

---

[34] As also explained above, plaintiffs and defendant disagree as to whether plaintiffs' calculations of their French income tax and United States income tax were properly conducted in light of the three-bite rule, but the parties do not appear to contest the framework of the three-bite rule.

[35] As explained above, the third bite of the three-bite rule represents the tax assessed by the United States against the taxpayer's income, after the United States' initial 15 percent tax on that income (the first bite) and France's tax on the taxpayer's income (the second bite). A tax credit is available against the third bite United States tax based on the amount of French income taxes paid in the second bite.

of Congress that the new levy be ineligible for foreign tax credits under [I.R.C.] §§ 27 and 901(a)." (alterations added).

In its briefs, defendant acknowledges that there are no documents in the record which indicate the interpretation of the 1994 Treaty, as amended, held by the Government of the French Republic regarding the tax issues relevant to plaintiffs' complaint in this court. Defendant nevertheless argues that in this case there is "no evidence that either the United States or France had any expectation that the United States would automatically apply foreign-tax credits against any and all income taxes subsequently enacted under the Code." With respect to France's understanding, defendant argues that "there is no evidence of French expectations regarding that provision [paragraph 2 of Article 24 of the 1994 Treaty, as amended] (other than the inference noted below), and nothing to suggest any disagreement by France with the interpretation of article 24(2) [of the 1994 Treaty, as amended,] expressed in the U.S. executive materials," by which defendant appears to mean the United States Treasury Department Technical Explanations of the 1994 Treaty, the 2004 Protocol, and the 2009 Protocol, as well as the model treaties and accompanying technical explanations, all prepared by the United States Treasury Department. (alterations added). Defendant urges a possible inference, however, without evidence, in the above quoted language, because "when the United States and France executed protocols amending the original 1994 convention, they left undisturbed the requirement that U.S. foreign tax credits be given 'in accordance with the provisions of U.S. law,'" which, according to defendant, demonstrated "an acquiescence by France in the Treasury Department's prior explanation of the function of article 24(2)(a)." (citing Adams Challenge (UK) Ltd. v. Comm'r, 156 T.C. at 53-54).

Defendant also argues that because paragraph 2 of Article 3 of the 1994 Treaty, as amended, provides that the United States "may apply to the Treaty's undefined terms 'the meaning . . . under [its own] taxation laws,'" (alteration and ellipsis in original), that "[w]hen U.S. taxation is at issue, the expectations of the United States have primacy, even if those expectations may not be 'shared' by the treaty partner." (alteration added) (citing Baturin v. Comm'r, 31 F.4th 170, 174 (4th Cir. 2022);[36] Adams Challenge (UK) Ltd. v.

---

[36] Defendant cites to the United States Court of Appeals for the Fourth Circuit's decision in Baturin v. Commissioner, which defendant characterizes as "applying U.S. tax law to determine whether particular payments were 'grants' or 'allowances' under article 18 of that treaty" between the United States and Russia. Baturin is a Fourth Circuit case concerning a treaty between the United States and Russia which provided that an undefined term in that treaty "'have the meaning which it has *under the laws of that State concerning the taxes to which this Convention applies.*'" See Baturin v. Comm'r, 31 F.4th at 174 (emphasis in original). Contrary to defendant's reason for citing Baturin, the Fourth Circuit in Baturin supported its interpretation of the United States-Russia treaty by reference to "the intent of the parties to the Treaty" and "the actual intent of the Treaty." See id. at 176. The Fourth Circuit in Baturin expressly states that "courts construe treaties liberally to effectuate the intent of the parties, not simply in favor of the party invoking the treaty," see id. (citing Nielsen v. Johnson, 279 U.S. at 51), therefore, not concluding support of defendant's argument that Baturin stands for the "primacy" of the United States'

Comm'r, 154 T.C. at 37, 58 (2020)).

Defendant further claims that plaintiffs "misinterpret the parenthetical," referring to "(as it may be amended from time to time without changing the general principle hereof)" in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. Defendant argues that "[t]he parenthetical does not, as plaintiffs claim, 'guarantee[]' a 'general principle allowing a credit of French income taxes against U.S. income taxes' for any possible levy that could conceivably be made by the United States." (first alteration added; internal reference omitted). Quoting the 1994 Treaty Treasury Department Technical Explanation, defendant argues that the parenthetical language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, "merely recognizes a general principle that, 'although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions of the U.S. statutory credit at the time a credit is given.'" Defendant further argues: "Thus, while the United States may not outright repeal the foreign-tax-credit framework from its domestic law, it has wide leeway to decide the extent to which to allow the credit and any conditions to attach to it." Defendant's caution that "the United States may not outright repeal the foreign-tax-credit framework" appears to be the only caution to defendant's otherwise broad conception of the United States' "leeway to decide the extent to which to allow the credit and any conditions to attach to it."

Defendant further argues, although the purpose of the 1994 Treaty, as amended, is "to reduce, or even eliminate where appropriate, double taxation of citizens and residents of the United States and France," that "nothing suggests that the two countries expected or even intended to tailor the reduction or elimination of double taxation to any individual case." Additionally, defendant contends that

> to the extent that double-taxation relief is targeted through article 24 of the Treaty (rather than through the allocation of taxing rights), the Treaty is explicit that double-taxation relief has meaningful limits. The Treaty, like any other, must be applied according to its terms; if a treaty's operative provisions provide no specific relief for a particular instance of double taxation, courts may not override the treaty to effect a more absolute conception of that goal than the treaty negotiators themselves intended and drafted.

As explained above, like plaintiffs, defendant makes the argument that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, interacts with the saving clause of Article 29 of the same treaty to implement the three-bite rule:

> Article 29(3), which plaintiffs refer to as the "carve out to the savings clause," ensures that the saving clause does not undo the portions of article 24 that implement the three-bite rule (and alter U.S. law to do so). Article 24(2)(b)(ii)

---

expectations of a treaty, even when they "may not be 'shared' by the treaty partner," Baturin actually seems better to support interpreting treaties consistent with the shared intent of the signatory governments.

> modifies U.S. tax law by allowing U.S. taxpayers to treat the portion of U.S.-source income on which France may impose a residency-based tax under the Treaty as foreign-source income. By modifying the source rules in the [Internal Revenue] Code, article 24(2)(b)(ii) increases the [I.R.C.] § 904 limitation that would otherwise cap the taxpayers' foreign tax credits at the pre-credit U.S. tax on their foreign source income. Together, Articles 24 and 29 of the Treaty implement the three-bite rule for U.S. citizens residing in France. They do not expand U.S. law to provide a foreign tax credit against the NIIT that the Code does not allow.

(alterations added; footnote and internal reference omitted). Defendant argues that, because paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, implements the second bite of the three-bite rule,[37]

> [i]f the Court were to credit plaintiffs' claim that subsection (2)(b) authorizes a separate foreign tax credit for U.S. citizens residing in France that is not subject to limitations in the Internal Revenue Code, it would render meaningless the resourcing rule in subsection (2)(b)(ii), which is premised on the application of the foreign-tax-credit limitation in [I.R.C.] § 904.

(alterations added).

Defendant also argues that a ruling for plaintiffs in the current case "would frustrate the policy foundation" of the foreign tax credit system and "would provide U.S. citizens residing in France with a far more generous foreign tax credit than would be available to U.S. citizens residing in the United States." Defendant argues that, if the court were to accept plaintiffs' interpretation of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended,

> then such taxpayers theoretically could, among other things:
> - Claim foreign tax credits against U.S. tax on U.S.-sourced income, despite the policy behind the foreign-tax-credit limitation under [I.R.C.] § 904;

---

[37] Defendant offers various versions of its contention that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, implements the second bite of the three-bite rule: "Article 24(2)(b) is an integral part of an ordering rule established by the Treaty (colloquially referred to as a 'three-bite rule');" "the saving clause does not undo the portions of article 24 that implement the three-bite rule;" "Articles 24 and 29 of the Treaty implement the three-bite rule;" "article 24(2)(b) is an integral part of the 'three-bite rule' established by the Treaty, the ordering rule that governs the application of foreign tax credits to French and U.S. taxes on income earned by U.S. citizens residing in France." Defendant's full explanation of its contention that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, implements the second bite of the three-bite rule, is set forth above in the discussion of the three-bite rule, in which defendant clarifies the operation of paragraph 2(b) in the calculation of United States and French taxes under the three-bite rule.

- Evade the [I.R.C.] § 904 limitation by cross-crediting foreign tax on general basket income against U.S. tax on passive basket income; or,

- Obtain a double benefit by claiming credits for foreign taxes paid on income excluded from U.S. tax by the foreign-earned income exclusion, contrary to [I.R.C.] § 911(d)(6).

(alterations added). None of the scenarios which defendant poses directly above, however, appear to be before this court based on the facts presented to this court by plaintiffs' case. Moreover, defendant appears to acknowledge by its reference to the "policy foundation" of foreign tax credits, that defendant is relying in large part on policy-based arguments against interpreting paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, to provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, and does not cite to any statute or regulation that prevent plaintiffs from entitlement to a foreign tax credit under paragraph 2(b) of Article 24 of the 1994 Treaty, as amended.

**Treaty Interpretation Standards and Principles for Resolving Potential Conflict Between Treaties and Domestic Statutes**

The United States Supreme Court and the United States Court of Appeals for the Federal Circuit have established precedential standards by which interpretation of treaties and international agreements should occur. The United States Supreme Court stated in Medellin v. Texas that "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text," Medellin v. Texas, 552 U.S. 491, 506-07 (2008) (alteration added) (citing Air France v. Saks, 470 U.S. at 396–97), but that "[b]ecause a treaty ratified by the United States is 'an agreement among sovereign powers,' we have also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as the 'postratification understanding' of signatory nations." Id. (alteration added) (quoting Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. at 226, and citing United States v. Stuart, 489 U.S. at 365–66; Choctaw Nation of Indians v. United States, 318 U.S. at 431–32); see also BG Grp., PLC v. Republic of Argentina, 572 U.S. 25, 37 (2014) ("As a general matter, a treaty is a contract, though between nations. Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent." (citing Air France v. Saks, 470 U.S. at 399; Sullivan v. Kidd, 254 U.S. 433, 439 (1921); Wright v. Henkel, 190 U.S. 40, 57 (1903)); Lozano v. Montoya Alvarez, 572 U.S. at 11 (citing Medellin v. Texas, 552 U.S. at 505; United States v. Choctaw Nation, 179 U.S. 494, 535 (1900)); United States v. Alvarez-Machain, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." (citing Air France v. Saks, 470 U.S. at 397; Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 11 (1936))). In the case of Air France v. Saks, the United States Supreme Court stated that interpretation of an international agreement "must begin, however, with the text of the treaty and the context in which the written words are used." Air France v. Saks, 470 U.S. at 397 (citing Maximov v. United States, 373 U.S. 49, 53–54 (1963)). Moreover, the Supreme Court explained that "[i]t is a familiar rule that the obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties."

Valentine v. United States ex rel. Neidecker, 299 U.S. at 10 (alteration added) (citing Factor v. Laubenheimer, 290 U.S. at 293; Jordan v. Tashiro, 278 U.S. at 127; Tucker v. Alexandroff, 183 U.S. 424, 437 (1902)); see also Factor v. Laubenheimer, 290 U.S. at 294-95 ("In ascertaining the meaning of a treaty we may look beyond its written words to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter, and to their own practical construction of it."); Cook v. United States, 288 U.S. at 112 ("In construing the Treaty its history should be consulted."); Jordan v. Tashiro, 278 U.S. at 127; Tucker v. Alexandroff, 183 U.S. at 437; In re Ross, 140 U.S. at 475 ("It is a canon of interpretation to so construe a law or treaty as to give effect to the object designed, and for that purpose all of its provisions must be examined in the light of attendant and surrounding circumstances.").

Similarly, the Supreme Court in Eastern Airlines, Inc. v. Floyd stated that "'[w]hen interpreting a treaty, we "begin 'with the text of the treaty and the context in which the written words are used,'"'" E. Airlines, Inc. v. Floyd, 499 U.S. 530, 534 (1991) (alteration added) (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988) (quoting Société Nationale Industrielle Aérospatiale v. United States Dist. Ct. for the S. Dist. of Iowa, 482 U.S. 522, 534 (1987) (quoting Air France v. Saks, 470 U.S. at 397))), but also that "'[o]ther general rules of construction may be brought to bear on difficult or ambiguous passages.'" Id. at 535 (alteration added) (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. at 700); see also Water Splash, Inc. v. Menon, 581 U.S. 271, 276 (2017) (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. at 699); Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 133-35 (1989) (explaining that "[w]e must thus be governed by the text," although "intricate drafting history" might "be consulted to elucidate a text that is ambiguous" (citing Air France v. Saks, 470 U.S. 392)); Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 180 ("The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" (quoting Maximov v. United States, 373 U.S. at 54)); Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1353 ("When construing a treaty, '[t]he clear import of treaty language controls unless "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories,"'" (alteration in original) (quoting Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 180 (quoting Maximov v. United States, 373 U.S. at 54)), and also holding that "effect must be given to the intent of both signatories" (citing Xerox Corp. v. United States, 41 F.3d at 656 (citing Valentine v. United States ex rel. Neidecker, 299 U.S. at 11)), but "when the language of a treaty provision 'only imperfectly manifests its purpose,' we are required to give effect to its underlying purpose," and "[t]o this end, we must 'examine not only the language, but the entire context of agreement.'" (alteration added) (quoting Great-West Life Assur. Co. v. United States, 230 Ct. Cl. at 481 (internal quotations omitted)))); United Techs. Corp. v. United States, 315 F.3d 1320, 1322 (Fed. Cir. 2003) ("The terms of a treaty are to be given their ordinary meaning in the context of the treaty, and are to be interpreted to best fulfill the purpose of the treaty." (citing Xerox Corp. v. United States, 41 F.3d at 652)); Great-West Life Assur. Co. v. United States, 230 Ct. Cl. at 481 (citing Factor v. Laubenheimer, 290 U.S. at 294-95, and In re Ross, 140 U.S. at 475, as "requir[ing] that the underlying purpose [of the treaty] be given effect" (alterations added)).

In particular, "[t]he course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning." O'Connor v. United States, 479 U.S. at 33 (alteration added) (citing Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. at 259-60; Pigeon River Imp., Slide & Boom Co. v. Charles W. Cox, Ltd., 291 U.S. at 158-61). Moreover, the Supreme Court has emphasized that "[i]t is our 'responsibility to read the treaty in a manner consistent with the *shared* expectations of the contracting parties.'" Lozano v. Montoya Alvarez, 572 U.S. at 12 (emphasis in original; alteration added) (quoting Olympic Airways v. Husain, 540 U.S. at 650 (internal quotations omitted)).

The United States Court of Appeals for the Federal Circuit succinctly summarized the Supreme Court's approach to treaty interpretation in Xerox Corp. v. United States:

> In construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purposes of the treaty. See United States v. Stuart, 489 U.S. 353, 365–66, 109 S. Ct. 1183, 1190–91, 103 L. Ed. 2d 388 (1989) (interpreting a treaty to carry out the intent or expectations of the signatories); Kolovrat v. Oregon, 366 U.S. 187, 193–94, 81 S. Ct. 922, 925–26, 6 L. Ed. 2d 218 (1961) (a treaty should be interpreted to carry out its purpose). As discussed in Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 185, 102 S. Ct. 2374, 2379, 72 L. Ed. 2d 765 (1982), the court's role is "limited to giving effect to the intent of the Treaty parties." See generally Restatement (Third) of Foreign Relations Law of the United States, Part III, Introductory Note at 144–145 (1987). The judicial obligation is to satisfy the intention of both of the signatory parties, in construing the terms of a treaty. Valentine v. United States, 299 U.S. 5, 11, 57 S. Ct. 100, 103, 81 L. Ed. 5 (1936) ("it is our duty to interpret [the treaty] according to its terms. These must be fairly construed, but we cannot add or detract from them.")
>
> Unless the treaty terms are unclear on its face, or unclear as applied to the situation that has arisen, it should rarely be necessary to rely on extrinsic evidence in order to construe a treaty, for it is rarely possible to reconstruct all of the considerations and compromises that led the signatories to the final document. However, extrinsic material is often helpful in understanding the treaty and its purposes, thus providing an enlightened framework for reviewing its terms. See Air France v. Saks, 470 U.S. 392, 400, 105 S. Ct. 1338, 1343, 84 L. Ed. 2d 289 (1985) ("In interpreting a treaty it is proper, of course, to refer to the records of its drafting and negotiation.") However, "the ultimate question remains what was intended when the language actually employed . . . was chosen, imperfect as that language may be." Great–West Life Assurance Co. v. United States, 678 F.2d 180, 188, 230 Ct. Cl. 477 (1982).

Xerox Corp. v. United States, 41 F.3d at 652 (alteration and ellipsis in original).

While both parties have provided the court with their view as to the "harmonization" of treaties and statutes in the event of a potential conflict, as is presented in this case, the precedents of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit provide more complicated analyses for the court to use to resolve such potential conflict than the parties have indicated. The Constitution of the United States provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. CONST. art. VI. (alteration added). In Weinberger v. Rossi, 456 U.S. 25, the Supreme Court explained, with respect to potential conflict between statutes and treaties of the United States:

> It has been a maxim of statutory construction since the decision in Murray v. The [Schooner] Charming Betsy, [6 U.S.] 2 Cranch 64, 118, 2 L. Ed. 208 (1804), that "an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains . . . ." In McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 20–21, 83 S. Ct. 671, 677–678, 9 L. Ed. 2d 547 (1963), this principle was applied to avoid construing the National Labor Relations Act in a manner contrary to State Department regulations, for such a construction would have had foreign policy implications. The McCulloch Court also relied on the fact that the proposed construction would have been contrary to a "well-established rule of international law." Id., at 21, 83 S. Ct., at 677–678.

Weinberger v. Rossi, 456 U.S. at 32 (ellipsis in original; alterations added). In the case of Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, which was cited in Weinberger as quoted above, the Supreme Court stated:

> It has also been observed that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.

Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118. In Whitney v. Robertson, 124 U.S. 190, cited above, the Supreme Court further explained:

> By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other: provided, always, the stipulation of the treaty on the subject is self-executing.

Id. at 194; see also MacLeod v. United States, 229 U.S. 416, 434 (1913) ("[I]t should not be assumed that Congress proposed to violate the obligations of this country to other nations, which it was the manifest purpose of the President to scrupulously observe, and which were founded upon the principles of international law." (alteration added)). The Supreme Court also has stated that "[a] treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed." Cook v. United States, 288 U.S. at 120 (alteration added) (citing United States v. Payne, 264 U.S. 446, 448 (1924); Chew Heong v. United States, 112 U.S. 536 (1884)); see also Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. at 252 ("There is, first, a firm and obviously sound canon of construction against finding implicit repeal of a treaty in ambiguous congressional action. 'A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed.'" (quoting Cook v. United States, 288 U.S. at 120)); Clark v. Allen, 331 U.S. 503, 507, 512 (1947) ("We will not readily assume that when Congress enacted § 5(b) [of the Trading with the Enemy Act] and authorized the vesting of property, it had a purpose to abrogate all such treaty clauses" as the provisions of a treaty with Germany "governing the testamentary disposition of realty and personalty" (alteration added) (citing Cook v. United States, 288 U.S. at 120)); United States v. Lee Yen Tai, 185 U.S. at 221 ("[T]he purpose by statute to abrogate a treaty or any designated part of a treaty, or the purpose by treaty to supersede the whole or a part of an act of Congress, must not be lightly assumed, but must appear clearly and distinctly from the words used in the statute or in the treaty." (alteration added)).

In 2013, in the case of In re City of Houston, the United States Court of Appeals for the Federal Circuit restated the longstanding principle from the Supreme Court's decision in Charming Betsy as "that 'an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains.'" In re City of Houston, 731 F.3d 1326, 1334 (Fed. Cir. 2013) (quoting Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118); see also In re Rath, 402 F.3d 1207, 1211 (Fed. Cir. 2005) ("In cases of ambiguity, we interpret a statute such as section 44(e) of the Lanham Act as being consistent with international obligations." (citing Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118; Allegheny Ludlum Corp. v. United States, 367 F.3d 1339, 1348 (Fed. Cir. 2004); Luigi Bormioli Corp., Inc. v. United States, 304 F.3d 1362, 1368 (Fed. Cir. 2002))); Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1347 (Fed. Cir. 2005) (referring to "the Charming Betsy doctrine of claim construction, which states that courts should interpret U.S. law, whenever possible, in a manner consistent with international obligations" (citing Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64)); Allegheny Ludlum Corp. v. United States, 367 F.3d at 1345 ("[T]his court's interpretation of [19 U.S.C.] § 1677(5) avoids unnecessary conflict between domestic law and the international obligations of this country." (alterations added)); Timken Co. v. United States, 354 F.3d 1334, 1343-44 (Fed. Cir. 2004) ("The crux of its argument hinges on the Charming Betsy canon of claim construction, according to which courts should interpret U.S. law, whenever possible, in a manner consistent with U.S. international obligations." (citing Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118; Luigi Bormioli Corp., Inc. v. United States, 304 F.3d at 1368; Fed.-Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995))). The Federal Circuit has recognized

the Supreme Court's rule set forth in <u>Charming Betsy</u> as a "two-century-old canon of construction" that a statute "'must be interpreted to be consistent with [international] obligations, absent contrary indications in the statutory language or its legislative history.'" <u>Allegheny Ludlum Corp. v. United States</u>, 367 F.3d at 1348 (alteration in original) (quoting <u>Luigi Bormioli Corp., Inc. v. United States</u>, 304 F.3d at 1368, and citing <u>Fed.-Mogul Corp. v. United States</u>, 63 F.3d at 1581); <u>see also</u> <u>Fed.-Mogul Corp. v. United States</u>, 63 F.3d at 1581 ("GATT [General Agreement on Tariffs and Trade] agreements are international obligations, and absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations." (alteration added)); <u>Abbott Lab'ys v. United States</u>, 84 Fed. Cl. 96, 107 and n.17 (2008) (describing a "canon of construction—that statutes and regulations should be construed consistently with international treaty obligations" (citing <u>Sale v. Haitian Ctrs. Council, Inc.</u>, 509 U.S. 155, 178-79 n. 35 (1993); <u>MacLeod v. United States</u>, 229 U.S. at 434; <u>Murray v. Schooner Charming Betsy</u>, 6 U.S. (2 Cranch) at 118; <u>Cannon v. United States Dep't of Justice, United States Parole Comm'n</u>, 973 F.2d 1190, 1193 (5th Cir. 1992))). The Federal Circuit, moreover, explained in <u>Xerox Corp.</u>:

> A treaty, when ratified, supersedes prior domestic law to the contrary, <u>United States v. Lee Yen Tai</u>, 185 U.S. 213, 220–22, 22 S. Ct. 629, 632–33, 46 L. Ed. 878 (1902), and is equivalent to an act of Congress. However, tacit abrogation of prior law will not be presumed and, unless it is impossible to do so, treaty and law must stand together in harmony.

<u>Xerox Corp. v. United States</u>, 41 F.3d at 658.

In addition to the principle articulated by the Supreme Court in the <u>Charming Betsy</u> case, other rules announced by the United States Supreme Court in the context of treaty interpretation bear on this court's interpretation of the 1994 Treaty, as amended. Particularly relevant to the above captioned case, the Supreme Court has instructed courts to afford a liberal interpretation to treaties, including treaties concerning the taxing power. In the case of <u>United States v. Stuart</u>, 489 U.S. 353, the Supreme Court explained

> that a treaty should generally be "construe[d] . . . liberally to give effect to the purpose which animates it" and that "[e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred[.]"

<u>Id.</u> at 368 (alterations and ellipsis in original) (quoting <u>Bacardi Corp. of Am. v. Domenech</u>, 311 U.S. 150, 163 (1940) (internal citations omitted)). In <u>United States v. Stuart</u>, the Supreme Court ruled against an attempt to restrict the sending of information from the United States to Canada under the Convention between the United States and Canada Respecting Double Taxation. <u>See</u> <u>id.</u>

The Supreme Court in <u>Bacardi Corp. of America v. Domenech</u>, which was cited in <u>Stuart</u>, addressed a conflict between a statute of the United States territory of Puerto Rico

and a multilateral treaty, "the General Inter-American Convention for Trade Mark and Commercial Protection signed at Washington on February 20, 1929." See Bacardi Corp. of Am. v. Domenech, 311 U.S. at 157. The Supreme Court in Bacardi explained "the accepted canon" that "we should construe the treaty liberally to give effect to the purpose which animates it. Even where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging rights which may be claimed under it, the more liberal interpretation is to be preferred." Id. at 163 (citing Factor v. Laubenheimer, 290 U.S. at 293-94; Nielsen v. Johnson, 279 U.S. at 52; Jordan v. Tashiro, 278 U.S. at 127). In the United States Supreme Court's decision in Kolovrat v. Oregon, 366 U.S. 187, the Supreme Court cited the Bacardi decision to consider a conflict between the succession laws of Oregon, which limited the ability of aliens to take under testate or intestate succession, and "an 1881 Treaty between the United States and Serbia, which country is now [in 1961] a part of Yugoslavia." See Kolovrat v. Oregon, 366 U.S. at 190 (alteration added). In Kolovrat, the United States Supreme Court rejected the "more restrictive interpretation" of the 1881 Treaty favored by the Supreme Court of Oregon, explaining that "[t]his Court has many times set its face against treaty interpretations that unduly restrict rights a treaty is adopted to protect." See id. at 193 and n.7 (alteration added) (citing Bacardi Corp. of Am. v. Domenech, 311 U.S. at 163; Jordan v. Tashiro, 278 U.S. at 128-29). The United States Supreme Court also addressed the rule that treaties should be afforded a "liberal interpretation" in Jordan v. Tashiro, 278 U.S. 123, a case cited by the United States Supreme Court in both Bacardi and Kolovrat. In Jordan, the Supreme Court explained:

> The principles which should control the diplomatic relations of nations, and the good faith of treaties as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. See [De] Geofroy v. Riggs, [133 U.S. 258, 267 (1890)[38]]; Tucker v. Alexandroff, 183 U.S. 424, 437, 22 S. Ct. 195, 46 L. Ed. 264; Wright v. Henkel, 190 U.S. 40, 57, 23 S. Ct. 781, 47 L. Ed. 948; In re Ross, 140 U.S. 453, 475, 11 S. Ct. 897, 35 L. Ed. 581. Upon like ground, where a treaty fairly admits of two constructions, one restricting the rights that may be claimed under it and the other enlarging them, the more liberal construction is to be preferred. Asakura v. Seattle, 265 U.S. 332, 44 S. Ct. 515, 68 L. Ed. 1041 [(1924)]; Tucker v. Alexandroff, supra; [De] Geofroy v. Riggs, supra.

Jordan v. Tashiro, 278 U.S. at 127 (alterations and footnote added).

     In addition to these precedential cases of the United States Supreme Court, decisions issued by the United States Court of Appeals for the Federal Circuit and by the United States Court of Federal Claims have applied the rule that treaties should be

---

[38] The Supreme Court in Jordan cites to the case of "Geofroy v. Riggs," see Jordan v. Tashiro, 278 U.S. at 126, 127, however, that case is originally captioned "De Geofroy v. Riggs" and the petitioner is identified by the name "Louis de Geofroy." See De Geofroy v. Riggs, 133 U.S. at 258.

liberally interpreted when interpreting tax treaties. See, e.g., Xerox Corp. v. United States, 41 F.3d at 652 (citing United States v. Stuart, 489 U.S. at 365-66, in the context of a treaty with the purpose of "the elimination of double taxation" between the United States and the United Kingdom); McManus v. United States, 130 Fed. Cl. at 616, 620 (citing United States v. Stuart, 489 U.S. at 365-66, in the context of a treaty for "the avoidance of double taxation" between the United States and Ireland); Nat'l Westminster Bank, PLC v. United States, 58 Fed. Cl. 491, 497 (2003) (citing United States v. Stuart, 489 U.S. at 368, in the context of a treaty for the avoidance of double taxation between the United States and the United Kingdom), aff'd, 512 F.3d 1347 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008).

In addition to the precedents of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit which establish the rules of treaty interpretation, including the cases in which the terms of a treaty and a statute potentially conflict, initially the parties and the court in the above captioned case also identified a non-precedential decision issued by the United States Tax Court, Toulouse v. Commissioner, 157 T.C. 49 (2021), which addressed, in part, the 1994 Treaty, as amended, between the United States and France. The Toulouse decision addressed whether the 1994 Treaty, as amended, with France provides for a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, in Chapter 2A of the I.R.C. The Toulouse case concerned "whether petitioner is entitled to a credit against the net investment income tax (foreign tax credit) on the basis of certain provisions of the United States' income tax treaties with France and Italy." Toulouse v. Comm'r, 157 T.C. at 50. The petitioner in the Toulouse case relied on paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, between the United States and France, as well as

article 23(2)(a) of U.S. income tax treaty with Italy, the Convention for the Avoidance of Double Taxation With Respect to Taxes on Income and the Prevention of Fraud or Fiscal Evasion, Aug. 25, 1999, It.-U.S., Aug. 25, 1999, T.I.A.S. No. 09-1216, as supplemented by Protocol dated Aug. 25, 1999 (U.S.-Italy Treaty)

to argue that the two treaties "permit a foreign tax credit against the net investment income tax." Toulouse v. Comm'r, 157 T.C. at 52. As described by the Tax Court, the petitioner in Toulouse made a similar argument to the argument made by the current plaintiffs in this court with respect to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. The United States Tax Court in Toulouse explained:

Petitioner concedes that the [Internal Revenue] Code does not provide a foreign tax credit against the net investment income tax. Instead, she argues that article 24(2)(a) of the U.S.-France Treaty[39] and article 23(2)(a) of the U.S.-Italy Treaty provide a foreign tax credit independent of the [Internal Revenue] Code. Under the Constitution, treaties are given the

_____

[39] The Tax Court in Toulouse referred to the 1994 Treaty, as amended, as the "U.S.-France Treaty."

same force and effect as legislation enacted by Congress. U.S. Const. art. VI, cl. 2; see [I.R.C.] sec. 7852(d)(1) ("For purposes of determining the relationship between a provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status[.]").

Toulouse v. Comm'r, 157 T.C. at 57 (fourth alteration in original). The Tax Court decision briefly articulated the basic standards of treaty interpretation, including that "[w]here a treaty and a statute relate to the same subject, courts attempt to construe them to give effect to both." Id. at 58 (alteration added) (citing Whitney v. Robertson, 124 U.S. at 194). The Tax Court in Toulouse explained that "[t]he U.S.-France and U.S.-Italy Treaties are intended to limit the effects of double taxation between the treaty partners and contain specific provisions that provide each country's obligations to grant a foreign tax credit as part of the treaties' general goal of reducing the amount of double taxation." Id. (alteration added). The Tax Court in Toulouse reasoned that "[u]nder the express terms of the articles of the Treaties that petitioner relies on, any allowable foreign tax credit must be determined in accordance with the [Internal Revenue] Code and is limited by the Code's provision of a credit." Id. (alterations added). In a footnote, the Tax Court further stated: "Petitioner does not argue that she is entitled to relief under any other treaty provisions. Accordingly, we express no view on the potential application of other provisions." Id. at 58 n.4. The Tax Court in Toulouse considered the petitioner's arguments "that the Treaties do not conflict with the [Internal Revenue] Code because the Code is silent as to whether there is a foreign tax credit against the net investment income tax," and "that there is no explanation in the legislative history for Congress' decision to impose the net investment income tax under chapter 2A [of the I.R.C.] or any indication that Congress considered whether to provide a foreign tax credit against the net investment income tax." Toulouse v. Comm'r, 157 T.C. at 59 (alterations added).

With respect to the net investment income tax imposed by I.R.C. § 1411, the Tax Court explained that "[t]he fact that section 1411 was enacted after the execution of the Treaties is not determinative," because the 1994 Treaty, as amended, "covers all 'Federal income taxes imposed by the Internal Revenue Code' and further states that its terms are subject to identical or substantially similar tax imposed after the effective date of the Treaty." Toulouse v. Comm'r, 157 T.C. at 59. The Tax Court reasoned that "[t]he placement of section 1411 in a newly created chapter was not happenstance. An enumerated chapter of the [Internal Revenue] Code to impose a distinct and separate tax is part of the Code's fundamental structure." Toulouse v. Comm'r, 157 T.C. at 59 (alterations added). The Tax Court also stated that "[t]here is no provision for any credits against the section 1411 tax. The enactment of a 3.8% net investment income tax as part of chapter 2A [of the I.R.C.] is a clear expression of congressional intent that credits against section 1 not apply against the section 1411 tax." Toulouse v. Comm'r, 157 T.C. at 60 (alterations added).

The Tax Court further considered the petitioner's argument "that the enactment of the net investment income tax in chapter 2A is not a 'limitation' as that term is used in the Treaties," and that such limitation "should not be imposed on the basis of Congress'

silence on the issue." Toulouse v. Comm'r, 157 T.C. at 59-60. The Tax Court in Toulouse rejected the petitioner's argument, stating:

> It is immaterial that the [Internal Revenue] Code does not affirmatively state that a foreign tax credit against the net investment income tax is disallowed. Section 1411(c)(1)(B) expressly provides for deductions allowed by subtitle A in the computation of net investment income. There is no provision for any credits against the section 1411 tax. The enactment of a 3.8% net investment income tax as part of chapter 2A [of the I.R.C.] is a clear expression of congressional intent that credits against section 1 not apply against the section 1411 tax.

Toulouse v. Comm'r, 157 T.C. at 60 (alterations added). The Tax Court reasoned that "[t]here is nothing in either article 24(2)(a) of the U.S.-France Treaty or article 23(2)(a) of the U.S.-Italy Treaty that entitles U.S. taxpayers to an elimination of all double taxation" and, with respect to the 1994 Treaty, as amended, between the United States and France, that the Tax Court's interpretation was "confirmed by the contemporary explanation provided by the Treasury Department, the Government agency charged with the Treaty's negotiation and enforcement." Toulouse v. Comm'r, 157 T.C. at 61 (alteration added). The Tax Court concluded that "petitioner is not entitled to a foreign tax credit against her net investment income tax" because "Congress has allowed a foreign tax credit only against taxes imposed under chapter 1. There is no [Internal Revenue] Code provision for a foreign tax credit against the net investment income tax." Toulouse v. Comm'r, 157 T.C. at 62 (alteration added). The Tax Court, however, also stated:

> Petitioner questions the purpose of the Treaties if there is no independent, treaty-based credit and a credit is allowable only if it is provided in the [Internal Revenue] Code. But we do not so hold. Other provisions of the Treaties may well provide for credits that are unavailable under the Code. Petitioner, however, relies on provisions that by their express terms do not.

Id. at 61-62 (alteration added).

In addition to plaintiffs' arguments with respect to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, plaintiffs argue that the Tax Court's decision in Toulouse support's plaintiffs' interpretation of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, to allow a foreign tax credit against the net investment income tax, because, when denying the Toulouse petitioner's argument, which had been limited to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, the Tax Court "referr[ed] to a possible other credit provision that would be available," which plaintiffs in this court argue "appears to agree that a plain reading of Article 24(2)(b) [of the 1994 Treaty, as amended,] would provide for a foreign tax credit even if the restrictions of Article 24(2)(a) [of the 1994 Treaty, as amended,] would otherwise apply." (alterations added). Plaintiffs, however, do not provide a citation from the Toulouse decision for their claim that the Toulouse decision "appears to agree" that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, "would provide for a foreign tax credit" independent of paragraph 2(a) of Article 24 of the

1994 Treaty, as amended. As noted above, the <u>Toulouse</u> court did not address paragraph 2(b) of Article 24 of the 1994 Treaty, as amended. Plaintiffs argue that "without any reference to the '[i]n accordance with the provisions and subject to the limitations of the law of the United States' Article 24(2)(a) language, Article 24(2)(b) [of the 1994 Treaty, as amended] allows a U.S. citizen living in France a credit for French taxes paid against that U.S. citizen's U.S. income tax liability." (first alteration in original). The <u>Toulouse</u> decision, however, explicitly did not interpret whether other provisions of the 1994 Treaty, as amended, provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, as the Tax Court solely analyzed paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. <u>See Toulouse v. Comm'r</u>, 157 T.C. at 58 n.4. Therefore, the Tax Court in the <u>Toulouse</u> decision left open the issue of whether paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, provides a tax credit against the net investment income tax imposed by I.R.C. § 1411. <u>See Toulouse v. Comm'r</u>, 157 T.C. at 61-62 ("Other provisions of the Treaties may well provide for credits that are unavailable under the Code. Petitioner, however, relies on provisions that by their express terms do not.").

After briefing was complete and oral argument was held on the cross-motions for partial summary judgment in the above captioned case, the United States District Court for the Central District of California issued a decision in <u>Kim v. United States</u>, No. 5:22-cv-00691-SPG-SP, 2023 WL 3213547 (C.D. Cal. Mar. 28, 2023), which considered, but was not limited to, the issue of whether an income tax treaty between the United States and the Republic of Korea provided a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411. <u>See Kim v. United States</u>, 2023 WL 3213547, at *10. The <u>Kim</u> decision addressed the inclusion in the United States-South Korea treaty of language which is "identical to the treaty language" of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, between the United States and France, which also was at issue in <u>Toulouse</u> and is at issue in the above captioned case. <u>See Kim v. United States</u>, 2023 WL 3213547, at *11. The District Court quoted the language of the United States-South Korea treaty as follows:

> In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the principles hereof), the United States shall allow a citizen or resident of the United States as a credit against the United States tax the appropriate amount of Korean tax . . . .

<u>Id.</u> at *14 (ellipsis added). The District Court in <u>Kim</u> deferred to the United States' interpretation of I.R.C. § 1411 as set forth in Treasury Regulation § 1.1411-1(e) and agreed with the Tax Court's decision in <u>Toulouse</u>: "As the <u>Toulouse</u> Tax Court found, and as this Court also finds, this language [in the United States-South Korea treaty] unambiguously mandates that any allowed foreign tax credit must conform to the statutory foreign-tax-credit framework already in place." <u>See Kim v. United States</u>, 2023 WL 3213547, at *14 (alteration added). While the <u>Kim</u> court analogized the United States-South Korea treaty to the 1994 Treaty, as amended, between the United States and France, the <u>Kim</u> court did so only to consider language which is identical to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, and, therefore, the <u>Kim</u> decision is not

relevant to this court's interpretation of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, which was not addressed by the Kim court. Moreover, the Kim court interpreted the text of a treaty between the United States and South Korea, which is not determinative of the intent of the United States and France as to the meaning of the 1994 Treaty, as amended, in the above captioned case before this court.

Plaintiffs further argue that certain other "[f]ederal courts have already had the opportunity to consider the meaning of the Article 24(2)(a) phrase 'as it may be amended from time to time without changing the general principle thereof [sic]'." (alteration added). The cases cited by plaintiffs, however, do not concern the 1994 Treaty, as amended, between the United States and France, but rather concern other treaties which use language similar to that used in Article 24 of the 1994 Treaty between the United States and France, as amended. In particular, plaintiffs cite to Eshel v. Commissioner of Internal Revenue Service,[40] 831 F.3d 512 (concerning a "totalization agreement" with respect to Social Security taxes between the United States and France and the statute at I.R.C. § 1401 note),[41] Jamieson v. Commissioner of Internal Revenue Service, 584 F.3d 1074, 1076 (D.C. Cir. 2009) (concerning a treaty for the prevention of double taxation between the United States and Canada and foreign tax credits against the alternative minimum tax at I.R.C. § 59), Haver v. Commissioner of Internal Revenue Service, 444 F.3d 656 (D.C. Cir. 2006) (concerning a treaty for the avoidance of double taxation between the United States and Germany and foreign tax credits against the alternative minimum tax at I.R.C. § 59), and Kappus v. Commissioner of Internal Revenue Service, 337 F.3d 1053, 1058 (D.C. Cir. 2003) (concerning a treaty for the avoidance of double taxation between the United States and Canada and foreign tax credits against the alternative minimum tax at I.R.C. § 59).

Because this court is concerned with interpreting the 1994 Treaty, as amended, between the United States and France, in light of the shared expectations of the signatory governments to that treaty, and because plaintiffs cite to cases interpreting treaties other than the 1994 Treaty, the 2004 Protocol, and the 2009 Protocol, but rather concerned different provisions of the I.R.C. than are at issue in the current case before the court, plaintiffs' cited cases do not lead to a resolution of plaintiffs' case. See Lozano v. Montoya Alvarez, 572 U.S. at 12 (quoting Olympic Airways v. Husain, 540 U.S. at 650 (quoting Air France v. Saks, 470 U.S. at 399); Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. at 226).

In response to plaintiffs' arguments regarding the impact of the Tax Court's decision in Toulouse on the above captioned case, defendant quotes the Tax Court's decision argue that "'[u]nder the express terms' of article 24(2)(a), 'any allowable foreign tax credit must be determined in accordance with the Code and is limited by the Code's

---

[40] Plaintiffs' counsel in the above captioned case was also counsel for the appellants in Eshel.

[41] The "note" from I.R.C. § 1401 is not visible on the commercial Westlaw database but appears in the statutory notes in the official published version of I.R.C. § 1401.

provision of a credit.'" (alteration added) (quoting Toulouse v. Comm'r, 157 T.C. at 58). Therefore, according to defendant, "the Treaty provides for relief from double taxation in the form of a foreign tax credit, and the extent of a taxpayer's eligibility for that foreign tax credit is determined in accordance with the Code." Quoting Toulouse, defendant argues: "The 'require[ment] [that] any foreign tax credit . . . be "in accordance with the Code"' necessarily means that, for plaintiff [sic] 'to prevail,' the 'Code must provide the credit if one exists.'" (ellipsis in original; last alteration added) (quoting Toulouse v. Comm'r, 157 T.C. at 60).

As described above, one of the treaty interpretation rules relevant to the court's analysis in the above captioned case is the rule, announced in United States v. Stuart, that a court should interpret a treaty "liberally." See United States v. Stuart, 489 U.S. at 369. Defendant, however, challenges the application of the liberal interpretation rule as announced in the United States Supreme Court's decision in United States v. Stuart, arguing that Stuart is the only case "in the last fifty years in which the Supreme Court suggested that that a tax treaty should generally be interpreted 'liberally.'" (emphasis in original) (quoting United States v. Stuart, 489 U.S. at 369). Defendant proposes that treaties relating to taxation should be interpreted differently than other treaties. According to defendant:

> While some courts have applied a general canon that treaties should be construed liberally to achieve their purpose, e.g., Bacardi Corp. of America v. Domenech, 311 U.S. 150, 163 (1940), commentators have criticized application of the canon "in the tax treaty context." See [Rebecca M.] Kysar, [Interpreting Tax Treaties,] 101 IOWA L. REV. [1387,] 1441 [(2016)]. "[S]pecialized meanings in the tax context abound, as do express and implicit references to domestic law, thus constraining the interpreters." Id. "A liberal presumption is also at odds with the notion of sovereignty . . . in the tax context. Given the tie between taxation and the fisc, the relinquishing of taxing jurisdiction is not something that a sovereign would likely do implicitly or lightly." Id. Finally, because tax credits and exemptions are matters of legislative grace, they are narrowly construed in favor of the government, a factor weighing against a liberal construction of the Treaty here. Schumacher [v. United States], 931 F.2d [650,] 652 [(10th Cir. 1991)]; [United States v.] McFerrin, 570 F.3d [672,] 675 [(5th Cir. 2009)].

(fifth alteration and ellipsis in original). The cases cited by defendant, however, do not concern treaty interpretation, but rather address the interpretation of the I.R.C. See United States v. McFerrin, 570 F.3d at 675; Schumacher v. United States, 931 F.2d at 652.

Defendant's sole cited source for the proposition that "commentators have criticized application of the [liberal interpretation] canon 'in the tax treaty context,'" which is the Interpreting Tax Treaties article by Professor Kysar, appears, however, to take a more nuanced view than defendant represents. (alteration added) (quoting Kysar, 101 IOWA L. REV. at 1441). While Professor Kysar argues that "[l]iberal interpretation is a poor fit in the tax treaty context" and "is also at odds with the notion of sovereignty," Professor Kysar also states a "recommendation for the presumption against double taxation,"

reasoning that "[a] presumption against double taxation is a softer version of the liberal presumption rule and more successfully navigates between the interests of sovereignty and harmonization." Kysar, 101 Iowa L. Rev. at 1442 (alterations added). While a law review article may provoke thinking on difficult and unsettled questions of law, a law review article, even if well-reasoned, is not binding on any court, including the United States Court of Federal Claims. Moreover, as discussed above, the Supreme Court's decision in Stuart and its articulation of the liberal interpretation rule has been relied on by the Federal Circuit and Judges of the Court of Federal Claims to interpret tax treaties. See, e.g., Xerox Corp. v. United States, 41 F.3d at 652; McManus v. United States, 130 Fed. Cl. at 620. Defendant's argument that the liberal interpretation rule should not be applied in the context of tax treaties, relying only on a single law review article, is not persuasive. Therefore, without deference to defendant's interpretation, as determined above, the court applies the liberal interpretation of treaties rule announced in United States v. Stuart, as well as the principle announced in the Charming Betsy case, described above, to inform the court's determination of the shared expectations of the United States and French Governments with respect to paragraphs 2(a) and 2(b) of Article 24 of the 1994 Treaty, as amended.

Mindful of the principles set forth above, including the Supreme Court's observation in Charming Betsy "that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains," see Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118, the court interprets paragraphs 2(a) and 2(b) of Article 24 of the 1994 Treaty, as amended, in light of the restriction of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against "the tax imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. §§ 27, 901(a). As discussed above, a potential conflict exists because, if paragraphs 2(a) of Article 24 of the 1994 Treaty, as amended, is interpreted to provide a foreign tax credit without restriction, that would allow a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, which is in Chapter 2A of the I.R.C., not in Chapter 1 of the I.R.C., and prohibited from the application of foreign tax credits by I.R.C. §§ 27 and 901(a). As quoted above, paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, provides, in relevant part, that the United States shall allow a foreign tax credit against "the United States income tax" for French income tax paid by United States citizens living in France, "[i]n accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof) . . . ." This "provisions" and "limitations" language is key to this court's interpretation of paragraph 2(a), just as it had been for the United States Tax Court in the Toulouse decision. The Tax Court in Toulouse, as discussed above, interpreted the "provisions" and "limitations" language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, as "subject[ing] the terms of the Treaties, and thus any allowable credit, to the provisions and limitations of the [Internal Revenue] Code." Toulouse v. Comm'r, 157 T.C. at 58 (alterations added). The Tax Court decision, which although not precedential for this court, states that under paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, "any allowable foreign tax credit must be determined in accordance with the [Internal Revenue] Code and is limited by the Code's provision of a credit." Toulouse v. Comm'r, 157 T.C. at 58 (alteration added). The reasoning of the Tax Court in Toulouse is consistent with this court's view of

the "provisions" and "limitations" language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended.

As explained above, the parties disagree about the meaning of the "[i]n accordance with the provisions and subject to the limitations of the law of the United States" language, (alteration added), in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. Plaintiffs argue that the "provisions" and "limitations" language of paragraph 2(a) makes foreign tax credits under that paragraph subject to one statute, the statute at I.R.C. § 904, "Limitation on credit." Defendant argues in response that the "provisions" and "limitations" language in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, includes the other provisions of the I.R.C. which affect the availability of foreign tax credits, as relevant here, I.R.C. §§ 27 and 901(a).

As described above, both I.R.C. §§ 27 and 901(a) restrict foreign tax credits only to apply against taxes imposed by Chapter 1 of the I.R.C. The statute at I.R.C. § 27 allows a foreign tax credit "against the tax imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. § 27. The statute at I.R.C. § 901(a) similarly provides that "the tax imposed by this chapter [Chapter 1 of the I.R.C.] shall, subject to the limitation of section 904, be credited" with a foreign tax credit. See I.R.C. § 901(a) (alteration added). By their terms, I.R.C. §§ 27 and 901(a) prohibit foreign tax credits from applying against the net investment income tax imposed by I.R.C. § 1411 because I.R.C. § 1411 is in Chapter 2A, and not Chapter 1, of the I.R.C. In addition, the statute at I.R.C. § 904, as explained above, sets forth a number of limitations on foreign tax credits, which, however, are not relevant to the issues raised by plaintiffs' complaint in this court. See generally I.R.C. § 904.

Moreover, the use of the broad language of "provisions" and "limitations" in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, is instructive. Paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, does not refer to a specific United States tax statute, but rather states explicitly that it allows a foreign tax credit "[i]n accordance with the provisions and subject to the limitations of the law of the United States . . . ." (alteration and ellipsis added). The only qualification of this language is the clarification in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, that it refers to United States law "as it may be amended from time to time without changing the general principle" of the 1994 Treaty, as amended.

The plaintiffs have argued, as described above, that this "general principle" language refers to the "general principle" of the 1994 Treaty, as amended, to provide foreign tax credits for citizens of the signatory governments in order to avoid double taxation, and that an amendment to United States tax law denying a foreign tax credit that would otherwise be allowed would "chang[e] the general principle" of the 1994 Treaty, as amended. (alteration added). Such a change, including the enactment of an income tax not statutorily subject to foreign tax credits, as is the case for the net investment income tax imposed by I.R.C. § 1411, and one which adds a new type of United States taxation provision not envisioned at the time of the 1994 Treaty or its subsequent amendatory protocols, and, therefore, does not "chang[e] the general principle" of the 1994 Treaty, as amended. (alteration added).

Furthermore, plaintiffs' claim that the "provisions" and "limitations" of United States tax law incorporated by paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, are exclusively the "limitations" set forth in the statute at I.R.C. § 904, is belied first by the fact that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, does not expressly refer to I.R.C. § 904. Nor can a reference only to I.R.C. § 904 be inferred from the use of "limitations." Although I.R.C. § 904 is titled "Limitation on credit" and sets forth statutory limitations on foreign tax credits, paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, speaks not only of "limitations," but also of "provisions." The use of both "limitations" and "provisions" in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, is sufficiently broad to indicate that foreign tax credits allowed by paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, are subject not only to the "limitations" of I.R.C. § 904, but also to other "provisions" and "limitations" set forth in other provisions of the I.R.C., including I.R.C. §§ 27 and 901(a). The statutory sections at I.R.C. §§ 27 and 901(a), which both restrict foreign tax credits to apply against taxes imposed by Chapter 1 of the I.R.C., are both "provisions" of the I.R.C., and, therefore, "of the law of the United States," in the language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. The foreign tax credits allowed by paragraph 2(a), therefore, must be "[i]n accordance with" the restrictions of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C. (alteration added). Both I.R.C. §§ 27 and 901(a) "limit" foreign tax credits to apply only against taxes imposed by Chapter 1 of the I.R.C., and in that sense, I.R.C. §§ 27 and 901(a) are "limitations" to which foreign tax credits are "subject" under the plain text of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended.

Furthermore, the record before the court, including following supplemental briefing ordered by the court, produced no evidence of congressional intent when placing I.R.C. § 1411 in Chapter 2A of the I.R.C. The statute at I.R.C. § 1411 is in Chapter 2A of the I.R.C., and the placement of I.R.C. § 1411 in Chapter 2A of the I.R.C. is significant. Because paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, incorporates I.R.C. §§ 27 and 901(a), the net investment income tax is excluded from a foreign tax credit under paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. In this respect, this court finds that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, provides foreign tax credits against taxes imposed by Chapter 1 of the I.R.C., but does not provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, in Chapter 2A of the I.R.C., enacted subsequent to the 1994 Treaty, as amended. This court's conclusion is consistent with the United States Tax Court's decision in Toulouse v. Comm'r, 157 T.C. at 58 ("[A]ny allowable foreign tax credit must be determined in accordance with the [Internal Revenue] Code and is limited by the Code's provision of a credit." (alterations added)).

Plaintiffs' reading of the "general principle" language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, is overbroad. The enactment of a tax which is excluded from the I.R.C.'s provision of foreign tax credits, as is the case with the net investment income tax imposed by I.R.C. § 1411 in Chapter 2A, does not violate the "general principle" of the 1994 Treaty, as amended. Plaintiffs' argument would require

that any new United States income tax be eligible for a foreign tax credit on the same terms and to the same extent as all other income taxes previously enacted in spite of the statutory requirements incorporated by paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. The "provisions" and "limitations" language incorporates I.R.C. statutory restrictions on the availability of foreign tax credits, and the "general principle" language, although modifying this incorporation, does not nullify the immediately preceding incorporation of the "provisions" and "limitations" of United States law.

Plaintiffs acknowledge in their motion for partial summary judgment that the 1994 Treaty Treasury Department Technical Explanation, quoted at length above, describes the "general principle" of Article 24 in particular: "The credits provided under the Convention are allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article [24], i.e., the allowance of a credit, is retained." (alteration added). The 1994 Treaty Treasury Department Technical Explanation articulates the "general principle" of Article 24 of the 1994 Treaty, as amended, although it is generally self-serving insofar as it represents only the United States' interpretation, without anything in the record before this court to establish the Government of the French Republic's understanding of the 1994 Treaty, as amended. The "general principle" of the 1994 Treaty, as amended, even based on its formal title, is to avoid double taxation of each signatory government's citizens who reside in the other signatory country. As the court has explained, however, paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, conditions the allowance of foreign tax credits in service of that "general principle" upon compliance with the "provisions" and "limitations" of United States tax laws.

For these reasons, the court concludes that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, subjects its allowance of foreign tax credits to the "provisions" and "limitations" of the I.R.C. relating to foreign tax credits, including the restrictions of I.R.C. §§ 27 and 901(a) that foreign tax credits apply only against "the tax imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. §§ 27, 901(a). The statute at I.R.C. §§ 27 and 901(a) foreclose the availability of foreign credits against the net investment income tax, which is imposed by I.R.C. § 1411, in Chapter 2A of the I.R.C. under paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. The enactment of the net investment income tax subsequent to the 1994 Treaty, as amended, in I.R.C. § 1411, was established subject to the restriction of foreign tax credits to Chapter 1 of the I.R.C. and does not "chang[e] the general principle" of the 1994 Treaty, as amended, (alteration added), which is consistent with the plain text of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. Accordingly, the court holds that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, does not provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411.

As discussed above, plaintiffs also argue that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, independently provides a foreign tax credit against the net investment income tax. Paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, states that "the United States shall allow as a credit against the United States income tax the French income tax paid," but, according to plaintiffs, only after calculation of the credit

due against French tax on account of income tax due to the United States.[42] Defendant disagrees and argues that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, implements the second bite of the three-bite rule, in particular by providing a foreign tax credit against United States income tax corresponding to the amount of the French income tax assessed in the second bite. Defendant indicates, therefore, that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, does not provide a foreign tax credit against the net investment income tax independent of the I.R.C. Defendant's explanation is difficult to understand, given defendant's own description of the three-bite rule and the role that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, fulfills within the three-bite rule. Defendant indicates that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, allows a foreign tax credit, and that the foreign tax credit is to be assessed against United States income tax to account for the second bite income tax paid to France, above the 15 percent tax assessed by the United States in the first bite. This foreign tax credit against United States income tax is set forth by the text of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, and not by a statute, according to defendant's own description of the three-bite rule. Plaintiffs, according to their argument, agree with respect to the mechanics of the three-bite rule. Therefore, by the plain text of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, and by defendant's description, paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, provides for a treaty-based foreign tax credit against United States income tax commensurate with French income tax paid.

As relevant to the case brought by plaintiffs, the difference between paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, and paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, is that while paragraph 2(a) expressly conditions the availability of a foreign tax credit on the "provisions" and "limitations" of the United States tax laws, paragraph 2(b) does not contain such "provisions" and "limitations" language. As discussed above, the "provisions" and "limitations" language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, is the reason that the restrictions of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C., prohibits foreign tax credits pursuant to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, against the net investment income tax imposed by I.R.C. § 1411, which is in Chapter 2A of the I.R.C. Because paragraph 2(b) of Article 24 of the 1994 Treaty, as

---

[42] Paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, refers to another provision in paragraph 1(a) of the same Article 24 of the 1994 Treaty, as amended, which provides for a credit against French income tax which shall equal,

> [i]n the case of income referred to in Article 10 (Dividends), Article 11 (Interest), paragraph 1 of Article 13 (Capital Gains), Article 16 (Director's Fees), and Article 17 (Artistes and Sportsmen), to the amount of tax paid in the United States in accordance with the provisions of the Convention; however, such credit shall not exceed the amount of French tax attributable to such income.

(alteration added).

amended, lacks such restraining language incorporating the restriction of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C., a potential conflict exists between the text of paragraph 2(b) and the I.R.C., unless the treaty or statutory provisions can be interpreted to avoid or resolve such potential conflict. If paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, and I.R.C. §§ 27 and 901(a) can be interpreted to allow a foreign tax credit against the net investment income imposed by I.R.C. § 1411, plaintiffs would succeed in establishing legal entitlement to a foreign tax credit in the above captioned case.

In light of the potential conflict between paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, and I.R.C. §§ 27 and 901(a), the court relies on the principles of treaty interpretation, outlined above, concerning when potential conflict occurs between treaty and statutory language. The court recognizes that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, is a separate paragraph from paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, and the two paragraphs in each iteration of the treaty, the original 1994 Treaty, the 2004 Protocol, and the 2009 Protocol, have existed as independent provisions. Paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, in each iteration of the 1994 Treaty, as amended, has followed paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. As explained above, the record before the court contains no evidence of the interpretation held by the French Government with respect to either paragraph 2(a) or paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, or the intent of either party regarding why the net investment income tax was placed in Chapter 2A of the I.R.C., rather than in Chapter 1 of the I.R.C. Therefore, in order to interpret paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, independently from paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, the court relies on the precedents of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit which concern treaty interpretation, including in instances of potential conflict between treaty and statutory provisions, giving effect to the shared expectations of both signatory governments to the treaty, here, the United States and France. See Lozano v. Montoya Alvarez, 572 U.S. at 12; Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 185. In so doing, as the United States Supreme Court and the United States Court of Appeals for the Federal Circuit have explained, the court must interpret 1994 Treaty, as amended, and I.R.C. §§ 27 and 901(a) to avoid conflict between the 1994 Treaty, as amended, and I.R.C. §§ 27 and 901(a). See, e.g., Weinberger v. Rossi, 456 U.S. at 32; Whitney v. Robertson, 124 U.S. at 194; In re City of Houston, 731 F.3d at 1334; Xerox Corp. v. United States, 41 F.3d at 658. The Supreme Court held in Charming Betsy that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains," Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118; see also Weinberger v. Rossi, 456 U.S. at 32, and the Federal Circuit similarly has held that a statute "'must be interpreted to be consistent with [international] obligations, absent contrary indications in the statutory language or its legislative history.'" Allegheny Ludlum Corp. v. United States, 367 F.3d at 1348 (alteration in original) (quoting Luigi Bormioli Corp., Inc. v. United States, 304 F.3d at 1368, and citing Fed.-Mogul Corp. v. United States, 63 F.3d at 1581). Therefore, when determining whether a treaty and a statute "stand together in harmony," see Xerox Corp. v. United States, 41 F.3d at 658, the statute in question must be construed not to violate the treaty,

unless no other interpretation is possible. See, e.g., Allegheny Ludlum Corp. v. United States, 367 F.3d at 1348; Fed.-Mogul Corp. v. United States, 63 F.3d at 1581. Moreover, the court is required to afford a liberal interpretation to the terms of the 1994 Treaty, as amended. See United States v. Stuart, 489 U.S. at 365-66; Xerox Corp. v. United States, 41 F.3d at 652; McManus v. United States, 130 Fed. Cl. at 620. By applying this guidance on treaty interpretation, the court may give effect to the shared expectations of the United States and France with respect to paragraph 2(b) of Article 24 of the 1994 Treaty, as amended.[43]

Also as discussed above, the statutes at I.R.C. §§ 27 and 901(a) restrict foreign tax credits to apply only against "the tax imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. §§ 27, 901(a). The text of I.R.C. §§ 27 and 901(a), however, does not indicate any intent that the restriction on foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C. should be interpreted to conflict with another international treaty obligation of the United States. See Fed.-Mogul Corp. v. United States, 63 F.3d at 1581 ("GATT agreements are international obligations, and absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations."). The statute at I.R.C. § 1411, which imposes the net investment income tax, does not mention foreign tax credits, or tax credits at all, although it does refer to "deductions" when defining the terms "net investment income," I.R.C. § 1411(c)(1)(B), and "modified adjusted gross income." Id. § 1411(d)(2). Moreover, as the parties stated in their briefs, nothing in the legislative history of the enactment of I.R.C. § 1411 indicates the congressional intent with respect to abrogating any foreign tax credit provided by the 1994 Treaty, as amended, when Congress enacted the net investment income tax in I.R.C. § 1411 in Chapter 2A of the I.R.C., and the record contains no information regarding France's intent beyond the words of the 1994 Treaty, as amended.

Defendant, as discussed above, asks this court to assume from the words of I.R.C. § 1411, and its placement in Chapter 2A of the I.R.C., rather than Chapter 1, that Congress intended to exclude the net investment income tax from all foreign tax credits. Absent additional information, however, the court should not make such assumptions. See MacLeod v. United States, 229 U.S. at 434 ("[I]t should not be assumed that Congress proposed to violate the obligations of this country to other nations, which it was the manifest purpose of the President to scrupulously observe, and which were founded upon the principles of international law." (alteration added)); see also Clark v. Allen, 331 U.S. at 512. Because the court can point to no "contrary indications in the statutory language or its legislative history," see Allegheny Ludlum Corp. v. United States, 367 F.3d at 1348 (internal quotations omitted), neither the Chapter 1 restriction of I.R.C. §§ 27 and 901(a) nor the text of I.R.C. § 1411 should be interpreted contrary to the international

---

[43] As explained above and for the same reasons as the court elaborated with respect to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, the court does not afford deference to defendant's interpretation of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, in the absence of evidence of the interpretation held by the French Government.

obligations imposed by paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, to allow foreign tax credits against United States income taxes.

Therefore, the court interprets the terms of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, which provide that "the United States shall allow as a credit against the United States income tax the French income tax paid," to allow for foreign tax credits independent of the restrictions of I.R.C. §§ 27 and 901(a). See Corus Staal BV v. Dep't of Commerce, 395 F.3d at 1347 (citing Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64). The statute at I.R.C. § 27 provides for "taxes imposed by foreign countries" to "be allowed as a credit against the tax imposed by this chapter to the extent provided in section 901[.]" See I.R.C. § 27 (alteration added). The statute at I.R.C. § 27, based on its text, may be read to impose a Chapter 1 restriction on foreign tax credits, but only "to the extent provided in section 901," which is to say, only insofar as I.R.C. § 901 imposes the restriction of foreign tax credits to Chapter 1 of the I.R.C. This reading of I.R.C. § 27 would contemplate the existence of foreign tax credits not subject to the Chapter 1 restriction, in particular credits not based on the I.R.C. itself, but originating outside the I.R.C. The statute at I.R.C. § 904 may be read to support this reading of I.R.C. § 27. The statute at I.R.C. § 904 refers to "the credit taken under section 901(a)," which can be read to refer only to foreign tax credits under I.R.C. § 901(a), rather than to all possible foreign tax credits which a taxpayer could claim. See I.R.C. § 904(a). This reading, like the above-described reading of I.R.C. § 27, would indicate the existence of foreign tax credits that are not restricted to those taken against taxes imposed by Chapter 1 of the I.R.C., because those credits arise from sources other than the I.R.C. § 901(a) provision for foreign tax credits.

Reading I.R.C. §§ 27 and 904 in this way avoids a potential conflict between the restriction of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C., and the unqualified foreign tax credit allowed by paragraph 2(b) of Article 24 of the 1994 Treaty, as amended. This acknowledges the existence of two distinct groups of foreign tax credits under United States law: "statutory" foreign tax credits, which are provided under the statute at I.R.C. § 901(a) and which only may be asserted against taxes imposed by Chapter 1 of the I.R.C., and "treaty" foreign tax credits, as in the context of the current case under review, which are provided by treaties concerning taxation, like the 1994 Treaty, as amended, and which are not bound by the restrictions on foreign tax credit availability set forth in the I.R.C. unless the terms of those treaties so provide. Under this reading, a foreign tax credit under paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, is not a credit "taken under section 901(a)," see I.R.C. § 904(a), and, therefore, may be asserted against United States income taxes outside of Chapter 1, including the net investment income tax imposed by I.R.C. § 1411 in Chapter 2A at issue here.

The distinction between statutory and treaty based foreign tax credits is supported by another provision of the I.R.C., at I.R.C. § 6511, which concerns the period of limitations for claims by taxpayers of refunds or credits. Subparagraph (d)(3) of I.R.C. § 6511 is titled "Special rules relating to foreign tax credit," and provides:

> If the claim for credit or refund relates to an overpayment attributable to any taxes paid or accrued to any foreign country or to any possession of the United States for which credit is allowed against the tax imposed by subtitle A <u>in accordance with the provisions of section 901 or the provisions of any treaty</u> to which the United States is a party, in lieu of the 3-year period of limitation prescribed in subsection (a), the period shall be 10 years from the date prescribed by law for filing the return for the year in which such taxes were actually paid or accrued.

I.R.C. § 6511(d)(3)(A) (2018) (emphasis added). The text of I.R.C. § 6511(d)(3)(A) makes an explicit distinction between a foreign tax credit allowed "in accordance with the provisions of section 901," and a foreign tax credit allowed by "the provisions of any treaty to which the United States is a party . . . ." <u>See</u> I.R.C. § 6511(d)(3)(A) (ellipsis added). While the statute applies the same limitation period to both forms of foreign tax credit, the statute uses the disjunctive "or" to differentiate between statutory foreign tax credits under section 901 and treaty foreign tax credits. The distinction between the two indicates that a foreign tax credit may be allowed by the provisions of a treaty without also being provided by the terms of I.R.C. § 901.

In adopting this reading of the 1994 Treaty, as amended, and the I.R.C., the court has followed the direction, first set forth by the Supreme Court in <u>Charming Betsy</u>, to interpret I.R.C. §§ 27 and 901(a) not to conflict with the provision of a foreign tax credit under paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, when doing so is "possible." <u>See</u> <u>Murray v. Schooner Charming Betsy</u>, 6 U.S. (2 Cranch) at 118; <u>In re City of Houston</u>, 731 F.3d at 1334; <u>Corus Staal BV v. Dep't of Commerce</u>, 395 F.3d at 1347; <u>Timken Co. v. United States</u>, 354 F.3d at 1343-44. Moreover, this court's reading is consistent with the Supreme Court's decision in <u>Stuart</u> to give a "liberal interpretation" to the terms of the 1994 Treaty, as amended. <u>See</u> <u>United States v. Stuart</u>, 489 U.S. at 368. This liberal interpretation would "enlarge" the availability of foreign tax credits "which may be claimed thereunder," and, as demonstrated above, is applicable to the interpretation of tax treaties, including the 1994 Treaty, as amended. <u>See</u> <u>id.</u>; <u>Xerox Corp. v. United States</u>, 41 F.3d at 652; <u>McManus v. United States</u>, 130 Fed. Cl. at 620. Moreover, this liberal interpretation would be consistent with the general principle in the 1994 Treaty, as amended, to avoid double taxation of each signatory government's citizens who reside in the other signatory country. Accordingly, the court interprets paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, to allow a foreign tax credit to be taken by a United States citizen residing in France against United States income tax without restricting that foreign tax credit to apply only against taxes imposed by Chapter 1 of the I.R.C. Based on the foregoing analysis, the provision of a foreign tax credit under paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, to United States citizens living in France, which is distinct from the limitation in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, best gives effect to the apparent shared intent of the United States and France with respect to paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, within the principles of treaty interpretation law and does not conflict with the relevant provisions of the I.R.C. For these reasons, the court concludes that, pursuant to paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, between the United States and France,

plaintiffs may assert a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411.

## CONCLUSION

Having resolved the legal question regarding the availability of foreign tax credits against the net investment income tax under the 1994 Treaty, as amended, there remains an outstanding matter which the parties agree prevents the court from entering judgment in this case at this time. The parties have not agreed on how to resolve the applicability and calculation of the three-bite rule to plaintiffs' tax refund in this case. Consistent with the foregoing analysis, plaintiffs' motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**, and defendant's cross-motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**. For the reasons stated above, the court concludes that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, does not provide a foreign tax credit against the net investment income tax for the French income taxes paid by plaintiffs. The court also concludes, however, that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, can provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411 for the French income taxes paid by plaintiffs. Further proceedings regarding the three-bite rule calculation will be scheduled in a separate Order.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**